UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTHONY PENTON,

         Plaintiff,

    v.

HUBARD, et al.,

         Defendants.

No.  2:11-cv-0518 TLN KJN P

ORDER AND FINDINGS AND
RECOMMENDATIONS

     Plaintiff, a state prisoner, proceeds through counsel.  This civil rights action proceeds on plaintiff's claims that certain defendants interfered with plaintiff's access to the courts and improperly withheld his mail, and defendants Salas and Lynch retaliated against plaintiff.[1] Defendants Donahoo, Salas, Walker, Bradford, Lynch, Virga, Morrow and Gaddi filed a request for judicial notice, and a motion for summary judgment, which is fully briefed.[2]

////

---

[1]  On April 14, 2020, defendants Pool, Quinn and Besenaiz were granted judgment on the pleadings.  (ECF No. 207.)  Plaintiff's third cause of action was solely pled as to defendant Pool. Defendant Nunez, despite service of process, has not appeared in this action.  Plaintiff's motion for default judgment is pending.

[2]  Defendant L. Johnson is represented by private counsel; the moving defendants are represented by the Office of the Attorney General.  Cross-motions for summary judgment filed by plaintiff and defendant Johnson will be addressed separately.

As set forth more fully below, the undersigned grants the request for judicial notice, and finds that defendants' motion should be granted in part and denied in part.

## BACKGROUND

Plaintiff proceeds on his unverified fourth amended complaint, filed by plaintiff's counsel on April 12, 2018.[3]  Plaintiff alleges in his first cause of action that defendants Bradford, Morrow, L. Johnson, Walker, Virga, Donahoo, Nunez, Gaddi, and Does 1-11 violated plaintiff's right to access the courts in violation of the First and Fourteenth Amendments.  (ECF No. 104 at 20-21.)  "As a result, [plaintiff] was not able to challenge his unconstitutionally increased sentence in light of the Ninth Circuit's opinion in Butler v. Curry," "constitut[ing] active interference with [plaintiff's] right of access to the courts, and resulted in a loss of a substantial, nonfrivolous claim."  (Id.)[4]

In his second cause of action, plaintiff alleges that defendants Johnson, Walker, Virga, Donahoo, Nunez, Gaddi, and Does 1-11, wrongfully withheld plaintiff's mail without notice and with no legitimate penological reasons, from November 8, 2007, through July 29, 2008.  (ECF No. 104 at 25.)  Plaintiff states he "still does not know the identities of Doe Defendants 1-11, or who else was responsible for the withholding of his mail."  (ECF No. 104 at ¶ 79.)

Plaintiff alleges in his fourth cause of action that defendants Lynch, Salas, and Does 12-13 violated plaintiff's First and Fourteenth Amendment rights to file prison grievances without retaliation.  (ECF No. 104 at 29.)  Defendant Salas, receiving and release property officer, returned plaintiff's 2008 annual package to the vendor without prior notice or explanation, and plaintiff did not receive the package or a refund.  (ECF No. 104 at ¶ 68.)  "Also during this time," defendant Lynch told plaintiff that "you have nothing coming to you, referring to withholding

---

[3]  Unverified allegations in pleadings do not create genuine disputes of material fact on summary judgment.  See Moran v. Selig, 447 F.3d 748, 759 (9th Cir. 2006) ("the complaint in this case cannot be considered as evidence at the summary judgment stage because it is unverified.").  However, the court relies on the fourth amended complaint solely to provide background details about this lawsuit and not as substantive evidence in support of, or in opposition to, the pending motions for summary judgment.

[4]  Butler v. Curry, 528 F.3d 624 (9th Cir.), cert. denied, 129 S. Ct. 767 (2008).

1  [plaintiff's] rights," "and also told [plaintiff] that he should do all that he can to transfer to

2  another prison."  (ECF No. 104 at 16 ¶ 69, 29.)  Plaintiff alleges such acts and omissions were in

3  retaliation for plaintiff filing prison grievances.

4        Plaintiff sues all of the defendants in their individual capacities.  He seeks a declaratory

5  judgment, money damages, costs and attorneys' fees.  (ECF No. 104 at 29-30.)

6  **REQUEST FOR JUDICIAL NOTICE**

7        Moving defendants ask the court to take judicial notice of the following:  plaintiff's

8  habeas case filed in the federal district court, <u>Penton v. Kernan</u>, No. 3:06-cv-0233 WQH RBM

9  (S.D. Cal.) (ECF No. 220-3 at 6-89) (DEF[5] 331-414); California Code of Regulations, Title 15, in

10  effect in 2007-2008 (ECF No. 220-3 at 91-112) (DEF 416-437); and certain rulings issued in the

11  instant action (ECF No. 220-3 at 114-148) (DEF 439-473).  Plaintiff did not oppose the request.

12        The undersigned grants the request for judicial notice because such documents are

13  "capable of accurate and ready determination by resort to sources whose accuracy cannot

14  reasonably be questioned."  Fed. R. Evid. 201(b)(2).

15  **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

16        Summary judgment is appropriate when it is demonstrated that the standard set forth in

17  Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

18  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

19  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]the moving party always bears the

20  initial responsibility of informing the district court of the basis for its motion, and identifying

21  those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

22  together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

23  of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting then-numbered

24  Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving

25  party need only prove that there is an absence of evidence to support the non-moving party's

26  case."  <u>Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),</u>

27

28  [5] "DEF" is used to denote defendants' Bates numbers.

3

1   627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp.</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P.

2   56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have

3   the trial burden of production may rely on a showing that a party who does have the trial burden

4   cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

5   judgment should be entered, after adequate time for discovery and upon motion, against a party

6   who fails to make a showing sufficient to establish the existence of an element essential to that

7   party's case, and on which that party will bear the burden of proof at trial.  <u>Celotex Corp.</u>, 477

8   U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

9   party's case necessarily renders all other facts immaterial."  <u>Id.</u> at 323.

10        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

11   the opposing party to establish that a genuine issue as to any material fact actually exists.  <u>See</u>

12   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to

13   establish the existence of such a factual dispute, the opposing party may not rely upon the

14   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

15   form of affidavits, and/or admissible discovery material in support of its contention that such a

16   dispute exists.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Matsushita</u>, 475 U.S. at 586 n.11.  The opposing party

17   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

18   of the suit under the governing law, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

19   (1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir.

20   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

21   a verdict for the nonmoving party, <u>see</u> <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436

22   (9th Cir. 1987), <u>overruled in part on other grounds</u>, <u>Hollinger v. Titan Capital Corp.</u>, 914 F.2d

23   1564, 1575 (9th Cir. 1990) (<em>en banc</em>).

24        In the endeavor to establish the existence of a factual dispute, the opposing party need not

25   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

26   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

27   trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

28   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

4

1    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

2    amendments).

3          In resolving a summary judgment motion, the court examines the pleadings, depositions,

4    answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

5    Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Liberty Lobby, Inc., 477

6    U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court

7    must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless,

8    inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

9    factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines,

10   602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally,

11   to demonstrate a genuine issue, the opposing party "must do more than simply show that there is

12   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

13   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

14   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

15                              **OTHER APPLICABLE LEGAL STANDARDS**

16         To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate:  (1) the

17   violation of a federal constitutional or statutory right; and (2) that the violation was committed by

18   a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Jones v.

19   Williams, 297 F.3d 930, 934 (9th Cir. 2002).  An individual defendant is not liable on a civil

20   rights claim unless the facts establish the defendant's personal involvement in the constitutional

21   deprivation or a causal connection between the defendant's wrongful conduct and the alleged

22   constitutional deprivation.  See Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Johnson v.

23   Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).  That is, plaintiff may not sue any official on the

24   theory that the official is liable for the unconstitutional conduct of his or her subordinates.

25   Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  The requisite causal connection between a

26   supervisor's wrongful conduct and the violation of the prisoner's constitutional rights can be

27   established in a number of ways, including by demonstrating that a supervisor's own culpable

28   action or inaction in the training, supervision, or control of his subordinates was a cause of

                                                    5

1   plaintiff's injury.  Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011).

2   I.  Summary Judgment Motion re Exhaustion (Walker, Virga, Donahoo, Salas & Lynch)

3        A.  Undisputed Facts ("UDF") re Exhaustion[6]

4        1.  Plaintiff was a prisoner housed at California State Prison, Sacrament ("CSP-SAC") at

5   all times relevant herein.

6        2.  The California Department of Corrections and Rehabilitation ("CDCR") provides its

7   prisoners with an administrative appeals process in which prisoners may administratively appeal

8   any decision, action, condition or policy by the department or staff which they can demonstrate

9   has an adverse effect upon their welfare.  Cal. Code Regs., Title 15, § 3084.1-3084.7 et seq.

10  (2007-2008 & current).  (ECF No. 220-3 (RJN) at 96-102 (DEF 421-27).)

11       3.  Between August 31, 2007, and February 24, 2011, the OOA received only two inmate

12  appeals potentially related to the remaining defendants and the allegations in plaintiff's fourth

13  amended complaint:  IAB log no. 0813106 (institutional log no. SAC-08-1769); and IAB log no.

14  0805882 (institutional log no. SAC-07-02453).  (ECF 220-4 at 6-7 (Moseley Decl. at ¶¶ 5-7);

15  (ECF No. 220-4 at 10-58 (Exs. A-C, DEF 005-054).)

16       4.  Inmate appeal log no. SAC-07-2453 relates to plaintiff's problems with mail, but the

17  parties dispute the scope of plaintiff's mail claims grieved therein.  (ECF No. 220-4 at 55, 57-58

18  (DEF 051, 053-54.)  However, it is undisputed that appeal log no. SAC-07-2453 exhausted

19  plaintiff's allegation that defendants impeded the delivery of his outgoing personal

20  correspondence.

21       5.  Inmate appeal log no. SAC-08-1769 relates to plaintiff's difficulties accessing the law

22  library in various ways which plaintiff alleges interfered with his access to the courts.  It is

23  undisputed that appeal log no. SAC-08-1769 exhausts plaintiff's claims against defendants

24  Bradford and Morrow for denying plaintiff access to the prison law library prior to September 30,

25  2007.  (ECF Nos. 220-1 at 23; 230 at 15.)  The parties dispute whether such appeal also exhausts

26  any of plaintiff's claims that arose in 2008.

27  _____

28  [6]  For purposes of summary judgment, the undersigned finds the following facts are undisputed, unless noted otherwise.

6

6. From August 31, 2007, through February 24, 2011, plaintiff received no other third and final level of review addressing the substance or underlying merits of an inmate appeal related to the allegations in plaintiff's fourth amended complaint or any remaining defendant. (ECF No. 220-4 at 6-7 (Moseley Decl.) (DEF 002-003); (DEF 005-054).)

7. From August 31, 2007, through February 24, 2011, plaintiff did not submit any other inmate appeals that were accepted for review at CSP-SAC related to the allegations in plaintiff's fourth amended complaint or any remaining defendant. (ECF No. 220-4 at 60-62 (DEF 056-058)); (DEF 059-136).

8. On August 5, 2008, plaintiff submitted an inmate appeal stating: "On July 29, 2018, I received via ASU legal mail officer C/O Gaddi 9 pieces of legal mail dating as far back as Nov. 9, 2007, through April 8, 2008, without any explanation." (ECF No. 220-4 at 145 (DEF 141).)  As a result, plaintiff wrote that his habeas petition was terminated, and he defaulted an opportunity to request oral argument in his civil appeal. (Id.)  Documents confirm that former defendant Pool screened out such appeal at the second and third levels. (See ECF No. 33 at 10.)

9. On September 11, 2008, plaintiff submitted an inmate appeal regarding the return of his 2008 annual package. (ECF No. 220-4 at 168 (DEF 164).)  Plaintiff wrote that the appeal was "remedial in an effort to prevent ad seg property staff from sending [his] annual package back." (Id.)  Plaintiff complained that on September 8, 2008, he received notice that his package was being returned despite plaintiff's eligibility to receive one. (Id.)  Documents confirm that Pool screened out this appeal at the second and third levels of review. (ECF No. 220-4 at 143 (Pool Decl.) (DEF 139); ECF No. 220-4 at 155-57 (DEF 151-53).)

10. The CDCR has no record that plaintiff filed a separate grievance in which he asserted that defendant Lynch retaliated against him based on plaintiff's protected conduct. (ECF No. 220-4 at 60-62 (DEF 056-058; Pl.'s Dep. at 45:12-23; 46:3-24 (DEF 328-29).)

   B. Legal Standards re Exhaustion of Administrative Remedies

   The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

1    remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion

2    requirement applies to all inmate suits about prison life, whether they involve general

3    circumstances or particular episodes, and whether they allege excessive force or some other

4    wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  The purpose of the PLRA was "to reduce

5    the quantity and improve the quality of prisoner suits."  Id. at 524.

6          Proper exhaustion of available remedies is mandatory, Booth v. Churner, 532 U.S. 731,

7    741 (2001), and "[p]roper exhaustion demands compliance with an agency's deadlines and other

8    critical procedural rules[.]"  Woodford v. Ngo, 548 U.S. 81, 90 (2006).  The Supreme Court has

9    also cautioned against reading futility or other exceptions into the statutory exhaustion

10   requirement.  See Booth, 532 U.S. at 741 n.6; Ross v. Blake, 136 S. Ct. 1850, 1857, 1859 (2016).

11   Moreover, because proper exhaustion is necessary, a prisoner cannot satisfy the PLRA exhaustion

12   requirement by filing an untimely or otherwise procedurally defective administrative grievance or

13   appeal.  See Woodford, 548 U.S. at 90-93.  "[T]o properly exhaust administrative remedies

14   prisoners 'must complete the administrative review process in accordance with the applicable

15   procedural rules,' [] - rules that are defined not by the PLRA, but by the prison grievance process

16   itself."  Jones v. Bock, 549 U.S. 199, 218 (2007) (quoting Woodford, 548 U.S. at 88).  See also

17   Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009) ("The California prison system's

18   requirements 'define the boundaries of proper exhaustion.'") (quoting Jones v. Bock, 549 U.S. at

19   218).  When the rules of the prison do not dictate the requisite level of detail for proper review, a

20   prisoner's complaint "suffices if it alerts the prison to the nature of the wrong for which redress is

21   sought."  Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).  This requirement is so because

22   the primary purpose of a prison's administrative review system is to "notify the prison of a

23   problem and to facilitate its resolution."  Griffin, 557 F.3d at 1120; accord Morton v. Hall, 599

24   F.3d 942, 946 (9th Cir. 2010).  The grievance need not include legal terminology or legal theories

25   unless they are needed to provide notice of the harm being grieved.  Griffin, 557 F.3d at 1120.  A

26   grievance is not required to include every fact necessary to prove each element of an eventual

27   legal claim.  Id.  The purpose of a grievance is to alert the prison to a problem and facilitate its

28   resolution, not to lay groundwork for litigation.  Id.  Rather, the grievance should include

8

1    sufficient information "to allow prison officials to take appropriate responsive measures." Id. at

2    1121 (citation and internal quotation omitted).

3          Failure to exhaust is "an affirmative defense the defendant must plead and prove." Jones

4    v. Bock, 549 U.S. at 204, 216.  It is the defendant's burden "to prove that there was an available

5    administrative remedy." Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc) (citing

6    Hilao v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996).)  The burden then shifts to the

7    plaintiff to show that the administrative remedies were unavailable.  See Albino, 747 F.3d at

8    1172.

9          A prisoner may be excused from complying with the PLRA's exhaustion requirement if

10   he establishes that the existing administrative remedies were effectively unavailable to him.  See

11   Albino, 747 F.3d at 1172-73.  When an inmate's administrative grievance is improperly rejected

12   on procedural grounds, exhaustion may be excused as effectively unavailable.  Sapp v. Kimbrell,

13   623 F.3d 813, 823 (9th Cir. 2010); see also Nunez v. Duncan, 591 F.3d 1217, 1224-26 (9th Cir.

14   2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable");

15   Brown v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (plaintiff not required to proceed to third

16   level where appeal granted at second level and no further relief was available).

17         "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure

18   to exhaust, a defendant is entitled to summary judgment under Rule 56.  If material facts are

19   disputed, summary judgment should be denied, and the district judge rather than a jury should

20   determine the facts." Albino, 747 F.3d at 1166.  The question of exhaustion "should be decided,

21   if feasible, before reaching the merits of a prisoner's claim." Id. at 1170.  If under the Rule 56

22   summary judgment standard, the court concludes that plaintiff failed to exhaust administrative

23   remedies, the proper remedy is dismissal without prejudice.  Wyatt v. Terhune, 315 F.3d 1108,

24   1120 (9th Cir. 2003), overruled on other grounds by Albino, 747 F.3d 1162.

25         C.  The Prison's Grievance System

26         The State of California provides its prisoners the right to appeal administratively "any

27   departmental decision, action, condition or policy which they can demonstrate as having an

28   adverse effect upon their welfare." Cal. Code Regs. tit. 15, § 3084.1(a) (2010).  It also provides

9

1  them the right to file appeals alleging misconduct by correctional officers and officials.  Id. at

2  § 3084.1(e).  The process is initiated by submitting a CDC Form 602.  Id. at § 3084.2(a).  Appeals

3  must be submitted within fifteen working days of the event being appealed, and the process is

4  initiated by submission of the appeal to the informal level, or in some circumstances, the first

5  formal level.  Id. at §§ 3084.5, 3084.6(c).  In order to exhaust available administrative remedies

6  within this system, a prisoner must proceed through several levels of appeal:[7]  (1) informal

7  resolution, (2) formal written appeal on a 602 inmate appeal form, (3) second level appeal to the

8  institution head or designee, and (4) third level appeal to the Director of the California

9  Department of Corrections and Rehabilitation.  Barry v. Ratelle, 985 F.Supp. 1235, 1237 (S.D.

10  Cal. 1997) (citing Cal. Code Regs. tit. 15, § 3084.5).  A final decision from the Director's level of

11  review satisfies the exhaustion requirement under § 1997e(a).  Id. at 1237-38; 15 Cal. Code Regs.

12  § 3084.7(d)(3).

13       D.  Discussion

14       The court addresses, in turn, the grievances plaintiff submitted to determine whether

15  plaintiff properly exhausted his administrative remedies prior to filing the instant action.

16       1.  Appeal No. SAC-07-2453

17       *The Documentary Evidence*

18       On September 2, 2007, plaintiff submitted inmate appeal log no. SAC-07-2453, describing

19  his problem as follows:

20          This (602) complaint arises out of a mail issue.  Prison staff/officials
are impeding my correspondence with family and friends outside of

21          prison.  Article 4 Title 15 "mail" (general policy) provides in part
that "the Department encourages correspondence between inmates

22          and persons outside the correctional facilities."  It further states "the
sending and receiving of mail by inmates will be uninhibited except

23          as provided in this article."   My mail has not been leaving the
institution/prison until 3 weeks after I've given it to the prison staff

24          at my cell door to be mailed.   My close family & friends who
communicate with [me] on a regular basis have informed me that my

25          letters are "post marked" 3 weeks from the date that it's given to the
officer at my door which is recorded at the top right corner of every

26

27     [7]  This four-step process was effective prior to January 28, 2011.  The current statute eliminates
the informal level, retains the first, second, and third levels, and reaffirms that third level review

28  exhausts administrative remedies.  15 Cal. Code. Regs. § 3084.7(d)(3) (eff. Jan. 28, 2011).

letter that I write.  These actions, holding my mail both going & coming, is believed to be in retaliation by prison staff for a pending staff complaint authored by this writer for prison staff brutality, excessive use of force, assault by staff against an inmate, and denial of medical treatment.   (Log No. #SAC-07-01905) Instead of encouraging family ties and correspondence prison staff members are actually inhibiting correspondence and discouraging family ties and communication.

By virtue of the fact that prison staff are holding my mail 3 weeks without delivering it to the U.S. Postal Service, and without providing me with any advanced notification for their reasons for holding my mail for such an extensive period of time, they are violating "federal law" without a legitimate penological reason for doing so . . . furthermore, these acts are destroying family ties and breaking down the process of effective communication by holding important materials such as birthday & anniversary cards for my wife and children, cards & letters to my mother, family and friends . . . holding most of these correspondences for 3 weeks before mailing them at the U.S. Postal Service.

In essence, prison staff are stripping these correspondences of [their] value & sentiment . . . .

Also, I received notification from my old cell mate that mail had come to me at my old cell.  However, I have not received any re-routed mail since my placement in ad seg.

There has been 3 incidents of this nature.  My letters were sent on 7-23-07, 7-25-07, & 7-26-07, the return correspondence indicating that the mail had been delayed was received on 8-31-07. . . .

(ECF No. 220-4 at 55, 57-58 (DEF 051, 053-54); ECF No. 231 at 7 (PENTON_VIRGA00001, 00003-4).)  Plaintiff requested the following actions: (1) to be informed in writing why his mail is being withheld and by whom; (2) to be free from retaliation for plaintiff's staff complaint; and (3) to have all my mail, legal and regular, leave the institution "as set forth in the plan of operation."  (ECF No. 220-4 at 55.)

On October 10, 2007, plaintiff's appeal was received and denied at the informal level of review:

We receive and process mail each day.  Any mail received with your name and location will be forwarded on to you after processing.  Any outgoing mail received in the mailroom is processed and sent out the "same" day.  We do not hold mail in the mailroom.  We have 10 working days to receive mail from the post office/post mark and another 5 days for processing once it arrives here.

(ECF No. 220-4 at 44 (DEF 051); ECF No. 231 at 6 (PENTON_VIRGA00001).)

11

In his request for formal review, plaintiff complained that the informal response was ambiguous and failed to answer plaintiff's question, why was his mail being held, and if his mail was being flagged, by whom?  (Id.)  The first level review response was assigned to defendant Johnson, who characterized plaintiff's appeal as:  "You contend that your mail is being withheld by Mailroom staff.  You are requesting to be notified in writing when your mail is being held.  You are requesting not to be retaliated against for filing this complaint."  (ECF No. 220-4 at 72 (DEF 068); ECF No. 231 at 7 (PENTON_VIRGA00005).)  Following an interview with plaintiff, the appeal was partially granted on December 21, 2007, and defendant Johnson summarized his investigation as follows:

> The Department rule(s) regarding this issue contained in the California Code of Regulations (CCR), Title 15, Section 3138, General Mail Regulations, (e) and the Mailroom Operational Procedure 17, which dictates that the Mailroom process outgoing and Incoming mail within a reasonable time frame.  The Mailroom forwards all mail received from the Facilities in the form of outgoing mail the same day that it is received in the Mailroom.  Mail is forwarded out daily Monday through Friday, excluding State mandated holidays.
>
> All incoming mail is processed and sent to the Facilities within two working days.  For example, mail received in the Institution on Monday is processed and forwarded to the Facilities on Tuesday.
>
> In response to your request to be notified in case your mail is withheld, you will be given notification in the form of Notification of Disapproval-Mail/Packages/Publications (CDCR 1819) after receiving this form you will have 15 working days to decide the disposition of the mail in question.

(ECF No. 220-4 at 72 (DEF 068); ECF No. 231 at 7 (PENTON_VIRGA00005-6).)

On July 18, 2008, plaintiff wrote a request for second level review:

> [Plaintiff] is still dissatisfied with this response as the included summary contends I've made the complaint that my mail is being withheld by mail room staff!  I never said that.  Instead my complaint contends that my correspondence is being impeded by prison staff.  Please respond accordingly.  (Returnee from out to court status.)

(ECF No. 220-4 at 69 (DEF 065); ECF No. 231 at 7 (PENTON_VIRGA00002).)  The appeal was screened out and returned to plaintiff on July 18, 2008, marked untimely because it exceeded the 15 working day time limit and "failed to offer a credible explanation as to why he could not submit the appeal within established time limits."  (ECF No. 220-4 at 76 (DEF 072); ECF No.

12

231 at 12 (PENTON_VIRGA00007).)  In the comments was written "602 returned to you 1/4/08.

It was received 7/18/08."  (Id.)  On July 23, 2008, plaintiff resubmitted the appeal with a copy of

his CDC 114-D confirming he was sent out to court.  (ECF No. 220-4 at 74-75 (DEF 070-71);

ECF No. 231 at 13 (PENTON_VIRGA00008).)

On August 22, 2008, plaintiff's grievance was granted at the second level of review.  The

appeal was summarized as follows:

> You claim staff has "impeded" the sending and receiving of your
> mail to family and friends outside of prison and that the delays have
> been up to three weeks.
>
> You are requesting the following actions:
> 1. That you are informed in writing "who" and "why" your mail is being delayed.
> 2. That you remain "free" from retaliation for a staff complaint you submitted.
> 3. That your legal and "regular" mail leave the institution without any delays.

(ECF No. 220-4 at 64 (DEF 060); ECF No. 231 at 21 (PENTON_VIRGA000016).)  After setting

forth various relevant guidelines, including those governing general mail policy and guidelines,

the following findings were written:[8]

> The FLR was comprehensive and appropriate and all your issues and
> concerns were clearly addressed.  The FLR established that all
> incoming mail is processed and sent to the facilities within two
> working days and all outgoing mail is picked-up by the U.S. Postal
> Service the same day it is received in the Mailroom.  The FLR notes
> if your mail is withheld for any reason, you will be sent a Notification
> of Disapproval-Mail/Packages/Publications (CDC-1819) and have
> 15 working days to decide the disposition of the mail which is
> disapproved.
>
> The AI conducted an investigation into the facts, circumstances, and
> arguments of your appeal.  The AI notes that your Inmate/Parolee
> Appeal Form (CDC-602) is cluttered with unnecessary information
> and excessive verbiage and that you are attempting to cloud the
> appeal issue with a barrage of circumstantial information.  The AI
> recommends that you state your appeal issues chronologically and
> concisely to eliminate any possibility of delays and/or canceled
> appeals (refer to DOM Section 54100.7 Appeal Procedure Abuse).
> However, the AI continued with the inquiry into your appeal issues.
>
> The AI established Mailroom staff are receiving your outgoing mail

---

[8] This memo identifies defendant B. Donahoo as the assigned Appeals Investigator ("AI"), and
bears a signature block for "James Walker, Warden," including the reference initials "JW:bmd."
(ECF No. 220-4 at 67.)  Rather than a signature, the handwriting appears to read, "4 J[illegible]
J.V."  (Id.)

1    and forwarding your mail, per procedure.  The AI notes once the
     Mailroom sends the mail out, the responsibility for control of the
2    mail is given to the United States Postal Service.  The AI further
     documents the institution's Mailroom does not have jurisdiction over
3    the United States Postal Service.

4    Your request that you be informed in writing when your mail is
     delayed is granted, per SAC Operational Procedure #17, which states
5    in part, "The inmate will be promptly informed in writing of the
     reason the mail is being retained via a CDC Form 1819."  Your
6    request that you are not retaliated against is granted, per CCR 3084.1,
     which states in part, "No reprisal shall be taken against an inmate . .
7    . for filing an appeal."  Your request that your mail leave the
     institution without any delays is granted, per SAC Operational
8    Procedure #17, which states in part, "All inmate mail that does not
     require special handling will be processed in/out of the Mailroom
9    within 40 business hours."

10   The AI notes that all staff involved in the processing of your outgoing
     mail acted professionally and appropriately and finds no evidence
11   that staff acted outside of the policy, procedures, and rules set by the
     California Department of Corrections and Rehabilitation.

12
     All submitted documentation and supporting arguments have been
13   considered, and you have failed to raise any significant new issues or
     evidence in appealing this matter to the SLR.  After close review of
14   this matter, it is determined staff have acted appropriately and in
     accordance with State law, the CCR, Title 15, and the DOM.
15
     (ECF No. 220-4 at 64-67 (DEF 060-63); ECF No. 231 at 21-24(PENTON_VIRGA00016-19).)
16
17          On September 1, 2008, plaintiff sought a Director's Level Review of Grievance No. 07-

18   02453, reporting that his incoming legal mail was withheld by the CSP-SAC mailroom while

19   plaintiff was out to court for 8 months, and then another 40 days upon his return to state prison.

20   (See ECF No. 33 at 6, referring to ECF No. 16 at 20.)[9]  On October 14, 2008, the Chief of the

21   Inmate Appeals Branch ("IAB") responded to plaintiff's third level of appeal.  (ECF No. 29 at

22   27.)  The Chief noted that plaintiff's appeal was being screened out and returned to plaintiff

23   because the "appeal was granted at the institutional level.  There is no unresolved issue to be

24   reviewed at the Director's Level of Review."  (Id.)

25   _____
     [9]  It appears that no party provided a copy of plaintiff's request for third level review or the
         rejection letter provided by the Chief of the Inmate Appeals Branch.  (ECF No. 220-4 at 40-58
26       (DEF 036-054); ECF No. 220-4 at 64-88 (DEF 060-084); ECF No. 231 at 6-24
         (PENTON_VIRGA00001-19).)  However, both documents were filed in the court's record, and
27       relied upon by the court in addressing a previous motion.  (ECF No. 33.)  At that time, no party
         objected to the validity of such exhibits.  Therefore, the undersigned finds that such exhibits are
28       part of the court record.

                                                 14

*The Parties' Arguments re Exhaustion*

Defendants Walker, Virga, and Donahoo contend that plaintiff's appeal Log No. SAC-07-2453 related solely to plaintiff's outgoing personal mail based on plaintiff's assertion that "my mail has not been leaving the institution/prison until 3 weeks after I've giv[e]n it to the prison staff at my cell door to be mailed," and did not address plaintiff's incoming mail, legal or personal.  (ECF No. 220-1 at 22.)  Defendants point to the court's prior ruling that because plaintiff specifically identified his concern as his outgoing personal correspondence with family and friends, appeal SAC-07-2453 cannot serve to exhaust plaintiff's claim that defendants subsequently withheld plaintiff's incoming legal mail while he was out to court, or upon his return.  (Id., citing ECF No. 33 at 7, 29.)  Because plaintiff's initial grievance did not put prison officials on notice that plaintiff's incoming legal mail was being withheld, defendants argue that such grievance cannot suffice to exhaust plaintiff's claims that such withholding of plaintiff's legal mail interfered with his access to the courts or stand-alone right to mail.

Moreover, to the extent such grievance exhausts any claim, defendants contend that the appeal was submitted on or about September 7, 2007, and thus could not suffice to exhaust any claim based on post-September 7, 2007 conduct.  In addition, defendants argue that any attempt to find appeal SAC-07-2453 addressed issues after September 7, 2007, fails because such issues were not properly exhausted under CDCR regulations, as required under Woodford, 548 U.S. at 91.  (ECF No. 220-1 at 22.)  At the time, CDCR regulations required (1) inmates to set forth their issues on the CDC form 602 to describe the problem and action requested, (2) the appeal be filed at the first level of review, and (3) the appeal be submitted within 15 working days from the incident being appealed.  (ECF No. 220-1 at 22-23) (citing Cal. Code Regs. tit. 15, §§ 3084.2(a)(11); 3084.5(b); & 3084.6(c) (2007-2008).)

*Plaintiff's Opposition*

Plaintiff contends that defendants "cherry-pick" quotations from plaintiff's appeal, and argue that defendants' arguments are flawed for at least three reasons, all of which establish genuine disputes of fact as to the appeal's scope and precluding summary judgment:

1.  Plaintiff contends that sufficient language contradicts defendants' view of the appeal:

15

For example, in the describe the problem section, plaintiff wrote, "complaint arises out of a **mail** issue," Title 15 encourages correspondence **between** inmates and persons outside CDCR custody; Title 15 requires that **the sending and receiving** of mail by inmates to be uninhibited; "prison staff members are inhibiting correspondence;" and although mail was delivered to plaintiff's old cell, plaintiff had not received any rerouted mail since being placed in ad seg. (ECF No. 230 at 12.)  Further, in the action requested section, plaintiff again refers to mail, stating he wants to be informed why his mail is being withheld and by whom, and "to have all his mail, legal and regular, leave the institution as set forth in the plan of operation."  (Id.)

Plaintiff's appeal to the first level and the first level response by defendant Johnson supports plaintiff's view of the appeal because each addressed both incoming and outgoing mail. (Id.)  Plaintiff requested written notice when his **mail** is being withheld; the summary of appeal noted plaintiff grieved that his "**mail is being withheld** by mailroom staff," and asked for such written notice when his "**mail is being held**;" and the summary of investigation noted "all incoming mail is processed and sent to facilities within two working days.  For example, mail received in the Institution on Monday is processed and forwarded to the Facilities on Tuesday." (ECF No. 230 at 12-13.)

Plaintiff attributes the second level review to defendants Donahoo, Virga, and Walker, arguing that Donahoo investigated and wrote the second level response, and defendant Virga signed the response on behalf of Walker.  (ECF No. 230 at 13.)  Plaintiff argues that the second level response also supports plaintiff's position:  The response confirmed that plaintiff claimed "staff has 'impeded' the **sending and receiving** of [plaintiff's] mail to family and friends outside of prison and that the delays have been up to three weeks;" described plaintiff's request as seeking to be "informed in writing 'who' and 'why' [his] **mail** is delayed," and that his "**legal and 'regular' mail** leave the institution without any delays;" and confirmed **all incoming mail** is processed and sent to the facilities within two working days, and all outgoing mail is picked up by the U.S. Postal Service the same day it is received in the Mailroom."  (ECF No. 230 at 13.)

Plaintiff argues that both plaintiff's and defendants' statements contained in appeal Log No. SAC-07-2453 contradict defendants' limited interpretation, and creates genuine issues of fact

16

1   as to exhaustion.

2   　　　　2.  Plaintiff contends that evidence obtained since the court's 2012 review of appeal Log

3   No. SAC-07-2453 warrants a fresh look into the scope of such appeal and contradicts defendants'

4   assertions.  (ECF No. 230 at 13, citing ECF No. 33 at 7.)  Defendant Johnson testified that during

5   his face to face interview with plaintiff about appeal Log No. SAC-07-2453, "the only thing

6   [plaintiff] was saying was he couldn't -- he hadn't gotten his mail."  (ECF No. 230 at 13, citing

7   ECF No. 231 at 30 (Johnson Dep. at 179.)  Defendants Virga and Walker "both testified that

8   during Johnson's first level investigation of [plaintiff's] appeal, Johnson should have discovered

9   that [plaintiff's] incoming legal mail had already been withheld in the CSP-SAC mailroom."

10  (ECF No. 230 at 13-14.)  In addition, plaintiff testified that appeal Log No. SAC-07-2453 related

11  to "both legal and regular mail, going and coming."  (ECF No. 230 at 14, citing ECF No. 231 at

12  101, 103 (Pl.'s Dep. at 71, 81).)

13  　　　　3.  Finally, plaintiff contends that defendants' position that appeal Log No. SAC-07-2453

14  could not serve to exhaust any incident occurring after September 7, 2007, is unavailing in light

15  of Ninth Circuit authority reasoning that "where a prisoner obtains a remedy or decision in

16  regards to an inmate appeal, it is not the prisoner's responsibility to ensure that prison officials

17  comply with that remedy or decision," and another Ninth Circuit case quoting, "A prisoner who

18  has not received promised relief is not required to file a new grievance where doing so may result

19  in a never-ending cycle of exhaustion."  (ECF No. 230 at 14) (citing Hawthorne v. Mendoza-

20  Power, 447 F. App'x 839 (9th Cir. 2011) (mem.); Harvey v. Jordan, 605 F.3d 681, 685 (9th Cir.

21  2010), (quoting Abney v. McGinnis, 380 F.3d 663, 669 (2d Cir. 2004)).)  Plaintiff argues that the

22  first level response partially granted plaintiff's appeal Log No. SAC-07-2453, advising plaintiff

23  he would be notified if his mail is withheld.  Moreover, after plaintiff returned from out to court

24  and grieved that his "correspondence is being impeded by prison staff," his appeal was granted by

25  defendants Donahoo and Virga (on behalf of Walker).  (ECF No. 230 at 14.)  While the appeal

26  was pending, plaintiff received all of his withheld mail on July 29, 2008, 40 days after he returned

27  from out to court, and almost two weeks after appealing defendant Johnson's first level response.

28  Plaintiff received no notice that his mail was withheld.  Plaintiff contends that this evidence

1   demonstrates that the court should find plaintiff sufficiently exhausted plaintiff's right to court

2   and access to the courts claim against all of the defendants.  Or, in the alternative, that genuine

3   issues of material fact as to the scope of appeal Log No. SAC-07-2453 preclude summary

4   judgment.  (ECF No. 230 at 14.)

5                    *Defendants' Reply*

6          Defendants contend that the appeal speaks for itself and supports the court's prior

7   conclusion that appeal Log No. SAC-07-2453 only related to outgoing personal mail and was

8   "insufficient to put prison authorities on notice that plaintiff was having difficulty receiving

9   incoming legal mail."  (ECF No. 236 at 2, quoting ECF No. 33 at 7:13-20, adopted ECF No. 40.)

10  Defendants argue that plaintiff's speculative comments concerning deposition testimony during

11  adverse questioning ten years after the incident "are immaterial and do not supplant the Court's

12  legal analysis."  (ECF No. 236 at 2.)  First, defendant Johnson's deposition testimony makes clear

13  that he does not quite recall the interview; he could not recall when the interview took place or

14  what he asked plaintiff.  In any event, Johnson's testimony was:  "I think the only thing that he

15  was saying was he couldn't -- he hadn't gotten his mail."  (Id., citing ECF No. 230-1 at 30

16  (Johnson Dep. at 179.)  Second, plaintiff's statements during the appeal interview could not

17  properly expand the scope of the appeal, citing Griffin, 557 F.3d at 1120, and other district court

18  cases.  (ECF No. 236 at 2-3.)  In addition, even if defendant Johnson were aware of incoming

19  mail issues, the documents that form the basis of plaintiff's access to courts claim would not have

20  arrived by December 31, 2007, the date of Johnson's first level review.  (ECF No. 236 at 3.)

21         Nevertheless, defendants reiterate that appeal Log No. SAC-07-2453 itself makes clear

22  that it does not relate to incoming mail:  "no mail has been leaving the institution/prison until 3

23  weeks after. . .," and "prison staff are holding my mail 3 weeks without delivering it to the U.S.

24  postal service."  (ECF No 236 at 3, citations omitted.)  Plaintiff's appeal to the second level states

25  he is "still dissatisfied with the response as the included summary contend[s] I've made the

26  complaint that my mail is being withheld by mail room staff!  I never said that. . . ."  (ECF No.

27  236 at 3.)  The second level appeal response summary restates the requested actions:  "1. That

28  you are informed in writing who and why your mail is being delayed... 3. That your legal and

18

1  regular mail leave the institution without any delays," and concluded that "mailroom staff are

2  receiving your outgoing mail and forwarding your mail, per procedure…. once the mailroom

3  sends the mail out, the responsibility for control of the mail is given to the United States Postal

4  Service," and "all staff involved in the processing of your outgoing mail acted professionally. …"

5  (ECF No. 236 at 3 (citations omitted).

6       In addition, as the court previously noted, in his August 5, 2008 grievance concerning

7  legal mail, plaintiff wrote "this grievance presents new issues which is [sic] separate and distinct

8  from the (grievance) in Log No. SAC-07-2453."  (ECF No. 236 at 3, quoting ECF No. 33 at 9:5-

9  12; see also ECF No. 231 at 144.)

10      Defendants contend that in appeal Log No. SAC-07-2453, plaintiff failed to identify any

11  of the issues pled in the operative pleading as required at the first level of review, within fifteen

12  days of the incident, could not have contemplated issues that had not yet taken place, and could

13  not expand the scope of the appeal during the grievance process.

14      *Discussion*

15           *Law of the case*[10]

16      Neither party argues that the court should find that the court is required to apply the law of

17  the case doctrine to the exhaustion question surrounding appeal Log No. SAC-07-2453.

18  Defendants recognize that the July 5, 2012 findings and recommendations (ECF No. 33),

19  although adopted by the district court (ECF No. 40), addressed plaintiff's pro se amended

20  complaint, and since that date, plaintiff is represented by counsel who filed a fourth amended

21  complaint and added allegations and other defendants.  (ECF No. 220-1 at 21 n.1.)  Such changed

22  circumstances warrant revisiting the issue of exhaustion as to appeal Log No. SAC-07-2453.

23  _____

24  [10]  Under the doctrine of the law of the case, "a court will not reexamine an issue previously
    decided by the same or higher court in the same case."  Lucas Auto Eng'g, Inc. v.

25  Bridgestone/Firestone, Inc., 275 F.3d 762, 766 (9th Cir. 2001).  The court may exercise its
    discretion to depart from the law of the case only if one of these five circumstances is present:  (1)

26  the first decision was clearly erroneous; (2) there has been an intervening change of law; (3) the
    evidence is substantially different; (4) other changed circumstances exist; or (5) a manifest

27  injustice would otherwise result.  United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997).
    It is an abuse of discretion for a court to depart from the law of the case without one of these five

28  requisite conditions.  Thomas v. Bible, 983 F.2d 152, 155 (9th Cir. 1993).

1    Nevertheless, the parties are not precluded from citing or arguing the court's reasoning included

2    in the prior findings and recommendations.

3              *Exhaustion*

4         In 2007 and 2008, inmates in CDCR custody were not required to specifically name

5    defendants; rather, they simply needed to set forth sufficient facts to put prison staff on notice of

6    the problem.  In 2009, the Ninth Circuit confirmed that "[t]he primary purpose of a grievance is to

7    alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation."

8    Griffin, 557 F.3d at 1120 (citation omitted).  "[W]hen a prison's grievance procedures are silent

9    or incomplete as to factual specificity, 'a grievance suffices if it alerts the prison to the nature of

10   the wrong for which redress is sought.'"  Griffin, 557 F.3d at 1120 (quoting Strong v. David, 297

11   F.3d 646, 650 (7th Cir. 2002)).

12        First, reading appeal Log No. SAC-07-2453 anew, it appears the court previously viewed

13   plaintiff's grievance too narrowly.  Indeed, even the reviewing officials at three separate levels

14   referred to plaintiff's incoming and outgoing mail.  At the time of plaintiff's grievance, he was

15   not required to write his grievance like a complaint with an eye toward litigation, or include legal

16   terminology, but simply to include sufficient facts that would alert prison staff to the problem

17   such that efforts could be undertaken to resolve the problem.  Initially, plaintiff identifies the

18   problem as a "mail issue."  Although plaintiff focused on the issue that his outgoing

19   correspondence to his family and friends was being unduly delayed, he also added that he had not

20   received any incoming mail since being housed in ad seg, despite mail being delivered to his old

21   cell.  Moreover, in his request for action, plaintiff addresses both legal and "regular" mail.  Thus,

22   in addition to his general reference to "mail" as the problem issue, plaintiff's reference to not

23   receiving "any" incoming mail while in ad seg covers both legal and regular incoming mail; his

24   request for action covers both outgoing legal and regular mail.  Plaintiff later objected that he did

25   not complain that his mail was "being withheld by mail room staff," but in his initial grievance he

26   wrote that prison staff were "holding [his] mail both going and coming," and he wanted to know

27   when his mail was being "held" and by whom.  Thus, it was obvious plaintiff did not know who

28   was "holding" his mail.  The undersigned does not find that plaintiff's subsequent objection

                                                    20

1    changes the nature of his initial grievance.

2            Second, as now argued by plaintiff, his grievance was granted at the second level of

3    review.  A prisoner need not "press on to exhaust further levels of review once he has received all

4    'available' remedies at an intermediate level of review or has been reliably informed by an

5    administrator that no remedies are available."  Brown v. Valoff, 422 F.3d at 936 (citing Booth,

6    532 U.S. at 736-39).  Therefore, an inmate "has no obligation to appeal from a grant of relief, or a

7    partial grant that satisfies him, in order to exhaust his administrative remedies."  Harvey, 605 F.3d

8    at 684-85; see also Finley v. Skolnik, 616 F. App'x 263, 264 (9th Cir. 2015) (reversing dismissal

9    for failure to exhaust); Reece v. Sisto, 536 F. App'x 705, 706 (9th Cir. 2013) (concluding that a

10   fully-granted appeal at the first level was sufficient to exhaust remedies, even when the relief

11   provided was not the exact relief plaintiff requested).[11]

12           Here, although plaintiff attempted to obtain a third level review, such review was screened

13   out because plaintiff's grievance was granted at the second level of review.  Thus, this court's

14   review of plaintiff's grievances ends at the second level of review because his appeal Log No.

15   SAC-07-2453 was granted at the second level of review on August 22, 2008.

16           *Did appeal Log No. SAC-07-2453 Exhaust Mail Issues Beyond September 2007?*

17           Plaintiff argues that he was not required to file another appeal concerning the withholding

18   of his legal mail while he was out to court because he had already grieved the withholding of his

19   mail, and the Ninth Circuit has held that in certain circumstances, prisoners are not required to

20   exhaust anew a claim already granted in order to avoid a repeating cycle of exhaustion, citing

21   Hawthorne, 447 F. App'x at 839; Harvey, 605 F.3d at 685, (quoting Abney, 380 F.3d at 669).

22

23   [11]  In addressing Reece in the district court, the magistrate judge explained that Reece's grievance
     specifically requested that prison officials supply heat to all dorms.  Reece v. Sisto, Case No.
24   2:10-cv-0203 JAM EFB P (E.D. Cal. Feb. 23, 2012) (ECF No. 35 at 7-8).  Although the
     grievance was partially granted at the informal level and fully granted at the first level of review,
25   neither response stated that prison officials would provide heat to all dorms.  The responses at
     both levels essentially informed Reece that the heating system in his dorm was working properly
26   and that he was being provided adequate heat."  Id. (ECF No. 35 at 7) (citations omitted).  The
     magistrate judge held that because Reece had not received a "favorable decision" at either the
27   informal or first level of review, and further administrative review was available, Reece had not
     exhausted his available administrative remedies.  Id. at 8.  The Ninth Circuit disagreed.
28

The undersigned is persuaded that the continued withholding of plaintiff's legal and personal mail, both incoming and outgoing, while plaintiff was housed at CSP-SAC was exhausted by appeal Log No. SAC-07-2453.  Whether or not appeal Log No. SAC-07-2453 governs future incidents of withheld mail turns on whether plaintiff had additional remedies available to him and whether he received satisfactory relief of his complaint.  Harvey, 605 F.3d at 681.

Plaintiff was partially granted relief at the first level of review on December 21, 2007, advising plaintiff that he would be notified if his mail is withheld.  Because the appeal was only partially granted, some remedies remained available, and plaintiff properly filed a request for second level review.  On August 22, 2008, plaintiff's request for second level review was granted.  Thus, as argued by plaintiff, he was not required to file new appeals concerning the withholding of his mail because appeal Log No. SAC-07-2453 was granted at the second level of review on August 22, 2008.  Plaintiff was again informed that he would be "promptly informed in writing of the reason the mail is being retained" as required by SAC Operational Procedure #17, and also confirmed such procedure provides that "*All inmate mail* that does not require special handling will be processed *in/out* of the Mailroom within 40 business hours."  (ECF No. 220-4 at 64-67 (emphasis added).  The undersigned finds that plaintiff's situation is akin to Harvey, where the prisoner was promised he would be granted a hearing and access to the requested videotape, yet five months later, Harvey had not received either.  Id., 605 F.3d at 683, 685.  Here, despite being granted relief at both the first and second level reviews and informed that he would receive timely written notice if his mail were withheld, plaintiff's mail was again withheld for a period of eight months while he was out to court, but also for an additional 40 days after he returned to CSP-SAC.  In Harvey, the Ninth Circuit held that the prisoner "exhausted the administrative process when the prison officials purported to grant relief that resolved his . . . grievance to his satisfaction."  Id. at 686.  The Ninth Circuit explained:

> An inmate has no obligation to appeal from a grant of relief, or a partial grant that satisfies him, in order to exhaust his administrative remedies.  Nor is it the prisoner's responsibility to ensure that prison officials actually provide the relief that they have promised. See Abney v. McGinnis, 380 F.3d 663, 669 (2d Cir. 2004) ("A prisoner

22

> who has not received promised relief is not required to file a new grievance where doing so may result in a never-ending cycle of exhaustion.").
>
> . . . Once the prison officials purported to grant relief with which [the inmate] was satisfied, his exhaustion obligation ended.   His complaint had been resolved, or so he was led to believe, and he was not required to appeal the favorable decision.

Harvey, 605 F.3d at 685.

While defendants are correct that such appeal would not govern future incidents of mail interference in perpetuity, the undersigned finds that such grievance was sufficient to govern mail issues that occurred at least during the pendency of plaintiff's appeal, which includes the period legal or personal mail was withheld without notice to plaintiff, while he was out to court for eight months, through at least July 29, 2008, when his withheld mail was delivered to plaintiff, forty days after his return to CSP-SAC.  Because the allegedly wrongful withholding of mail for such a lengthy period of time would foreseeably impact plaintiff's obligations while engaged in conduct protected under the First Amendment, such grievance also exhausts any resulting interference with access to court and mail claims plaintiff incurred during such period.

### 2.  Appeal No. SAC 08-1769

*Documentary Evidence*

Inmate appeal log no. SAC-08-1769 describes plaintiff's problem as follows:

> This is a remedial complaint concerning the arbitrary deprivation of access to the . . . law library, and the inadequacies . . . having a potentially injurious effect upon appellant's access to the courts pursuant to the California Code of Regulation . . .  Specifically, on 9-12-07 appellate submitted a request for priority legal user status ("PLU") with the necessary document [Ex. B] illustrating that appellant had a verified deadline date of 9-28-07.   The PLU application seemingly demonstrates that the library technical assistant ("LTA") Ms. Bradford approved appellant access 2 days following its submission.  However, the following Wednesday 9-19-07, appellant was not called nor could appellant get any officer to assist him in his dilemma as appellant had been informed that he was not on the PLU list for that day 9-19-07.

(ECF No. 220-4 at 16, 18.)  On September 30, 2007, plaintiff wrote that on September 26, 2007, plaintiff's name was not called; he spoke with Sgt. Cross, who provided for plaintiff's access to

1    the law library on that day.  But despite Sgt. Cross claiming he would also make provision for

2    plaintiff to attend on 9-28-07, plaintiff was not called on 9-28-07.  "C/O Morrow was overheard

3    stating that he did not want I/M Penton in the law library."  (ECF No. 220-4 at 18.)  Plaintiff

4    noted his belief that staff was impeding plaintiff's access to the courts in retaliation for the 2-20-

5    07 staff assault.  Because plaintiff was denied law library access, he had to gather information

6    from unqualified sources to draft an extension of time to file objections to pending findings and

7    recommendations.  (Id.)  In addition, plaintiff was prosecuting another civil case and a criminal

8    case.  Plaintiff also complained that the two hours a week access to the law library, as well as the

9    paging system, are inadequate, and explained why.  (ECF No. 220-4 at 18-19.)

10        In the action requested section, plaintiff sought access to the same computers general

11   population inmates use, and that plaintiff be provided continuous PLU status until plaintiff's

12   litigation was complete.  (ECF No. 220-4 at 16.)

13        On November 6, 2007, appeal log no. SAC-08-1769 was denied by defendant Morrow at

14   the informal level citing "too many issues."  (ECF No. 220-4 at 16.)  Morrow noted plaintiff had

15   physical access to the library on August 22 and 31, September 5, 12, and 26, and November 2,

16   2007; informed plaintiff that any paging concerns needed to be addressed to Correctional Officer

17   Dunn; "your other allegations in reference to me are unfounded;" and "your PLU access has been

18   granted when proper forms completed and received."  (ECF No. 220-4 at 16.)

19        Plaintiff sought review at the formal level of review, claiming the response failed to

20   address any of plaintiff's main concerns.  (ECF No. 220-4 at 16.)  D. Hamad, Supervisor of

21   Academic Instruction, Education Department, summarized plaintiff's appeal as follows:

22             You contend that you have been denied access to the courts.  You
              claim you had approved PLU status, yet were not on the weekly
23             access list to be escorted to the Library, there was a delay in receiving
              materials when you were in the Ad Seg Law Library, you receive
24             only two hours per week access, staff is often busy with other patrons
              and your photocopy request[s] have taken 2-3 days to fill.  You
25             request that staff respond to your requests more quickly, that you
              have more than two hours per week of access to the library and that
26             you have access to the legal computers (purchased with Inmate
              Welfare Funds) in the Library.
27

28   (ECF No. 220-4 at 28.)  Hamad responded that inmates with PLU status receive two consecutive

                                                  24

hours of priority access per week, which plaintiff received during September of 2007, and that the

paperwork plaintiff submitted confirmed that staff responded to plaintiff's requests for PLU status

and photocopies within five days.  (Id.)  "The legal computers were purchased by the Office of

Correctional Education for use in the libraries and are not available in the Ad Seg Units."  (Id.)

Hamad found that staff acted appropriately, and plaintiff's appeal was partially granted on

September 9, 2008.  (Id.)

In his request for second level review, plaintiff objected that he does not receive

photocopies in 2-3 days, and cited one example where he did not receive his photocopies for 7

days, and then deprived him of the second copy he needed for the second opposing attorney.

Further, plaintiff claimed that the deprivation of library access on September 19, 2007, deprived

him of crucial research time given his September 21, 2007 deadline, resulting in the termination

of his habeas petition.  (ECF No. 220-4 at 23.)  On October 20, 2007, plaintiff submitted another

PLU request which took 11 days to process, and then only granted plaintiff two hours' access.

(ECF No. 220-4 at 27.)  Plaintiff argued that such response failed to meet existing regulations.

(Id.)

Former defendant Pool was assigned to investigate plaintiff's second level review.  (ECF

No. 220-4 at 29.)  Plaintiff's appeal was summarized as:

> during the month of September 2007, you were denied access to the
> courts.  You claim that you had approved Priority Legal Use (PLU)
> status; however, were not on the weekly access list to be escorted to
> the Library from Administrative Segregation (AD-SEG).  You claim
> there was a delay in receiving requested materials when you were in
> the AD-SEG Law Library.  You claim you were only allowed two
> hours per week access to the Law Library.  You claim staff is often
> busy with other patrons.  You claim your photocopy request[s] have
> taken 2-3 days to fill.

(ECF No. 220-4 at 29.)   The actions plaintiff requested were set forth as:

> 1.  That AD-SEG inmates be provided access to the same computers
> used by general population inmates.

> 2.  That you be allowed to continue PLU access until your litigation
> process has been fully exhausted in the State and Federal Court.

> 3.  That you be given more access to the Law Library and service by
> the staff in a more timely manner.

1

2     (Id.)  On November 14, 2008, the reviewer partially granted plaintiff's request to have his PLU

3     status recognized until his litigation was completed, "based on it is [plaintiff's] responsibility to

4     submit all required documentation" as required by the governing rules and regulations.  Plaintiff's

5     request to use the legal computers purchased by the Office of Correctional Education was denied

6     because unavailable to AD-SEG inmates.  Plaintiff's request to have more law library access and

7     assistance in a more timely manner was partially granted in that plaintiff would receive "timely

8     staff assistance/service in accordance to the guidelines prescribed [as] expeditiously as possible,

9     however [plaintiff's] access to the Law Library will remain the same as any other inmate" on

10     PLU status."  (ECF No. 220-4 at 30.)  Defendant Virga signed the 602 appeal form as the second

11     level of review was completed on November 17, 2008.  (ECF No. 220-4 at 23.)

12           On December 3, 2008, plaintiff sought third level review, claiming he had been denied

13     meaningful access to the law library, and such deprivation subsequently deprived him of access to

14     the courts.  (Id.)

15           On February 8, 2009, plaintiff's third level review was denied by nonparty N. Grannis,

16     Chief, Inmate Appeals Branch.  (ECF No. 231 at 120.)  Grannis summarized plaintiff's argument

17     as follows:

18
19             the staff at [CSP-SAC] are inappropriately failing to provide the
             inmate population a sufficient number of research computers in the
20            Administrative Segregation Unit (ASU) law library.   [Plaintiff]
            asserts that there are not any computers to conduct research.
21            Additionally, [plaintiff] contends that his request for [PLU] status
            was not responded to in a timely manner and he was provided
22            [in]sufficient access to meet his court deadlines.  [Plaintiff] requests
            that the [CSP-SAC] provide computers in the ASU law library and
            that he be granted continued PLU status.

23     (ECF No. 231 at 141.)  After summarizing the second level review decision, Grannis made the

24     following findings:

25             the [CSP-SAC] reviewers advised [plaintiff] that computers would
            not be installed in the ASU due to security concerns. . . .  [CSP-SAC]
26            provides a law library for inmate access and . . . additional assistance
            may be provided dependent upon the need. . . .  [P]ursuant to the
27            California Code of Regulations, Title 15, Section (CCR) 3120, "Each
            warden shall ensure a library, law library and related services are
28            maintained for the benefit of inmates in their facility. . . .A library

1
2
3
4
5
6
7
8

> access schedule shall be approved by the warden and posted throughout the facility."  Review of this matter reflects that the institution does have an approved procedure for ensuring that the library is updated and is adhering to that procedure.  [Plaintiff] has not provided any evidence that his ability to prepare legal documents has been hindered because of the [CSP-SAC] library procedures or available resources. . . .  [T]he [CSP-SAC], and CDCR, are operating at a time of fiscal crisis and is making a good faith effort to ensure that the [CSP-SAC] ASU law library provides sufficient resources for the inmate population access to the courts. . . .  [Plaintiff] was advised of the procedures to be granted PLU status and it is his responsibility to provide the necessary court documents.  Therefore, based upon the evidence presented it is determined that the actions taken by staff are consistent with the rules cited here.

9    (ECF No. 231 at 141.)

10         It is undisputed that appeal log no. SAC-08-1769 exhausts plaintiff's claims against

11   defendants Bradford and Morrow for allegedly denying plaintiff access to the prison law library

12   prior to September 30, 2007.  (ECF Nos. 220-1 at 23; 230 at 15.)  The issue is whether such

13   appeal exhausts plaintiff's claims occurring thereafter.

14         *The Parties' Arguments re Exhaustion*

15              *Defendants' Position*

16         Defendants argue that plaintiff's appeal log no. SAC-08-1769 should be limited to

17   plaintiff's claims arising prior to September 30, 2007, because such appeal complains about the

18   CSP-SAC law library, computers, and a PLU application from 2007.  (ECF No. 220-1 at 23.)

19   Defendants contend that plaintiff's claim that defendant Bradford prevented or interfered with

20   plaintiff's law library access after plaintiff returned from out to court in 2008, cannot be

21   exhausted by appeal log no. SAC-08-1769 because such alleged conduct occurred after plaintiff

22   submitted this appeal.  (ECF No. 220-1 at 23) (citing see Griffin, 557 F.3d at 1120; Avery v. Elia,

23   2012 WL 6738312, at *5 (E.D. Cal. Dec. 28, 2012) (rejecting prisoner's argument that a

24   grievance prospectively exhausts related issues that arose later.))  Defendants argue that appeal

25   log no. SAC-08-1769 only exhausts a claim that plaintiff was not called to the law library in

26   September of 2007, after his request for PLU status was approved.  (ECF No. 220-1 at 23.)

27   ////

28   ////

1

*Plaintiff's Opposition*

2    After plaintiff returned from out to court in June of 2008, plaintiff appealed defendant

3    Morrow's November 6, 2007 denial of plaintiff's appeal log no. SAC-08-1769 at the informal

4    level.  Plaintiff contends that he pursued his claims through the third level of review because he

5    was still "deprived of meaningful access to the law library," "which denied him access to the

6    courts."  (ECF No. 230 at 15.)  Thus, plaintiff argues that from 2007 through 2009, he pursued

7    appeal log no. SAC-08-1769 through the highest level of review to remedy the deprivation of his

8    access to litigate his habeas case.  (Id.)  Contrary to defendants' argument that the appeal should

9    only address 2007 claims, plaintiff contends that plaintiff's allegations against Bradford

10   concerning her improper denial of law library access in 2008 is directly related to appeal log no.

11   SAC-08-1769.  Plaintiff points out that the relief sought was being granted continuous PLU

12   access until his litigation was completed.  (ECF No. 230 at 16.)  Plaintiff maintains that had he

13   filed a new grievance in August 2008 after Bradford denied plaintiff PLU status in response to

14   plaintiff's request for PLU status to prepare a motion to reopen his habeas case, such grievance

15   would have duplicated appeal log no. SAC-08-1769 in which he sought additional law library

16   access to litigate his habeas case.  (ECF No. 230 at 16) (citing Harvey, 605 F.3d at 685 (citing

17   Abney, 380 F.3d at 669).)

18   Plaintiff argues that Griffin supports plaintiff's position, because "a grievance suffices if it

19   alerts the prison to the nature of the wrong for which redress is sought."  Id., 557 F.3d at 1120.

20   At a minimum, plaintiff contends that there are genuine disputes of material fact as to whether

21   appeal log no. SAC-08-1769, which plaintiff pursued from 2007 to 2009, notified prison officials

22   that plaintiff's difficulties accessing the law library to work on his habeas case continued in 2008

23   after he returned from out to court.  (ECF No. 230 at 16.)

24   Plaintiff also distinguishes Avery from the instant case.  (ECF No. 230 at 16, discussing

25   Avery, 2012 WL 6738312.)  In Avery, the district court "examined two distinct harms and found

26   no exhaustion where the relief requested in the first inmate appeal had already been fully granted

27   before the second harm occurred."  (ECF No. 230 at 16.)  Specifically, the court found that a

28   prison official's second revocation of an inmate's diet card was distinct from the first denial

28

1   because Avery's diet card was restored and the first appeal granted prior to the second revocation

2   of the diet card.  Plaintiff contends that the instant action differs because appeal log no. SAC-08-

3   1769 remained pending through February 2009, long after Bradford deprived plaintiff library

4   access in 2008.  Plaintiff argues that had plaintiff filed a second appeal challenging Bradford's

5   deprivation, it would have been duplicative of appeal log no. SAC-08-1769.

6                       *Defendants' Reply*

7          In reply, defendants reiterate that Bradford's alleged deprivation could not be exhausted

8   by appeal log no. SAC-08-1769 because the alleged act occurred in 2008, long after the 2007

9   allegations contained in the initial grievance, and in violation of the regulation requiring that the

10  grievance be filed 15 working days after the alleged misconduct.  Defendants point out that

11  plaintiff's initial grievance focused on the deprivations in 2007, as did the first and second levels

12  of review.  Although the second level review noted plaintiff requested continued PLU access, it

13  reminded plaintiff that it was his responsibility to submit the required documents.  (ECF No. 230

14  at 4.)  Accordingly, defendants argue that appeal log no. SAC-08-1769 was not sufficient to put

15  prison officials on notice that despite having access to the law library six times between August

16  and November of 2007, plaintiff would later have problems accessing the law library in August

17  2008, for entirely different reasons.  (ECF No. 236 at 4.)  Defendants contend that to find

18  otherwise would "absolve prisoners from complying with the mandatory grievance process as

19  long as they had submitted an appeal on a similar subject at some point in the past."  (Id.)

20                     *Discussion*

21         The undersigned is persuaded that appeal log no. SAC-08-1769 was not sufficient to

22  exhaust plaintiff's claim that defendant Bradford deprived plaintiff of access to the law library in

23  2008.  In the fourth amended complaint, plaintiff alleges that defendant Bradford wrongfully

24  denied plaintiff's August 11, 2008 request for PLU status, "on the basis that plaintiff failed to

25  attach a court order with an explicit deadline."  (ECF No. 104 at 10.)  Plaintiff contends that the

26  PLU request form allowed prisoners to seek PLU status by citing a rule, and plaintiff cited Rule

27  60(b) of the Federal Rules of Civil Procedure.  (ECF No. 104 at 10.)

28         While appeal log no. SAC-08-1769 put prison officials on notice that plaintiff experienced

numerous difficulties accessing the law library in 2007, the grievance did not allege that plaintiff had been wrongfully denied PLU access.  Rather, it claimed, *inter alia*, that he was granted PLU status, yet was not called to the library, and complained that the two-hour limit was insufficient. Thus, appeal log no. SAC-08-1769 did not put prison officials on notice that plaintiff's request for PLU status was wrongfully denied, thus preventing him from accessing the law library in August of 2008.  In addition, prison officials reviewing appeal log no. SAC-08-1769 would have no way of knowing that the habeas action referred to in appeal log no. SAC-08-1769 was still pending in 2008; indeed, it had been terminated, which was why plaintiff sought to prepare a Rule 60(b) motion in 2008.  Also, the appeals process confirmed that plaintiff would have to continue submitting PLU requests like other inmates.  Because prison regulations required inmates to submit requests for PLU access, plaintiff was required to grieve a particular alleged wrongful denial of such a request to put prison officials on notice of such problem.  Just because plaintiff requested continuous PLU status does not persuade the court otherwise.  Accordingly, defendant Bradford is entitled to summary judgment on plaintiff's claim that Bradford wrongfully denied plaintiff PLU status in 2008 because plaintiff failed to exhaust administrative remedies.

### 3.  August 5, 2008 Screened Out Appeal

*The Documentary Evidence*

On August 5, 2008, plaintiff submitted an inmate appeal claiming:

> On July 29, 2008, I received (via A.S.U. legal mail officer) C/O Gaddi (9) pieces of legal mail dating as far back as Nov. 9th, 2007, thru April 28th, 2008, without any explanation, justification, nor reason given, as to why my legal mail had been withheld for over (8) months. . . as a direct product of the withholding of said legal mail, my habeas petition has been (terminated), and I defaulted on my opportunity for (oral argument) in my civil appeal resulting from my inability to comply with the notifications and orders contained therein, the above-mentioned legal mail. . . NOTE: this grievance presents new issues which is [sic] separate, and distinct from the (grievance) in Log No. 07-02453.

(ECF No. 16 at 34; ECT No. 231 at 144.)  Plaintiff sought an advance for the cost of attorney's fees to re-litigate the cases impeded by the withheld mail, as well as compensatory and punitive damages.  (Id.)  On August 18, 2008, plaintiff received an informal level response, which stated:

////

> [t]he reason you received the legal mail dating back to 2007 is because the mailroom was holding it while you were out to court (federal).  Once you returned you requested all your mail.  For the reasons stated above and the reasons your mail was held, your appeal is denied.

(ECF No. 16 at 34; ECF No. 231 at 144.)  On September 2, 2008, plaintiff noted such response was returned to plaintiff 15 days after the August 18, 2008 response date, the response was inadequate, and sought a formal level review.  (Id.)  The subsequent responses, screen-outs and resubmissions are not relevant here.

To fall within the noted exception to exhaustion, a prisoner must show he attempted to exhaust his administrative remedies, but was thwarted by improper screening.  Sapp, 623 F.3d at 823.  Specifically, the inmate must establish (1) that he actually filed a grievance or grievances that, if pursued through all levels of administrative appeals, would have sufficed to exhaust the claim he seeks to pursue in federal court, and (2) that prison officials screened his grievance or grievances for reasons inconsistent with or unsupported by applicable regulations.  Id. at 823-24.

*Discussion*

Defendants argue that even if the court considers the August 5, 2008 screened out appeal, such appeal cannot serve to exhaust administrative remedies against defendants Walker, Virga, Donahoo, Gaddi, or any claims for incoming personal mail.  (ECF No. 220-1 at 24.)

*Law of the Case*

"[A] court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case."  United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotations and citation omitted).

As pointed out by plaintiff, the court already determined that plaintiff's August 5, 2008 grievance was improperly screened out, and therefore plaintiff's administrative remedies were not available.  (ECF No. 230 at 17.)  In 2012, defendants Donahoo, Johnson, Pool, Virga, and Walker filed a motion to dismiss the August 5, 2008 screened out appeal, alleging plaintiff failed to properly exhaust his administrative remedies.  (ECF No. 27.)  In detailed findings, the court found that the August 5, 2008 appeal contained factual allegations supporting plaintiff's claims in federal court, was improperly screened out, and that plaintiff was not required to use the phrase

1    "access to the courts," and such grievance was "sufficient to put prison officials on notice of

2    plaintiff's claims concerning the withheld incoming legal mail and the resulting interference with

3    plaintiff's access to the courts," and "recommended that *defendants'* motion to dismiss plaintiff's

4    claims as unexhausted should be denied." (ECF No. 33 at 11-12, 15 (emphasis added).)  Such

5    findings and recommendations were adopted in full by the district court on September 13, 2012.

6    (ECF No. 40.)  Accordingly, such findings are law of the case, and the efforts of defendants

7    Donahoo, Virga, and Walker to revisit the exhaustion of such appeal are unavailing.  See

8    Gonzales v. Arizona, 677 F.3d 383, 390 n.4 (9th Cir. 2012) ("Under the law of the case doctrine,

9    a court will generally refuse to consider an issue that has already been decided by the same court

10   or a higher court in the same case.")

11        *New Arguments*

12        Defendants now argue that the August 5, 2008 grievance would not have put prison

13   officials on notice of the involvement of prison staff other than the mailroom or mail delivery

14   staff, thus failing the first prong of Sapp as to defendants Walker, Virga, Donahoo and Gaddi.

15   (ECF No. 220-1 at 24.)  But in 2008, plaintiff was not required to set forth the names of the prison

16   staff involved, and because plaintiff had received no notice that his mail was being withheld, he

17   had no idea who decided to withhold his legal mail, or why the mail was withheld; due to such

18   lack of information, he was unable to determine whether the legal mail was withheld due to

19   prison policy or a violation of prison policy.  Indeed, it was not until August 18, 2008, that

20   plaintiff was informed that his legal mail was held while he was out to court.  Here, unlike the

21   cases relied upon by defendants, the problem grieved was concrete:  plaintiff's legal mail was

22   withheld while he was out to court.  There were no other specific facts he could allege absent

23   more information he did not have.  This court cannot find that plaintiff was required to speculate

24   whether supervisors or other prison staff might have been involved in the wrongful withholding

25   of his legal mail.  Therefore, the court finds there are no new grounds to support setting aside the

26   prior finding that plaintiff's August 5, 2008 appeal was improperly screened out, and that such

27   appeal would have exhausted plaintiff's claims against defendants Walker, Virga, and Donahoo.

28   Alexander, 106 F.3d at  876 (court may exercise its discretion to depart from the law of the case

1    only if one of these five circumstances is present:  (1) the first decision was clearly erroneous; (2)

2    there has been an intervening change of law; (3) the evidence is substantially different; (4) other

3    changed circumstances exist; or (5) a manifest injustice would otherwise result.).

4        Although defendant Gaddi was not a party to the earlier motion to dismiss, defendant

5    Gaddi was named in the appeal.  Defendants' argument that the August 5, 2008 appeal failed to

6    exhaust plaintiff's claims against defendant Gaddi is also unavailing.  Plaintiff did not know who

7    was responsible for the deprivation of his legal mail.  Although defendant Gaddi was the ASU

8    legal mail officer who did not work in the mail room, it was defendant Gaddi who delivered the

9    withheld legal mail.  Thus, it was plausible that defendant Gaddi could have been involved in the

10   withholding of plaintiff's legal mail.  The withholding of plaintiff's legal mail is the alleged

11   misconduct, and by naming defendant Gaddi, such connection is implied, particularly where

12   Gaddi offered no "explanation, justification [or] reason" for the delayed delivery of plaintiff's

13   legal mail.  (ECF No. 231 at 144.)  Thus, the undersigned finds that the April 5, 2008 screened

14   out grievance was sufficient to exhaust plaintiff's claim as to defendant Gaddi.

15       That said, the appeal specifically grieved the withholding of plaintiff's legal mail and the

16   injuries he sustained therefrom.  There was no mention of personal correspondence, or a general

17   challenge that all of his mail was withheld while he was out to court.  Plaintiff's August 5, 2008

18   grievance did not exhaust plaintiff's claim as to personal mail.

19       Thus, the April 5, 2008 improperly screened out grievance, challenging the withholding of

20   plaintiff's legal mail, was sufficient to exhaust plaintiff's claims as to defendants Walker, Virga,

21   and Donahoo, as the court previously found on July 5, 2012, and adopted by the district court on

22   September 13, 2012.  (ECF Nos. 33, 40.)  Also, as to defendant Gaddi, such appeal was sufficient

23   to exhaust plaintiff's claim that his legal mail was wrongfully withheld.  Therefore, defendants

24   Walker, Virga, Donahoo, and Gaddi are not entitled to summary judgment based on the alleged

25   failure to exhaust administrative remedies in connection with the August 5, 2008 appeal.  See

26   Ross, 136 S. Ct. at 1859 ("[A]n inmate is required to exhaust those, but only those, grievance

27   procedures that are 'capable of use' to obtain 'some relief for the action complained of.'")

28   (quoting Booth, 532 U.S. at 731).

1            4. <u>September 11, 2008 Screened Out Appeal</u>

2            Defendants contend that plaintiff failed to exhaust his retaliation claim against defendant

3    Salas through the third level of review, and that even if the court finds administrative remedies

4    were unavailable, the September 11, 2008 grievance would not exhaust such retaliation claim.

5    Plaintiff counters that prison officials thwarted his ability to exhaust such claim by improperly

6    screening out his appeal, and that the grievance is adequate to demonstrate exhaustion.

7            *The Documentary Evidence*

8            On September 11, 2008, plaintiff submitted an inmate appeal regarding a 2008 annual

9    package.  (ECF No. 220-4 at 168 (DEF 164); ECF No. 231 at 181 (PENTON_SALAS00003).)

10   Plaintiff wrote:

11           This is a remedial 602 in an effort to prevent ad seg property staff
             from sending my annual package back to the sender. . . . on
12           September 8, 2008, [plaintiff] received notice from [defendant] Salas
             informing [plaintiff] that his package was being returned to vendor
13           because it was received after ad seg placement.  The fact is . . .
             [plaintiff has] been assigned to work privilege Group "D" for
14           approximately 14 months making [plaintiff] eligible to receive an
             annual package.
15

16   (<u>Id.</u>)  As action, plaintiff requested that he be allowed his annual package, and if it had already

17   been returned to the vendor, the purchaser be reimbursed for shipping, handling and re-stocking

18   fees.  (<u>Id.</u>)  Defendant Salas responded at the informal level:

19           My records indicate that your D-status started 6-19-08.  However, it
             was determined to be incorrect.  Therefore your annual package was
20           unintentionally sent back to the vendor based on my records.  You
             are eligible to receive an annual package.  At this point of your
21           appeal, I am unable to determine reimbursement for charges.

22   (<u>Id.</u>)  The appeal was returned to plaintiff on September 23, 2008.  (<u>Id.</u>)  Plaintiff sought a formal

23   level review, writing:

24           There seems to be a discrepancy concerning the actual date the
             package was received at R&R and the date it was returned to the
25           vendor.  I respectfully request that a record of those events be
             attached to this 602 as documented proof establishing C/O Salas'
26           inadvertence.

27   (<u>Id.</u>)  The appeal was submitted on October 5, 2008.  (<u>Id.</u>)

28   ////

1   The second page of this appeal form is blank; no first level response or first level screen

2   out is provided.[12]

3   Plaintiff received two subsequent screening letters from former defendant Pool, marked

4   2nd and 3rd, dated October 14, 2008, and October 31, 2008, noting plaintiff's failure to re-attach

5   all previous screening forms.  (ECF No. 220-4 at 160, 162 (DEF 156, 158.)  Pool provided a

6   declaration explaining that all screening letters (CDC 695's) informed plaintiff that he must re-

7   attach all previous screening letters relative to the September 11, 2008 appeal before the appeal

8   could be processed further.  (ECF No. 220-4 at 143.)

9   *Standards*

10   The PLRA requires that an inmate exhaust only those administrative remedies "as

11   are available."  42 U.S.C. § 1997e(a).  The Ninth Circuit concluded that the PLRA does not

12   require exhaustion when circumstances render administrative remedies "effectively unavailable."

13   Sapp, 623 F.3d at 822 (citing Nunez, 591 F.3d at 1226).  In Sapp, the Ninth Circuit held that

14   "improper screening of an inmate's administrative grievances renders administrative remedies

15   'effectively unavailable' such that exhaustion is not required under the PLRA."  Sapp, 623 F.3d at

16   823.  As the Ninth Circuit noted, if prison officials screen out an inmate's appeals for improper

17   reasons, the inmate cannot pursue the necessary sequence of appeals, and, as a result, his

18   administrative remedies become unavailable.  Id.

19   To fall within the noted exception to exhaustion, a prisoner must show he attempted to

20   exhaust his administrative remedies but was thwarted by improper screening.  Id.  Specifically,

21   the inmate must establish (1) that he actually filed a grievance or grievances that, if pursued

22   through all levels of administrative appeals, would have sufficed to exhaust the claim he seeks to

23   pursue in federal court, and (2) that prison officials screened his grievance or grievances for

24   reasons inconsistent with or unsupported by applicable regulations.  Id. at 823-24.

25   ////

26

27   _____

[12]  Pool declares the appeal was screened out at the first level of review, but no copy of such first
level screening was provided.  (ECF No. 220-4 at 143 (Pool Decl.) (DEF 139); ECF No. 220-4 at
28   155-57 (DEF 151-53).)

1          *First Prong of Sapp*

2          Based on the evidence presented, the undersigned finds that plaintiff failed to properly

3  exhaust his administrative remedies as to defendant Salas prior to filing suit.  The Ninth Circuit

4  has held that:

5          A grievance need not include legal terminology or legal theories
           unless they are in some way needed to provide notice of the harm
6          being grieved.  A grievance also need not contain every fact
           necessary to prove each element of an eventual legal claim.  The
7          primary purpose of a grievance is to alert the prison to a problem and
           facilitate its resolution, not to lay groundwork for litigation.
8

9  Griffin, 557 F.3d at 1120.  See also McCollum v. Cal. Dep't of Corrs. & Rehab., 647 F.3d 870,

10 876 (9th Cir. 2011) ("While an inmate need not articulate a precise legal theory, 'a grievance

11 suffices if it alerts the prison to the nature of the wrong for which redress is sought.'").[13]

12         Here, it is undisputed that plaintiff's September 11, 2008 appeal was the only appeal

13 addressing defendant Salas' wrongful return of plaintiff's annual package.  As argued by

14 defendants, and discussed below, the September 11, 2008 appeal did not include sufficient facts

15 to put prison officials on notice of plaintiff's constitutional claims against defendant Salas.

16 Plaintiff argues that he was not required to include legal terminology such as "retaliation" in the

17 grievance, because the immediate problem was Salas' wrongful return of the annual package,

18 which plaintiff believed to be in retaliation for his attempts to use the inmate appeals system

19 regarding his withheld mail, and not mere inadvertence as Salas claimed.  (ECF No. 230 at 23.)

20 Plaintiff points to his request for first level review, where plaintiff asked for proof of the alleged

21 inadvertence.  Plaintiff relies solely on Griffin, 557 F.3d at 1120.  (ECF No. 230 at 23.)

22         In this appeal, plaintiff objected to the return of his annual package on the basis that he

23 was entitled to receive it under the governing prison regulation.  Plaintiff did not mention

24 retaliation or retaliatory conduct, or even suggest misconduct was at issue.  See Jennings v.

25 ─────────────────

26 [13]  In McCollum, the Ninth Circuit found that a claim of religious discrimination predicated on
   the CDCR's failure to provide Wiccan chaplains was not exhausted by grievances addressing
27 other problems encountered by Wiccan inmates, and affirmed the district court's finding that
   challenge to paid-chaplaincy policy was unexhausted because grievances did not complain of lack
28 of chaplaincy.  Id. at 876-77.

1   Huizar, 2007 WL 2081200, at *4 (D. Ariz. July 19, 2007) (holding Jennings sufficiently

2   exhausted retaliation claim where he wrote in his grievance that the defendant changed Jennings'

3   work assignment for an "improper purpose," thereby "afford[ing] corrections officials time and

4   opportunity to address [the retaliation claim] internally.")  Here, plaintiff did not set forth any

5   facts about any alleged "improper purpose," his constitutionally protected conduct, i.e., filing an

6   inmate grievance about the withholding of his mail, or otherwise.  Plaintiff did not include any

7   facts suggesting an ill or questionable motive on the part of defendant Salas.  Moreover, asking

8   for proof of the alleged inadvertence does not suggest that the property was returned due to

9   plaintiff's protected conduct.  While plaintiff is correct that inmates need not set forth legal

10   terminology in their grievances, they are required to set forth sufficient facts to put prison

11   officials on notice of the alleged misconduct.  See, e.g., Walton v. Hixson, 2011 WL 6002919, at

12   *2 (E.D. Cal. Nov. 30, 2011), adopted Jan. 3, 2012) (complaining about prison official's

13   interference with Walton's praying was not sufficient to alert prison officials to Walton's claim

14   that such interference was in retaliation for plaintiff submitting a grievance against the official);

15   Martinez v. Adams, 2010 WL 3912359 at *5 (E.D. Cal. Oct. 5, 2010) (finding a failure to exhaust

16   a retaliation claim because plaintiff's inmate grievances did not "mention retaliation or set forth

17   facts that would alert a prison official to retaliatory conduct for protected conduct"); Trevino v.

18   McBride, 2010 WL 2089604 at *3 (E.D. Cal. May 21, 2010) (finding Trevino failed to

19   adequately alert prison officials to the problem of retaliatory acts by correctional officers because

20   there was no "linkage mentioned between previously filed lawsuits and the defendants'

21   deprivation of his property."); Thomas v. Sheppard-Brooks, 2009 WL 3365872 at *5 (E.D. Cal.

22   Oct. 16, 2009) (finding Thomas' grievance "did not provide enough information in his grievance

23   to allow prison officials to take appropriate responsive measures because Thomas failed to notify

24   prison officials that his cell housing without light was retaliatory.).

25          Here, although the grievance put prison officials on notice of the wrongful return of the

26   package, plaintiff included no facts concerning his theory that Salas did so because plaintiff had

27   filed an inmate grievance.  Alleged misconduct connected to plaintiff's protected conduct is

28   different from the wrongful return of the package due to Salas' alleged inadvertence or in

violation of prison regulations that established plaintiff was entitled to receive the package.  Thus, the September 11, 2008 appeal, if exhausted through the third level of review, would not have exhausted plaintiff's retaliation claim against defendant Salas; accordingly, plaintiff fails to meet the first prong of Sapp.

                    *Second Prong of Sapp*

       Plaintiff meets the second prong of Sapp.  Plaintiff's September 11, 2008 appeal was also improperly rejected, similar to the August 5, 2008 appeal.  Defendants provided no copy of the first level review or evidence demonstrating that the appeals office responded to plaintiff's request for documentation as to why and when his annual package was actually returned.  Despite plaintiff's continued efforts to appeal the return of his package, Pool rejected plaintiff's efforts, again asking plaintiff to append a screening document that apparently did not, and does not, exist. In light of this fact, Pool screened plaintiff's September 11, 2008 grievance for improper reasons, rendering the appeals process unavailable.

       *Conclusion*

       Plaintiff includes no other arguments demonstrating he should be excused from exhausting his retaliation claim against defendant Salas.  (ECF No. 230 at 22-23.)  Under Sapp, plaintiff must meet both prongs in order to establish that exhaustion was thwarted by improper screening.  Id. 623 F.3d at 823-24.  Because plaintiff's September 11, 2008 grievance would not have exhausted plaintiff's retaliation claim against defendant Salas, defendant Salas is entitled to summary judgment based on plaintiff's failure to properly exhaust his retaliation claim.

                    5.  Defendant Lynch

       Defendants adduced evidence that plaintiff filed no grievance claiming defendant Lynch retaliated against plaintiff.  Plaintiff provided no inmate grievance claiming that defendant Lynch allegedly retaliated against plaintiff by telling plaintiff "If I were you, I would try to get transferred.  You have nothing coming here."  (Pl.'s Dep. at 43-44.)  Therefore, the undersigned finds it undisputed that plaintiff did not file a grievance which, if pursued through the third level of review, would have exhausted plaintiff's retaliation claim against defendant Lynch.  Absent evidence that demonstrates plaintiff's administrative remedies were effectively unavailable,

1    defendant Lynch is entitled to summary judgment based on such failure.

2           Plaintiff argues that Pool's "repeated wrongful screening" of plaintiff's appeals prevented

3    plaintiff from pursuing inmate appeals in 2008 upon his return from out to court, and taken with

4    defendant Lynch's statement to plaintiff that "you have nothing coming to you," which plaintiff

5    understood to be retaliatory based on his attempts to grieve the withholding of his mail while out

6    to court, should excuse plaintiff's obligation to exhaust his retaliation claim against defendant

7    Lynch.  (ECF No. 230 at 23.)  Further, plaintiff claims that "genuine disputes of material fact

8    exist as to whether Lynch thwarted plaintiff "from taking advantage of [the] grievance process

9    through machination, misrepresentation, or intimidation," quoting Ross, 136 S. Ct. at 1860.  (ECF

10   No. 230 at 24.)

11          In 2015, the Ninth Circuit recognized that "the threat of retaliation for reporting an

12   incident can render the prison grievance process effectively unavailable."  McBride v. Lopez, 807

13   F.3d 982, 987 (9th Cir. 2015).  Whether or not exhaustion may be excused on such basis is

14   demonstrated as follows:

15                  To show that a threat rendered the prison grievance system
                    unavailable, a prisoner must provide a basis for the court to find that
16                  he actually believed prison officials would retaliate against him if he
                    filed a grievance.  If the prisoner makes this showing, he must then
17                  demonstrate that his belief was objectively reasonable.  That is, there
                    must be some basis in the record for the district court to conclude that
18                  a reasonable prisoner of ordinary firmness would have believed that
                    the prison official's action communicated a threat not to use the
19                  prison's grievance procedure and that the threatened retaliation was
                    of sufficient severity to deter a reasonable prisoner from filing a
20                  grievance.

21   Id. at 987.  In other words, prisoners must demonstrate both that the prisoner actually believed the

22   defendant would retaliate against him, and that such belief was objectively reasonable -- that "a

23   reasonable prisoner of ordinary firmness" would have felt sufficiently threatened by defendant to

24   not pursue administrative remedies.  Id.; Rodriguez v. County of Los Angeles, 891 F.3d 776, 792

25   (9th Cir. 2018).

26          Here, plaintiff did not adduce any evidence that plaintiff did not file a grievance because

27   he actually believed defendant Lynch would retaliate against plaintiff.  As disputed facts in

28   connection with this claim, plaintiff refers to two pages of his deposition testimony.  (ECF Nos.

1  230-1 at 22:13; 230-2 at 35:8) (citing Pl.'s Dep. at 43:5-44:15.)  But on the pages cited, plaintiff

2  confirmed that he spoke with defendant Lynch about multiple issues, including multiple

3  grievances, during which plaintiff "conveyed [his] concerns about ad seg placement through

4  withholding of mail to not hav[ing] access to law library." (Pl.'s Dep. at 43.)  Plaintiff further

5  testified that at one of these interactions, defendant Lynch responded, "If I were you, I would try

6  to get transferred.  You have nothing coming here." (Pl.'s Dep. at 44.)  But plaintiff did not

7  testify to any belief that Lynch would retaliate against plaintiff if he filed a grievance.  (Id.)

8  Further, plaintiff points to no declaration or deposition testimony whereby plaintiff stated he

9  actually believed defendant Lynch would retaliate against him, or that plaintiff was fearful of

10 retaliation if he filed a grievance.  Plaintiff points to no declaration or deposition testimony where

11 plaintiff stated that the screening out of his appeals coupled with Lynch's statement caused

12 plaintiff to fear retaliation if he filed any administrative appeals.

13       Moreover, taking Lynch's statement as true, the undersigned is not persuaded that a

14 reasonable prisoner of ordinary firmness who heard Lynch's statement would consider such

15 statement, without more, as a threat not to use the prison grievance system, or find such statement

16 to be so severe that such reasonable prisoner would be deterred from filing a grievance.[14]  Also,

17 plaintiff was unable to pinpoint the time, other than "in 2008," defendant Lynch made the

18 statement such that the court could tie the statement to the screening out of plaintiff's appeals by

19 former defendant Pool.  (Pl.'s Dep. at 44.)  Plaintiff's deposition testimony also failed to provide

20 a specific context in which Lynch's words could be viewed as a threat.

21       For all of the above reasons, the undersigned finds that no material dispute of fact exists as

22 to whether plaintiff's administrative remedies were rendered unavailable.  The record lacks

23 evidence that plaintiff actually feared retaliation by defendant Lynch or that any fear of retaliation

24 would have been objectively reasonable.  See McBride v. Lopez, 807 F.3d at 986-88.

25 Accordingly, defendant Lynch is entitled to summary judgment based on plaintiff's failure to

26

27 [14]  As noted by defendants, plaintiff submitted twelve different grievances through the third level
   of review from 2007 to 2011.  (ECF No. 236 at 7.)  Three of those appeals were accepted in
28 November and December of 2008.  (ECF No. 220-4 at 10 (DEF 006).)

1    exhaust administrative remedies.

2    II.  Are Plaintiff's Access to the Courts Claims Barred by Heck?

3            Defendants renew their argument that plaintiff's access to the court claim is barred by

4    Heck v. Humphrey, 512 U.S. 477 (1994).  However, as pointed out by plaintiff, on April 14,

5    2020, the district court adopted this court's findings and recommendations on this issue, and

6    denied defendants' motion for judgment on the pleadings based on the favorable termination rule

7    of Heck.  (ECF No. 207 at 3; see also ECF No. 177 at 5-6.)  Accordingly, defendants' renewed

8    Heck argument is barred by the law of the case doctrine.  See Gonzales, 677 F.3d at 390 n.4

9    ("Under the law of the case doctrine, a court will generally refuse to consider an issue that has

10   already been decided by the same court or a higher court in the same case.)  Defendants' reliance

11   on Sampson v. Garrett, 917 F.3d 880, 881 (6th Cir. 2019), is unavailing because this court is not

12   bound by authorities from the Sixth Circuit,[15] and defendants wholly failed to acknowledge or

13   address the prior findings in the instant action by both this court as well as the Ninth Circuit Court

14   of Appeals.  Defendants' motion for summary judgment on the grounds that plaintiff's access to

15   the court claim is barred by Heck should be denied.

16   III.  Plaintiff's Access to Courts Claims

17           A.  Undisputed Facts

18           1.  Plaintiff was convicted of robbery, attempted robbery, and false imprisonment on

19   November 8, 2000, and was ultimately sentenced to 52 years and eight months.  (ECF No. 220-3

20   at 29.)

21           2.  Plaintiff unsuccessfully appealed his conviction through the California Supreme Court.

22   (ECF No. 220-3 at 30.)

23           3.  Plaintiff filed a petition for habeas corpus in Penton v. Kernan, No. 2:06-cv-0233

24   WQH (PCL) (S.D. Cal.).  (ECF No. 220-3 at 8.)

25           4.  On March 3, 2006, plaintiff was ordered to immediately notify the Southern District

26   Court of any change in address, and warned that failure to do so would subject his case to

27   _____

28   [15]  Indeed, the Sixth Circuit Court of Appeals noted the Ninth Circuit's disagreement.  Sampson,
     917 F.3d at 882 (citation omitted).

                                                    41

dismissal.  (ECF No. 220-3 at 22.)

5.  Plaintiff briefed his habeas petition, including the filing of an amended petition and a traverse.  (ECF No. 220-3 at 8-11.)

6.  On August 31, 2007, report and recommendations were issued in Penton v. Kernan, No. 2:06-cv-0233 WQH (PCL) (S.D. Cal.), recommending that plaintiff's petition for writ of habeas corpus be denied, and providing that any objections were to be filed on or before September 21, 2007.  (ECF Nos. 220-3 at 24-62; 220-4 at 134, 136.)

7.  Plaintiff filed a motion for extension of time, *nunc pro tunc*, to object to the report and recommendations, which was granted extending the deadline to object to November 7, 2007. (ECF No. 220-3 at 11-12.)

8.  Plaintiff submitted another motion to extend the deadline, but an unidentified person mailed it to a different court.  (ECF No. 104 at ¶ 35.)

9.  Plaintiff did not file objections to the report and recommendations.  (ECF No. 220-3 at 11-12.)

10.  Plaintiff was transferred from CSP-SAC to the custody of the U.S. Marshal on November 8, 2007, for transport to a prison in Kentucky to serve as a prosecution witness in a criminal case.  (ECF No. 104 at ¶ 36.)

11.  Plaintiff's mail was retained at CSP-SAC while he was out to court from November 9, 2007.  (ECF No. 220-5 at 115.)

12.  On December 20, 2007, the habeas court adopted all portions of the report and recommendations, and denied plaintiff's petition; judgment was entered on December 26, 2007. (ECF No. 220-3 at 64-68; 70.)

13.  On December 21, 2007, defendant Johnson partially granted appeal 07-02453 at the first level of review.  (ECF No. 220-4 at 48.)

14.  Plaintiff returned to CSP-SAC from out to court on June 19, 2008.  (ECF No. 226-3 at 3 (Pl.'s Decl.); ECF No. 220-4 at 139 (CDC-114-D).)

15.  When plaintiff returned to CSP-SAC he was placed in administrative segregation. (ECF No. 220-4 at 139 (CDC-114-D).)

16.  Plaintiff's mail was returned to him on July 29, 2008, by defendant Gaddi.  (ECF No. 220-5 at 112, 115.)

17.  On August 18, 2008, plaintiff's August 5, 2008 appeal was denied at the informal level of review,[16] stating his mail had been withheld while he was out to court.  (ECF Nos. 220-4 at 145; 231 at 144.)  Subsequent reviews were conducted by nonparty O'Brian and former defendant Pool.

18.  On August 22, 2008, defendant Virga, on behalf of defendant Walker, granted plaintiff's appeal 07-02453 at the second level of review.  (ECF No. 220-4 at 64.)

19.  On August 28, 2018, over ten years later, plaintiff's motion for relief from judgment was granted by the habeas court; the judgment and portions of the order adopting the report and recommendations and denying the amended petition were vacated.  (ECF No. 220-3 at 72-79.)

20.  On September 9, 2008, nonparty Hamad partially granted plaintiff's appeal SAC-B-08-01769 at the first level of review.  (ECF No. 220-4 at 113.)

21.  On November 14, 2008, defendant Virga, on behalf of defendant Walker, partially granted plaintiff's appeal SAC-B-08-01769 at the second level of review.  (ECF No. 220-4 at 98.)

22.  On November 26, 2018, plaintiff filed objections to the report and recommendations in his habeas action.  (ECF No. 220-3 at 14.)

23.  On September 12, 2019, the district court again denied plaintiff's habeas petition and judgment was entered.  (ECF No. 220-3 at 81-89.)

24.  Plaintiff filed an appeal which is currently pending.  (ECF No. 220-3 at 15-16.)

25.  Defendant Walker was Warden of CSP-SAC from mid-2006 until December 2009. As warden, Walker had overall administrative responsibility of the institution.  (ECF No. 220-5 at 1-2 (Walker Decl., ¶¶ 1-2, DEF 178-79).)

26.  In order to manage the institution, CSP-SAC operates through a chain of command. A Chief Deputy Warden reports to the Warden.  The Chief Deputy Warden supervises the four Associate Wardens, who basically are assigned to oversee a facility, specific unit or function.

---

[16]  Defendant Johnson testified that he recognized the signature of the reviewer to be that of defendant J. Nunez.  (ECF No. 231 at 28 (Johnson Dep. at 160).)

1   Each Associate Warden in turn supervises a Correctional Captain.  This chain of command

2   continues through various middle managers and supervisors down to line staff.  (ECF No. 220-5

3   at 2, 42 (Walker Decl. ¶ 4, DEF 179); (Virga Decl. ¶¶ 3-5, DEF 219).)

4        27.  Defendant Virga was the Chief Deputy Warden at California State Prison,

5   Sacramento (CSP-SAC), from approximately April/May 2007, to March 2010, with the exception

6   of a brief ninety-day period in 2009.  A Chief Deputy Warden is under the administrative

7   direction of the Warden and functions as the operations chief over institution programs and staff.

8   (ECF No. 220-5 at 41-42 (Virga Decl. ¶¶ 1-2, DEF 218-19).)

9        28.  In 2007 to 2008, defendant Donahoo was a sergeant, and in 2008 was assigned as an

10  appeals investigator.  (ECF No. 220-5 at 85 (DEF 262).)

11       29.  Defendant Donahoo did not process inmate mail, personal or legal, during 2007 or

12  2008, including but not limited to plaintiff's incoming and outgoing mail, and Donahoo had no

13  law library responsibilities during 2007 to 2008.[17]  (ECF No. 220-5 at 85-86 (Donahoo Decl. ¶¶

14  1-2, DEF 262-63).)

15       30.  Plaintiff's appeal no. SAC-07-02453 was assigned for second level review on August

16  4, 2008.  (ECF No. 220-4 at 61 (Boxall Decl. ¶ 8, DEF 057).)  Defendant Donahoo investigated

17  such appeal at the second level of review.  (Virga Dep. at 248.)

18       31.  Defendant Donahoo drafted the August 22, 2008 second level response to plaintiff's

19  appeal no. SAC-07-02453 for review by defendant Associate Warden Virga.  (Walker Dep. at

20  176; Virga Dep. at 248.)

21       32.  Defendant Gaddi has been a Correctional Officer at CSP-SAC since 2003 and

22  generally worked in the administrative segregation unit during 2004 until about spring 2008.

23  (ECF No. 220-5 at 111 (Gaddi Decl.) (DEF 288).)

24       33.  Gaddi did not work in the mailroom and did not have any responsibility for the

25  processing of mail in the mailroom.  (Id.)

26       34.  In 2007-2008, the CSP-SAC mailroom received mail from the post office and would

27  _____

28  [17]  Plaintiff disputes this fact (ECF No. 230-2 at 16), but fails to identify specific evidence that
     rebuts this statement.

1   bag the mail and deliver it to the A/B gate, for inmates assigned to administrative segregation.

2   The mail bag would be waiting at the A/B gate at the start of each weekday.  On days that

3   defendant Gaddi worked, he would pick up the mail bag and process it, generally within one hour

4   and fifteen minutes of starting his shift.  (ECF No. 220-5 at 112) (Gaddi Decl.) (DEF 289).)

5       35.  Defendant Gaddi delivered some of plaintiff's legal mail to plaintiff on July 29, 2008.

6   This mail was delivered to plaintiff by defendant Gaddi on the same day it was received by Gaddi

7   from the mailroom.  The mail listed on plaintiff's legal mail log, signed by plaintiff on July 29,

8   2008, was delivered to plaintiff on the same day that it was received by Gaddi.   (ECF No. 220-5

9   at 111-13; 115) (Gaddi Decl.; Ex. A) (DEF 288-90; 292).)[18]

10      36.  Defendant Gaddi testified that normally when he received legal mail it would be

11  stamped the day that the institution received it, which is usually the day before.  (Gaddi Dep. at

12  88.)  With regard to the July 29, 2008 legal mail, defendant Gaddi testified that it was strange or

13  peculiar that the date stamps were not from the day before, so defendant Gaddi documented the

14  received date from the envelope onto the mail log to make that clear.  (Gaddi Dep. at 88-89, 93-

15  94.)

16      37.  Defendant Gaddi did not withhold and was not responsible for withholding plaintiff's

17  legal or personal mail, and had no knowledge as to whether plaintiff's mail was being held or

18  withheld while plaintiff was away from CSP-SAC.  (ECF No. 220-5 at 112-13) (Gaddi Decl.)

19  (DEF 289-90.)[19]

20

21  [18]  Plaintiff disputes these facts, citing "Virga Dep. Ex. 5," and plaintiff's deposition testimony at
    "189:2-190:14."  (ECF No. 230-2 at 24.)  Exhibit 5 to Virga's deposition is plaintiff's August 5,
22  2008 appeal that was screened out.  (ECF No. 231 at 144.)  In this appeal, plaintiff wrote that
    ASU legal mail officer Gaddi delivered 9 pieces of legal mail to plaintiff on July 29, 2008.  (Id.)
23  However, plaintiff fails to explain how plaintiff's August 5, 2008 appeal rebuts defendant Gaddi's
    declaration.  Plaintiff also cites to pages 189:2 to 190:14 of his deposition.  (ECF No. 223 at 198-
24  99.)  On such pages, plaintiff testified as to letters from plaintiff's family members but does not
    address defendant Gaddi.  (Id.)
25

26  [19]  Plaintiff disputes this statement, citing specific pages from the depositions of plaintiff,
    Le'Vance Anthony Quinn and defendant Gaddi, as well as Exhibit 1 to defendant Gaddi's
27  deposition, the July 29, 2008 CSP-SAC Sacramento Legal Mail Log.  (ECF No. 230-2 at 24-25.)
    Plaintiff fails to explain how such mail log (ECF No. 220-5 at 115) refutes defendant Gaddi's
28  declaration.  Plaintiff also fails to explain how the cited testimony of plaintiff, Quinn or Gaddi

1          B.  Defendants Walker, Virga, Donahoo and Gaddi

2               1.  The Parties' Positions

3       *Defendants' Motion*

4          Defendants Warden Walker, Chief Deputy Warden Virga, Appeals Investigator Donahoo

5  and Correctional Officer Gaddi argue that they are entitled to judgment as a matter of law because

6  they were not involved in processing plaintiff's mail and did not cause or authorize the

7  withholding of plaintiff's mail.  (ECF No. 220-1 at 28-29.)  Specifically, defendants Walker and

8  Virga oversee the prison and operate through a chain of command; neither directly supervised the

9  mailroom or law library, or had a direct role in training.  Defendants contend that defendants

10  Walker, Virga, and Donahoo were not even aware plaintiff's mail was being withheld and not

11  forwarded to plaintiff while he was out to court.  (ECF No. 220-1 at 29.)  Further, defendants

12  point out that liability cannot be imputed to defendants Walker, Virga and Donahoo based on

13  respondeat superior or vicarious liability.  "[T]he Supreme Court has rejected the notion that a

14  supervisory defendant can be liable based on knowledge and acquiescence in a subordinate's

15  unconstitutional conduct because government officials, regardless of their title, can only be held

16  liable under Section 1983 for his or her own conduct and not the conduct of others."  (ECF No.

17  220-1 at 29) (citing Iqbal, 556 U.S. at 676-77 (rejecting argument that "a supervisor's mere

18  knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the

19  Constitution.").)  Defendants contend there is no evidence demonstrating defendants Walker,

20  Virga and Donahoo actively interfered with plaintiff's mail.

21          Defendants argue that the sole involvement of defendants Virga and Donahoo was related

22  to the handling of plaintiff's inmate appeal 07-02453, and because defendant Virga signed the

23  appeal on Walker's behalf, defendant Walker had no involvement.  (ECF No. 220-1 at 30, 31.)

24  Such involvement is insufficient to hold them liable for any alleged constitutional violation.

25  (ECF No. 220-1 at 30-31.)  Nevertheless, if their involvement in the review of plaintiff's appeal

26  could give rise to liability, defendants argue that appeal No. 07-02453 would not have given

27  _____

28  rebuts the evidence regarding Gaddi's role in delivering the withheld mail to plaintiff or how such
    testimony rebuts defendant Gaddi's declaration (ECF No. 230, *passim*).

defendants notice that plaintiff's legal mail was not being forwarded to him while he was out to court because at the time he submitted his initial grievance on September 2, 2007, he had not yet left for Kentucky and his legal mail had not yet been withheld.  Moreover, by the time the appeal was assigned to defendant Donahoo on August 4, 2008, and signed by defendant Virga on August 22, 2008, plaintiff had already returned from Kentucky and received all of his withheld mail. (ECF No. 220-1 at 31.)  Because appeal No. 07-02453 did not concern plaintiff's "incoming legal mail, there could be no failure to investigate incoming legal mail, endorsement of any practice of withholding mail, cover-up or failure to rectify such."  (ECF No. 220-1 at 31-32.)  Finally, defendants contend that none of them were involved in plaintiff's appeal screened out on August 5, 2008, which also took place after plaintiff's withheld mail was returned to him.  (ECF No. 220-1 at 32.)

Defendants argue that the sole role of defendant Gaddi was delivering the withheld mail to plaintiff on July 29, 2008.

*Plaintiff's Opposition*

Plaintiff argues that "discovery revealed facts supporting that Walker, Virga, and Donahoo either were involved in or endorsed defendant Johnson's practice of withholding 'out to court' inmate mail at CSP-SAC, . . . or knew or should have known about the practice and failed to correct it."  (ECF No. 230 at 28.)  Plaintiff identified multiple job duties defendant Donahoo engaged in during 2007 to 2008, "including directly supervising Johnson's operation of the mailroom."  (Id., citing Donahoo Dep. at 70, 157, 167, 168) (Donahoo would go down to the mailroom to "make sure [Johnson] was on task in completing his assignments," "to check in . . . and make sure [Johnson] was performing [assigned] tasks," "just to see how everything was going," "to talk to [Johnson] about appeals, about other assignments," worked with [Johnson] on his appeal responses and ensuring that he'[d] turned in his work in a timely manner," "saw [Johnson] pick up mail, bring it there," "pour it on tables for sorting," and "saw him at a table looking at mail.")  In connection with plaintiff's appeal No. 07-02453, defendant Donahoo testified that he interviewed defendant Johnson, asking him to explain the mail process, and Johnson claimed "in basic terms that all the mail that is received goes out that same day . . . they

1   process all their mail." (ECF No. 230 at 29, quoting Donahoo Dep. at 225.) Defendant Donahoo

2   testified that he "went into the mailroom all the time and I made sure that there wasn't pockets of

3   mail sitting around . . . I looked in drawers, everywhere, make sure that stuff wasn't being

4   sequestered or hidden or something like that." (ECF No. 230 at 29, quoting Donahoo Dep. at

5   226.) Defendant Donahoo also testified that defendants Walker and Virga were also responsible

6   for the operation of the CSP-SAC mailroom. (ECF No. 230 at 30, citing Donahoo Dep. at 85.)

7     Plaintiff points to defendant Virga's deposition testimony confirming Virga "had overall

8   general responsibility for the operation of that whole area . . . [his] responsibility was to address

9   issues that either [he] saw happening or that were brought to [his] attention or that the managers

10  would come and talk about," and that as chief deputy, Virga was "responsible for operations, and

11  mail room is part of the operations." (ECF No. 230 at 30, citing Virga Dep. at 102-03; 147.) As

12  part of his responsibilities of supervising defendant Johnson's operation of the mailroom,

13  defendant Virga testified he was "supposed to be out reviewing and walking through and talking

14  to people and visually checking as much as waiting to be told something's wrong." (ECF No.

15  230 at 30, quoting Virga Dep. at 155-57.) However, defendant Virga denied proactively looking

16  into any issues in the CSP-SAC mail room during 2007 or 2008, and denied knowing if there was

17  a process for how the CSP-SAC mail room was supposed to handle incoming mail for an inmate

18  out to court, but testified that defendant Johnson was "responsible for implementing the policy in

19  the mail room" of withholding "out to court" inmate mail at CSP-SAC. (ECF No. 230 at 31,

20  quoting Virga Dep. at 160, 176, 178, 185-86, 187-88.) "Virga then admitted, however, that

21  Johnson's practice of withholding "out to court" inmate mail in the CSP-SAC mailroom until the

22  inmate returned conflicted with the requirements of Title 15 of the CCR. (Id.) Consistent with

23  such testimony, defendant Walker agreed that defendant Johnson's practice of withholding out to

24  court inmate mail at in the CSP-SAC mailroom violated Title 15 of the CCR. (ECF No. 230 at

25  31, citing Walker Dep. at 107, 112-13; 116-21.)

26    Both defendants Virga and Walker testified that defendant Johnson should have

27  discovered plaintiff's legal mail had already been withheld when defendant Johnson responded to

28  plaintiff's first level appeal on December 31, 2007. (Virga Dep. at 262-65; Walker Dep. at 174-

1    75.)

2          Defendant Walker testified that defendant Virga was "responsible for the daily operation

3    of the CSP-SAC mailroom in 2007 - 2008 and that Walker was responsible for monitoring the

4    chief deputy warden's performance of his job duties pertaining to the operation of the CSP-SAC

5    mailroom.)  (ECF No. 230 at 31, quoting Walker Dep. at 174-75; 55-56.)  Defendant Walker

6    confirmed that as warden, he was "at the head of institution, and ultimately, he's in charge of

7    everything that happens under the umbrella of the institution," including the CSP-SAC mailroom.

8    (ECF No. 230 at 311, quoting Walker Dep. at 63-64.)

9          Further, defendant Walker testified that he was responsible for establishing mail

10   procedures, "the routine operation of the mail room processing of inmate mail in and out of the

11   institution" at CSP-SAC in 2007-2008.  (ECF No. 230 at 31, quoting Walker Dep. at 90, 104-05.)

12   Plaintiff points to Walker's testimony that if an office services supervisor "was storing incoming

13   mail in his office space, and not delivering it to the inmate," such situation would have been

14   serious enough to warrant Walker's involvement concerning how to rectify such wrongful

15   conduct in the mailroom.  (ECF No. 230 at 31, quoting Walker Dep. at 69-70.)

16         Plaintiff contends that such testimony demonstrates that genuine disputes of material fact

17   preclude summary judgment as to plaintiff's access to courts claims against defendants Walker,

18   Virga, and Donahoo.  Plaintiff argues that such testimony demonstrates their roles extend beyond

19   addressing administrative appeals, and that evidence establishes that defendant Donahoo was

20   routinely present in the CSP-SAC mailroom in 2007 to 2008 to oversee defendant Johnson's

21   operation of the mailroom, that defendants Virga and Walker were responsible for the overall

22   operation of such mailroom, and that defendant Walker was responsible for establishing

23   mailroom procedures at CSP-SAC during 2007-08.  (ECF No. 230 at 32.)  Moreover, plaintiff

24   argues that defendants Donahoo and Virga should have been put on notice of plaintiff's mail

25   issues when addressing and investigating plaintiff's mail appeal No. 07-02453, and if Pool had

26   not improperly screened out the appeal, such defendants would have been provided further notice.

27   (ECF No. 230 at 32.)

28   ////

1    *Defendants' Reply*

2        Defendants contend that plaintiff's evidence is insufficient to raise a genuine dispute of

3    material fact as to defendants Walker, Virga, or Donahoo.  As to defendants Walker and Virga,

4    defendants argue that plaintiff relies solely on a theory of respondeat superior, which was rejected

5    by the Supreme Court.  (ECF No. 236 at 9) (citing Iqbal, 556 U.S. at 677.)  "Where purpose

6    rather than knowledge is required to impose liability on a subordinate for constitutional

7    violations, the same applies for an official charged with violations arising from his or her

8    supervisory responsibilities."  (ECF No. 236 at 9.)

9        Defendants argue that plaintiff's reliance on Donahoo's statements that he "would talk to

10   the mailroom supervisor about appeals and other assignments or questions about mail related to

11   an appeal response," "typical appeals investigator issues," fails to demonstrate defendant

12   Donahoo was involved in the withholding of plaintiff's mail.  Indeed, defendants contend that

13   plaintiff failed to offer competent evidence linking defendants Walker, Virga or Donahoo to such

14   mail withholding, or showing such defendants even knew plaintiff's mail was withheld or

15   delayed.  (ECF No. 236 at 9.)  Defendants point out that plaintiff failed to make any argument

16   with regard to defendant Gaddi.

17            2.  Standards Governing Access to the Courts Claims

18       Under the First and Fourteenth Amendments to the Constitution, state prisoners have a

19   right of access to the courts.  Lewis v. Casey, 518 U.S. 343, 346 (1996); Phillips v. Hust, 477

20   F.3d 1070, 1076 (9th Cir. 2007).[20]  Traditionally, courts have identified two types of access

21   claims:  "those involving prisoners' right to affirmative *assistance*, and those involving prisoners'

22   right to litigate without active *interference*."  Silva v. Di Vittorio, 658 F.3d 1090, 1102 (9th Cir.

23   2011), overruled on other grounds as stated by Richey v. Dahne, 807 F.3d 1202, 1209 n.6 (9th

24   Cir. 2015).

25       The right to assistance is limited to direct criminal appeals, habeas petitions, and civil

26

27   [20]  Phillips was overruled on other grounds by Hust v. Phillips, 555 U.S. 1150 (2009) (holding
     librarian entitled to qualified immunity due to reasonable belief that prisoner plaintiff not required
28   to comb-bind petition).

1  rights actions.  Lewis, 518 U.S. at 354.  Where interference is alleged, the right of access to courts

2  does not stop at the pleading stage of a civil rights or habeas litigation.  Silva, 658 F.3d at 1102

3  (citing Lewis, 518 U.S. at 355; Bounds v. Smith, 430 U.S. 817, 828 (1977), limited in part on

4  other grounds by Lewis, 518 U.S. at 354).  Prisoners also have the right to pursue claims that

5  have a reasonable basis in law or fact without active interference by prison officials.  Silva, 658

6  F.3d at 1103-04 (finding that repeatedly transferring the plaintiff to different prisons and seizing

7  and withholding all of his legal files constituted active interference where the prisoner alleged

8  cases had been dismissed).  This right forbids state actors from erecting barriers that impede the

9  right of access to the courts by incarcerated persons.  Silva, 658 F.3d at 1102 (internal quotations

10 omitted).

11      In both types of access to the courts claims, the defendant's actions must have been the

12 proximate cause of actual prejudice to the plaintiff.  Silva, 658 F.3d at 1103-04.

13      Where, as here, a prisoner asserts a backward-looking denial of access claim, seeking a

14 remedy for a lost opportunity to present a legal claim, the prisoner must adduce evidence

15 demonstrating:  (1) the loss of a "nonfrivolous" or "arguable" underlying claim; (2) the official

16 acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not

17 otherwise available in a future suit.  See Christopher v. Harbury, 536 U.S. 403, 413-14 (2002).

18      "An arguable (though not yet established) claim [is] something of value."  Lewis, 518

19 U.S. at 353.  Therefore, to demonstrate the existence of a nonfrivolous claim, plaintiffs "need not

20 show, ex post, that [they] would have been successful on the merits had [their] claims been

21 considered."  Allen v. Sakai, 48 F.3d 1082, 1085 (9th Cir. 1994).  To hold otherwise "would

22 permit prison officials to substitute their judgment for the courts' and to interfere with a

23 prisoner's right to access on the chance that the prisoner's claim would eventually be deemed

24 frivolous."  Id.  Examples of actual prejudice include the "inability to meet a filing deadline or to

25 present a claim."  Lewis, 518 U.S. at 348 (citations and internal quotations omitted).

26          3.  No Vicarious Liability

27      As discussed above, liability under § 1983 must be based on a defendant's personal

28 participation in the alleged deprivation of constitutional rights.  Barren v. Harrington, 152 F.3d

1   1193, 1194 (9th Cir. 1998).  A cognizable claim under Section 1983 also requires plaintiff to

2   show causation, or that a particular defendant engaged in "'an affirmative act, participat[ed] in

3   another's affirmative act, or omit[ted] to perform an act which he is legally required to do that

4   causes the deprivation of which complaint is made.'"  Preschooler II v. Clark Cty. Sch. Bd. of

5   Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d at 743); Leer v.

6   Murphy, 844 F.2d 628, 632-33 (9th Cir. 1988).

7          To establish causation, a plaintiff must provide evidence of each individual defendant's

8   causal role in the alleged constitutional deprivation.  Leer, 844 F.2d at 634.  Accordingly, when

9   determining causation, a court "must take a very individualized approach which accounts for the

10  duties, discretion, and means of each defendant."  Id. at 633-34.  Similarly, "[a] supervisor is only

11  liable for the constitutional violations of . . . subordinates if the supervisor participated in or

12  directed the violations, or knew of the violations and failed to act to prevent them."  Taylor v.

13  List, 880 F.2d 1040, 1045 (9th Cir. 1989); see also Iqbal, 556 U.S. at 676 ("Because vicarious

14  liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official

15  defendant, through the official's own individual actions, has violated the Constitution.").

16  Respondeat superior liability does not exist under § 1983.  List, 880 F.2d at 1045.

17          4.  Discussion

18      A.  Defendant Walker

19          1.  No Evidence of Personal Involvement

20      Defendant Walker provided his own declaration in which he declares he had no direct

21  involvement in the mail process, and in 2007 to 2008, he did not directly supervise mailroom staff

22  or law library staff, and had no direct role in training staff in the processing of mail, mailroom

23  operations or law library operations.  (ECF No. 220-5 at 2 (DEF 179).)  Defendant Walker

24  declares he did not withhold plaintiff's mail, did not endorse the alleged practice of wrongfully

25  withholding plaintiff's mail, was not aware that plaintiff's mail was withheld, and did not impede

26  plaintiff's access to the courts or right to mail.  (ECF No. 220-5 at 3.)  Thus, the burden shifts to

27  plaintiff to demonstrate otherwise.

28      In opposition, plaintiff boldly claims that defendant Walker "endorsed the practice of

52

1    wrongfully withholding mail at CSP-SAC addressed to inmates that were transferred out to court,

2    or knew or should have known about the practice and failed to correct it." (ECF No. 230 at 28.)

3    But plaintiff then points to Walker's testimony that as warden, Walker was responsible for

4    monitoring the chief deputy warden's performance of his job duties pertaining to the operation of

5    the CSP-SAC mailroom," and that as "head of institution, . . . ultimately, he's in charge of

6    everything that happens under the umbrella of the institution," including the CSP-SAC mailroom.

7    (ECF No. 230 at 31.) Such duties are the type of supervisorial duties that the Supreme Court

8    finds are insufficient to establish liability in a § 1983 action. Iqbal, 556 U.S. at 676. Plaintiff

9    points to no evidence demonstrating defendant Walker was personally involved, directed,

10   endorsed or was even aware that plaintiff's mail was being withheld while he was out to court.

11   See Blantz v. Cal. Dep't of Corr. & Rehab., 727 F.3d 917, 926-27 (9th Cir. 2013) (concluding

12   that "conclusory allegations" that a supervisory defendant "directed" other defendants, without

13   factual assertions to support the allegation, were insufficient to defeat a motion to dismiss).

14        Plaintiff's claim as to defendant Walker fails because plaintiff adduced no competent

15   evidence demonstrating that defendant Walker was personally involved in the processing or

16   withholding of plaintiff's legal mail. Plaintiff failed to raise a genuine dispute of material fact as

17   to whether the warden even knew that plaintiff's legal mail was being withheld. See List, 880

18   F.2d at 1045 (no respondeat superior liability under § 1983; plaintiff must show defendant's

19   personal involvement in the alleged violations). Rather, plaintiff recites all manner of duties

20   defendant Walker performed in his role as warden. (ECF No. 230-1 at 15.) But all of the facts

21   relied on by plaintiff as precluding summary judgment are solely based on vicarious liability due

22   to defendant Walker's position as warden of CSP-SAC. The Supreme Court confirmed that "each

23   Government official, his or her title notwithstanding, is only liable for his or her own

24   misconduct." Iqbal, 556 U.S. at 677. Plaintiff identified no personal misconduct by defendant

25   Walker.

26              2. No Role in Appeals Process

27        Defendant Walker declared that he did not participate in plaintiff's appeal No. 07-02453

28   or in plaintiff's screened out appeal dated August 5, 2008. (ECF No. 220-5 at 3-4.) Defendant

1   Virga testified that defendant Walker did not participate in the second level review of plaintiff's

2   appeal No. 07-02453.  (ECF No. 231 at 71 (Virga Dep. at 267).)  Defendant Virga testified that he

3   would always sign appeals on behalf of defendant Warden Walker.  "It's pro forma.  He's

4   [Walker] the warden.  He's the one that is on all the inmate appeals, and since we had split the

5   duties, and I was doing the appeals, I signed on his behalf."  (ECF No. 231 at 71 (Virga Dep. at

6   267-68.)  Plaintiff failed to adduce evidence rebutting defendants' evidence that defendant

7   Walker was not involved in addressing plaintiff's administrative appeals.

8              3.  Mail Procedures

9         Moreover, although defendant Walker testified that he was responsible for the

10   "establishment of mail procedures," meaning "the routine operation of the mail room processing

11   of inmate mail in and out of the institution" at CSP-SAC in 2007 to 2008 (ECF No. 231 at 82

12   (Walker Dep. at 90-91), the warden later clarified that "there were already written policies and

13   procedures for everything in the institution, so in 2007-2008 we would update the current policy

14   and the procedures.  So the term establishment maybe isn't the right term" (ECF No. 231 at 86

15   (Walker Dep. at 106).).  While defendant Walker was ultimately responsible as warden for the

16   annual review of the established procedure, he testified he was not directly involved.  (ECF No.

17   231 at 84 (Walker Dep. at 105-06.)  Plaintiff points to no written procedures authored or

18   approved by defendant Walker requiring mail room staff to retain an inmate's mail rather than

19   forward the mail as required under Title 15 of the CCR.  Plaintiff points to no memos or other

20   testimony demonstrating that defendant Walker was informed of issues with the mail room in

21   2007 to 2008.  Walker agreed that if an office services supervisor was storing inmate mail in his

22   office and not delivering it to an inmate such situation would warrant Walker's involvement, but

23   plaintiff adduced no evidence demonstrating that defendant Walker was informed that inmate

24   mail was being stored and not delivered.  Plaintiff failed to adduce evidence demonstrating that

25   defendant Walker was aware that anyone in the mail room was withholding mail from plaintiff or

26   other inmates who were out to court, rather than forwarding such mail.  In addition, although

27   Walker testified that defendant Johnson's practice of holding mail for inmates who were out to

28   court violated Title 15 of the CCR, such testimony fails to demonstrate defendant Walker was

1    aware of defendant Johnson's practice.  The undersigned finds that plaintiff fails to demonstrate

2    genuine material disputes of fact exist as to defendant Walker's involvement in creating or

3    implementing the mailroom procedures at issue here, or in defendant Johnson's alleged

4    withholding of "out to court" inmate mail at CSP-SAC.

5         For all of the above reasons, defendant Walker is entitled to summary judgment.

6         B.  Defendant Virga

7              1.  No Personal Involvement

8         While defendant Virga had "overall general responsibility for the operation of that whole

9    area," including the mailroom, his duties, like defendant Walker's, were supervisorial in nature.

10   (ECF No. 230-1 at 13-14.)  When asked whether any issues came up during 2007 to 2008

11   regarding operation of the mail room at CSP-SAC, or regarding how defendant Johnson was

12   operating the mail room, defendant Virga testified, "[n]ot to my memory during this time frame,

13   no." (ECF No. 231 at 58 (Virga Dep. at 102, 104).)  Plaintiff points to no memos or other

14   testimony demonstrating that defendant Virga was informed of issues with the mail room or with

15   defendant Johnson's role in supervising the mail room in 2007 to 2008.  Plaintiff adduced no

16   evidence of defendant Virga's personal involvement in processing or withholding plaintiff's mail

17   or that defendant Virga was even aware that plaintiff's mail was retained while plaintiff was out

18   to court.  (ECF No. 230-1 at 13-14.)  In a civil rights action, plaintiff is required to adduce

19   evidence demonstrating that defendant Virga, by his own actions, violated the Constitution.

20   Iqbal, 556 U.S. at 676.  Plaintiff has not done so.

21              2.  Appeals Process

22        Defendant Virga testified that defendant Donahoo conducted the second level review

23   investigation for appeal No. 07-2453 and also wrote the August 22, 2008 second level reviewer's

24   response.  (ECF No. 231 at 71 (Virga Dep. at 267.)  Virga declared that he did not personally

25   investigate plaintiff's claims.  (Virga Decl. ¶¶ 13, 14 DEF 221.)  Virga denied writing any portion

26   of such second level review.  (Id.; Virga Dep. at 269.)  Virga testified:  "Donahoo did the

27   investigation.  I reviewed the response," and also reviewed the first level review and response.

28   (Virga Dep. at 248, 267, 269-70.)  Defendant Walker confirmed that defendant Donahoo would

55

1  have prepared the second level response, not defendant Virga.  (Walker Dep. at 177.)  Defendant

2  Walker further confirmed that defendant Virga had authority to sign the appeal response on

3  Walker's behalf.  (Walker Dep. at 178.)  Thus, it appears that defendant Virga merely signed off

4  on the review for defendant Walker.  Plaintiff adduced no evidence to the contrary.

5        Plaintiff argues that Virga should have been put on notice of plaintiff's problems with the

6  mail when Virga reviewed the appeal (both first and second levels).  But even assuming

7  defendant Virga's personal involvement by virtue of his reviewing the first and second levels in

8  connection with signing off on the second level review, such involvement comes too late.

9  Review was completed after plaintiff's mail was withheld and plaintiff had returned from out to

10  court on June 19, 2008.  Plaintiff did not request the second level review until July 18, 2008, and

11  his mail was delivered on July 29, 2008.  Thus, by August 28, 2008, the date the second level

12  review was signed, defendant Virga could take no steps to rectify the retention of plaintiff's mail

13  while he was out to court because the mail had already been withheld and returned.

14        For all of the above reasons, defendant Virga is entitled to summary judgment.

15        C.  Defendant Donahoo

16            1.  Johnson's Supervisor?

17        Plaintiff argues that defendant Donahoo conceded that when he was an administrative

18  sergeant at CSP-SAC, his job duties included directly supervising Johnson's operation of the

19  mailroom, citing Donahoo's testimony:  "I usually would go down and see Layton Johnson

20  because he supervised the mailroom," and "sometimes I would be called down there to make sure

21  that he was on task in completing his assignments."  (ECF No. 230 at 29.)  Defendants object that

22  defendant Donahoo's role as appeals investigator and mere presence in the mail room does not

23  demonstrate he withheld or interfered with plaintiff's mail.

24        Importantly, plaintiff disregards Donahoo's testimony that he "never officially supervised

25  the mailroom ever in [his] career."  (ECF No. 231 at 36 (Donahoo Dep. at 69).)  Donahoo "had no

26  reporting structure with [Johnson]."  (ECF No. 231 at 41 (Donahoo Dep. at 158).)  Donahoo

27  denied ever going to the mailroom to make sure defendant Johnson was performing his duty of

28  supervising the processing of inmate mail.  (ECF No. 231 at 43 (Donahoo Dep. at 169).)

Indeed, defendant Johnson testified that he reported to the visiting Lieutenant, and maybe a central services captain.  (Johnson Dep. at 80, 81.)  Although defendant Johnson could not recall names (defendant Johnson testified the positions were a "revolving door,") nonparty Mclendan and Lynch were identified as central service captains.  (Johnson Dep. at 81, 171-73.)  Defendant Walker confirmed that Johnson's direct supervisor, the correctional captain, would have known what were Mr. Johnson's job responsibilities.  (Walker Dep. at 72.)  Walker denied knowing whether defendant Donahoo had job responsibilities as to the operation of the CSP-SAC mail room.  (Walker Dep. at 72.)  When asked whether defendant Donahoo had any responsibilities with regard to the CSP-SAC mail room in 2007 through 2008, defendant Virga responded, "I don't believe he did.  I believe he was doing appeals during that time frame."  (Virga Dep. at 164-65.)  Virga explained that he believed that because he recalled Donahoo responding to inmate appeals.  (Virga Dep. at 165.)

Defendant Donahoo testified he "was all over that institution as being the administrative sergeant . . . tr[ying] to . . . cover the whole institution, do whatever I was directed to do."  (Donahoo Dep. at 73.)  Former defendant Pool confirmed that defendant Donahoo "was in and out, going to all different places."  (Pool Dep. at 181.)  Custody Captain Fred Schroeder would ask Donahoo to go down to the mailroom "in different capacities:"  verifying correctional officers temporarily assigned in there were working; going down to talk to Johnson about a memo or an appeal close to being overdue; "just go see what's going on down there," appeals office says that this appeal's coming up.  Can you go check the status of it," "sometimes [Donahoo] would be called down there to make sure that [Johnson] was on task in completing his assignments," "to ensure that certain staff made it to work," "most of the time it was the staff that were redirected there that couldn't work inside the prison walls because they were being investigated.  So [Donahoo] would verify that certain staff members are there," that accounted for about 50% of Donahoo's time; other times Donahoo went down to talk to Johnson about "appeals," "other assignments," "he might be doing a memo . . . or any other work;" "somebody could be responding to a second level," Donahoo "might be looking for a book that an inmate alleges that he didn't receive," Donahoo worked with Johnson "on his appeal responses and ensuring that he's

1    turned in his work in a timely manner," there were times Donahoo went down "because staff had

2    made allegations [about] this or that[,] and [Donahoo would] go down there and try to be the

3    sound of reason." (Donahoo Dep. at 69, 70, 88, 157, 168-69.) Donahoo conceded he had seen

4    Johnson pick up mail, bring it in, and pour it on the table for sorting, but not every time, and

5    never saw other staff do it; most of the time the mail had already been sorted when Donahoo went

6    down there. (ECF No. 231 at 43 (Donahoo Dep. at 169).)

7            On this record, a reasonable juror would not find that defendant Donahoo supervised

8    defendant Johnson in his role as supervisor of the mailroom. But even assuming Donahoo's

9    myriad duties could be construed as serving such a role, plaintiff adduced no evidence that

10   defendant Donahoo was responsible for processing mail, withheld plaintiff's mail, or was even

11   aware that plaintiff's mail was withheld while plaintiff was out to court. There is no material

12   dispute of fact as to whether defendant Donahoo was involved in withholding plaintiff's mail.

13                         2. Appeals Process

14           It is undisputed that appeal no. SAC-07-02453 was assigned to defendant Donahoo on

15   August 2, 2008, and Donahoo investigated and authored the second level response for defendant

16   Virga to review and sign on behalf of defendant Walker. Donahoo was confident he interviewed

17   Johnson "about the processing of outgoing mail to the inmate population." (ECF No. 231 at 45

18   (Donahoo Dep. at 225).) In essence, Johnson responded, "all the mail that is received goes out

19   that same day." (Id.) "They process all their mail." (ECF No. 231 at 46 (Donahoo Dep. at 226).)

20   At that time OP17 was in place and it provided for mail to be processed within 40 business hours.

21   (Id.)

22                    I went into the mailroom all the time and I made sure that there
                      wasn't pockets of mail sitting around. . . . I looked in drawers,
23                    everywhere, make sure that stuff wasn't being sequestered or hidden
                      or something like that, people weren't doing their job. To be honest,
24                    I wanted to make sure that what people said, there were other people
                      that claimed the same thing -- that there was no truth to it. There was
25                    no mail in the mailroom.

26   (ECF No. 231 at 46 (Donahoo Dep. at 226).) Donahoo testified that they would "occasionally"

27   get appeals on mail being delayed, and Donahoo would "do an inquiry." (ECF No. 231 at 46

28   (Donahoo Dep. at 227).) Throughout his career he would get inmate appeals for mail issues for

                                                    58

various reasons, could not recall how many, "wasn't like [he] did 100 of them."  (Id.)  He recalled

a couple concerning delayed mail, a couple of inmates who were high influential STG members,

gang members, but none with this type of delay; mostly it was a couple of days' delay, and

usually it was general mail, not legal mail.  (ECF No. 231 at 46 (Donahoo Dep. at 227-28).)  In

connection with this appeal, Donahoo interviewed Johnson because Johnson supervised the

issuance of the mail; Donahoo looked at the OP17 and Title 15, and looked in the mailroom to see

if any mail was being held.  (ECF No. 231 at 46 (Donahoo Dep. at 229).)  Donahoo could not

recall whether he interviewed plaintiff, or whether Donahoo reviewed other appeals plaintiff had

filed.  (ECF No. 231 at 47 (Donahoo Dep. at 230-31).)  Donahoo did not confirm with Johnson

that Johnson had actually interviewed plaintiff (no date for such interview was included despite

Johnson writing that he had personally interviewed plaintiff).  (ECF No. 231 at 48 (Donahoo Dep.

at 235-36).)

That said, the record reflects that defendant Donahoo's role in investigating and drafting

the response to plaintiff's appeal no. SAC-07-02453 did not begin until August 2, 2008.  Thus, by

the time defendant Donahoo became involved, plaintiff's legal mail had already been withheld,

and returned to plaintiff on July 29, 2008.  Therefore, there were no steps defendant Donahoo

could take to rectify the problem.  Accordingly, defendant Donahoo is entitled to summary

judgment.

D.  Defendant Gaddi

Defendants argue that plaintiff presented no evidence that defendant Gaddi interfered with

plaintiff's mail, pointing out that plaintiff failed to argue as to Gaddi, thus apparently abandoning

this claim.  (ECF No. 236 at 9.)  Although defendant Gaddi is mentioned in a subheading (ECF

No. 230 at 20), plaintiff included no arguments as to defendant Gaddi.  (Id., passim.)

The undersigned finds it undisputed that defendant Gaddi's sole role was to deliver

plaintiff's withheld mail to plaintiff on July 29, 2008, the same day that defendant Gaddi received

it from the mailroom.  (ECF No. 220-1 at 32.)  It is undisputed that defendant Gaddi did not work

in the mail room at CSP-SAC.  There is no evidence that defendant Gaddi withheld, or caused

plaintiff's mail to be withheld, legal or personal, while plaintiff was out to court.  Because no

1    reasonable jury would find defendant Gaddi liable on these undisputed facts, defendant Gaddi is

2    entitled to summary judgment.

3         E.   Qualified Immunity

4         Because no evidence demonstrates that defendants Walker, Virga, Donahoo and Gaddi

5    were personally involved in the processing or withholding of plaintiff's mail, the court need not

6    reach their request for qualified immunity.

7    IV.   Mail Claims

8         A.   The Parties' Positions

9         In the fourth amended complaint, plaintiff contends that defendants Walker, Virga,

10   Donahoo, and Gaddi interfered with plaintiff's right to receive mail.  Such defendants argue they

11   are entitled to summary judgment because plaintiff fails to adduce evidence that any of them were

12   involved in processing, withholding, or causing plaintiff's mail to be withheld.  Defendants

13   Walker, Virga and Donahoo did not supervise the mail room or have a direct role in the training

14   of mail room personnel.  Because such defendants were not aware plaintiff's mail was withheld,

15   they were unable to provide notice to plaintiff that his mail was withheld.  (ECF No. 220-1 at 35.)

16   Defendant Gaddi's only role was delivering plaintiff's mail to him on the day Gaddi received it

17   from the mail room.

18        Plaintiff contends that genuine disputes of material facts exist as to the involvement of

19   defendants Walker, Virga, and Donahoo in Johnson's practice of wrongfully withholding out to

20   court inmate mail, based on plaintiff's arguments supporting his access to courts claim.  (ECF No.

21   230 at 40.)  In reply, defendants argue that plaintiff offered no evidence that such defendants were

22   involved in the processing or withholding of plaintiff's mail, or even knew plaintiff's mail was

23   withheld or delayed.  "[T]here must be more than some metaphysical doubt as to the material

24   facts."  (ECF No. 236 at 9) (citing Liberty Lobby Inc., 477 U.S. at 261.)  Finally, defendants point

25   out that plaintiff offered no argument or evidence demonstrating that defendant Gaddi interfered

26   with plaintiff's mail.

27        B.   Legal Standards

28        Under the First Amendment, prisoners have a right to send and receive mail.  Witherow v.

60

1  Paff, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam).  However, a prison may adopt regulations or

2  practices for inmate mail which limit a prisoner's First Amendment rights as long as the

3  regulations are "reasonably related to legitimate penological interests." Turner v. Safley, 482

4  U.S. 78, 89, (1987).  "When a prison regulation affects outgoing mail as opposed to incoming

5  mail, there must be a 'closer fit between the regulation and the purpose it serves.'" Witherow, 52

6  F.3d at 265 (quoting Thornburgh v. Abbott, 490 U.S. 401, 412 (1989)).  Courts have also

7  afforded greater protection to legal mail than non-legal mail.  See Thornburgh, 490 U.S. at 413.

8  If prison officials withhold mail, a prisoner has a due process right to receive notice that his

9  incoming mail is being withheld.  See Frost v. Symington, 197 F.3d 348, 353-54 (9th Cir. 1999);

10  see also Prison Legal News v. Cook, 238 F.3d 1145, 1152-53 (9th Cir. 2001) (holding that due

11  process rights apply to withheld mail where prisoners had constitutionally protected right to

12  receive the mail).

13       C.  Discussion

14       As discussed in detail in the access to courts section above, plaintiff adduced no evidence

15  demonstrating that defendants Walker, Virga, Donahoo or Gaddi were involved in processing,

16  withholding, or causing plaintiff's mail to be withheld.  Because there is no evidence

17  demonstrating the personal participation in the alleged constitutional violations, defendants

18  Walker, Virga, Donahoo and Gaddi are also entitled to summary judgment on plaintiff's

19  interference with mail claims.  See Jones v. Williams, 297 F.3d at 934 ("In order for a person

20  acting under color of state law to be liable under section 1983 there must be a showing of

21  personal participation in the alleged rights deprivation. . . .").

22       D.  Qualified Immunity

23       Because no evidence demonstrates that defendants Walker, Virga, Donahoo and Gaddi

24  were personally involved in the processing or withholding of plaintiff's mail, the court need not

25  reach their request for qualified immunity.

26  V.  Law Library Access:  Defendants Bradford and Morrow

27       A.  Undisputed Facts

28       1.  Plaintiff's objections to the August 31, 2007 report and recommendations issued in

61

1   <u>Penton v. Kernan</u>, No. 2:06-cv-0233 WQH (PCL) (S.D. Cal.), were due on or before September

2   21, 2007.  (ECF Nos. 220-3 at 24-62; 220-4 at 134, 136.)  Plaintiff did not receive the report and

3   recommendations until September 9, 2007.  (ECF No. 226-3 at 2 (Pl.'s Decl.).)

4        2.  Plaintiff was given physical access to the law library on September 12, 2007, and

5   November 2, 2007.  (ECF No. 220-5 at 118, 121, 126, 131 (DEF 295, 298, 303, 308).)[21]

6        3.  Plaintiff filed a motion for extension of time, *nunc pro tunc*, to object to the report and

7   recommendations, which was granted extending the deadline to object to November 7, 2007.

8   (ECF No. 220-3 at 11-12.)

9        4.  Plaintiff submitted another motion to extend the deadline, but an unidentified person

10   mailed it to a different court.  (ECF No. 104 at ¶ 35.)

11        5.  Plaintiff did not file objections to the report and recommendations.  (ECF No. 220-3 at

12   11-12.)

13        6.  On November 8, 2007, plaintiff was transferred out to court.

14        7.  Inmates housed in the ad seg stand-alone unit could access the library through paging,

15   PLU requests and GLU requests.  (Pl.'s Dep. at 154-55; Morrow Dep. at 30, 91; Bradford Dep. at

16   96-97; ECF No. 220-5 at 117-18 (Morrow Decl. DEF 294-95).)  Plaintiff testified that paging was

17   not effective for litigation due to delays, and defendant Bradford testified that an ad seg inmate's

18   ability to access the law library through a GLU request was "slim" due to demand.  (Pl.'s Dep. at

19   154-55; Bradford Dep. at 87-89.)

20        8.  Defendant Bradford was a Library Technical Assistant at CSP-SAC during 2007 and

21   2008.

22   _____

23   [21]  Plaintiff disputes this fact.  (ECF No. 230-2 at 29.)  Plaintiff testified that he attended the law
     library on September 12, 2007, and could not recall if he was called in November 2007 (Pl.'s

24   Dep. at 151-52, 154), but did not rebut defendants' evidence that he attended the law library on
     November 2, 2007.  Plaintiff testified that although nonparty Sgt. Cross took plaintiff for law

25   library access on September 26, 2007, no one was there, so plaintiff had no access to law library
     materials because the law library was closed.  (Pl.'s Dep. at 153.)  Defendants argue that plaintiff

26   was also provided physical access on August 22, 2007, August 31, 2007, and September 5, 2007,
     but plaintiff did not receive the report and recommendations until September 9, 2007, so law

27   library attendance prior to such receipt would not assist plaintiff in preparing objections or a
     certificate of appealability.

28

9.  As a Library Technical Assistant, defendant Bradford's duties included:  opening the law library in the morning and begin programs; create ducat lists for all inmates with priority status; call for inmates on the ducat list for program; let inmates in to use the library, prepare case law requests, priority legal user and general legal user eligibility approval forms; sort the institutional library mail, copy requests, supply requests, and authorize paging requests.

10.  On September 12, 2007, plaintiff signed, and on September 14, 2007, defendant Bradford approved, a preferred legal user ("PLU") request to access the law library for plaintiff to object "to report and recommendation."  (ECF No. 220-5 at 136 (DEF 313).)  Despite such approval, plaintiff was not called or escorted to the law library on September 19, 2017.

11.  On October 31, 2007, defendant Bradford also approved a subsequent PLU request by plaintiff for a state court action.  (ECF No. 220-5 at 138 (DEF 315).)

12.  Both PLU request forms include a section entitled "Note" informing plaintiff that "[i]f you are unable to meet your deadline for ANY reason, your ONLY recourse is to apply to the court for an extension of time.  (DEF 313, 315.)

13.  An in Cell Legal Request Form, dated "8-22-07," a form in which inmates can request for legal materials, reflects plaintiff was sent case materials on August 31, 2007.  (ECF No. 220-5 at 140 (DEF 317).)

14.  On August 11, 2008, plaintiff completed a PLU request.  (ECF No. 231 at 407.) Plaintiff's purpose was "Rule 60(b) motion to reinstate habeas petition," and cited "Federal Rules of Appellate Procedure[] Rules 2-6," and "Rule 60(b) Motion to Reinstate."  (Id.)  Plaintiff explained that he had been out to court since November 2007, did not return until June 19, 2008, did not receive legal properly until August 1, 2008, and was appending a copy of the legal mail log to establish he was not provided his legal mail until July 29, 2008.  (Id.)

15.  The August 11, 2008 PLU request was denied by defendant Bradford on August 13, 2008, marking the box "Document submitted does not establish a deadline for filing and inmate has not provided other proof of existing deadline."  (Id.)

16.  The "note" section of the PLU request form states:

Priority access (PLU) is granted only to inmates who are acting in

63

propria person, without benefit of counsel, subject to verification by COURT DOCUMENTATION supplied by the inmate. This means that you must submit a court order that directs you to file a specific document by a specific date that is no longer than 30 days from now. . . . If the court does not specify a date, YOU must find the applicable court rule and cite it in the space above. Only the last 30 days or less, before a deadline, will qualify, even though 60 or 90 days may be granted by the court or rule.

(ECF No. 231 at 407.)  This form also states above the inmate's signature that "I have read and understood the above procedures."  (Id.)  Plaintiff added:  "legal mail log dated 7/29/08 along with 3 separate documents including judgment from U.S. Dist. Court attached."  (Id.)

17.  A copy request sent to the CSP-SAC A Facility Law Library, stamped received "Aug 27 2008," requesting a writ of mandate be copied was approved by Bradford on "8/29/08."

18.  Defendant Morrow was a Correctional Officer at CSP-SAC from 1986 to 2020.

19.  Defendant Morrow's responsibilities included, but were not limited to, supervising the conduct of inmates and ensuring the safety and security of the institution, staff and inmates. Defendant Morrow testified that he would also feed, count, and escort inmates to the yard.  (ECF No. 231 at 394 (Morrow Dep. at 21).)

20.  In 2007, on days defendant Morrow was working, he was primarily assigned to the facility A administrative segregation unit law library.  In this law library, defendant Morrow's duties included escorting inmates from their cell block to the administrative segregation unit law library and securing inmates in holding cells in the law library.

21.  Once an inmate was escorted to the library and secured in a holding cell, inmates would give Morrow a paper with their request, which Morrow would give to a clerk, who would then retrieve legal materials.  Defendant Morrow was not responsible for retrieving legal materials, but would simply pass forms from an inmate to a clerk, who would retrieve requested legal materials, and then pass the legal materials back to the inmate, once retrieved by the clerk.

B.  The Parties' Positions

*Defendants' Motion*

Defendants contend that because plaintiff's claim against defendants Morrow and Bradford arose after the pleading stage of his habeas action, and the matter was fully-briefed,

1   plaintiff was not prevented from presenting a habeas petition and there is no basis for an access to

2   the courts claim.  In addition, defendants argue that plaintiff was not harmed because the district

3   judge issued a ruling on the merits of the petition.  (ECF No. 220-1 at 32-33.)  Further, defendants

4   argue there is no evidence that they actively interfered with plaintiff's access to the courts by

5   improperly denying him such access.  Rather, the evidence shows that plaintiff was provided law

6   library access on several occasions.  Plaintiff successfully moved to extend his deadline to file

7   objections, plaintiff had over two months to file such objections, and thus cannot plausibly

8   attribute his failure to timely file objections to any conduct by defendants Morrow or Bradford.

9   (ECF No. 220-1 at 33.)  Defendants contend that even if defendant Bradford did not call plaintiff

10  after approving his request, such failure would be mere negligence.  Defendant Morrow could not

11  authorize PLU requests.  In addition, plaintiff chose to seek another extension to file objections

12  until December of 2007, and the mailing of such request to the wrong address breaks the causal

13  connection between any alleged misconduct by defendants Morrow and Bradford in 2007.  (Id.)

14  Finally, defendants argue that plaintiff was aware that his objections were due by the requested

15  extension date, yet failed to file them; defendants Morrow and Bradford cannot be held

16  responsible for such failure.  (ECF No. 220-1 at 33.)

17       *Plaintiff's Opposition*

18       Plaintiff contends that defendants Morrow and Bradford violated plaintiff's right of access

19  to the courts by actively interfering and preventing plaintiff from accessing the law library to file

20  objections in his habeas case in 2007 before he was sent out to court.  Plaintiff contends that the

21  Ninth Circuit's ruling that the "'actual injury' analysis . . . is not an assessment of the merits of

22  the underlying claim that is now lost," demonstrates that defendants' argument concerning the

23  merits of the habeas action is unavailing.  (ECF No. 230 at 33.)  Further, plaintiff contends that

24  the library appeal (log no. SAC-07-02453) and evidence revealed through discovery establish

25  material disputes of fact as to whether defendants Bradford and Morrow prevented plaintiff from

26  accessing the law library to obtain legal materials necessary to file objections.  (ECF No. 230 at

27  34.)  Plaintiff's arguments specific to such defendants are set forth below.

28  ////

1

*Plaintiff's Arguments re Defendant Bradford*

2          On September 9, 2007, plaintiff received the report and recommendations, and submitted

3   his PLU request on September 12, 2007.  Defendant Bradford, library technical assistant at CSP-

4   SAC, was responsible for addressing PLU requests, creating daily ducat lists for prisoners with

5   PLU status, for calling prisoners on the PLU ducat list to access the law library, and for letting

6   inmates in to use the library and preparing case law and PLU requests.  (ECF No. 230 at 34.)  On

7   September 14, 2007, defendant Bradford granted plaintiff's PLU request.  Because plaintiff was

8   housed in ad seg, Wednesdays were the only days plaintiff could use the law library.  Therefore,

9   plaintiff expected to use the law library on Wednesday, September 19, 2007, but defendant

10  Bradford did not call plaintiff.  Defendant Morrow's November 6, 2007 informal level of review

11  of appeal log no. SAC-07-02453 confirms plaintiff was not called on September 19, 2007.

12  Defendant Bradford testified that plaintiff should have gotten access to the law library prior to the

13  September 21, 2007 deadline.  (ECF No. 230 at 35.)

14         Subsequently, defendant Bradford did not call plaintiff for law library access on

15  Wednesday, September 26, 2007.  Plaintiff spoke with Sgt. Cross who escorted plaintiff to the

16  law library, but the law library was closed.  On September 27, 2007, plaintiff filed a request for

17  extension of time to file objections due to his inability to attend the library.  On October 22, 2007,

18  the habeas court granted plaintiff an extension of time until November 7, 2007.  However, due to

19  delays with plaintiff's mail, plaintiff did not receive the court's order until November 6, 2007.

20  Plaintiff immediately submitted another request for extension, which did not make it to the habeas

21  court, and plaintiff was transferred out to court on November 8, 2007, without his legal materials

22  or the ability to notify family or friends as to his whereabouts.  Plaintiff argues he was unable to

23  file his objections because defendant Bradford never called plaintiff to the law library after she

24  granted plaintiff PLU status on September 14, 2007.[22]

25  ////

26

27  _____

[22]  Because plaintiff failed to exhaust his access to court claim against defendant Bradford after
plaintiff returned from out to court in 2008, the court does not set forth plaintiff's arguments
28  concerning his 2008 access to the courts claim against Bradford.

1

*Plaintiff's Arguments re Defendant Morrow*

2          In 2007, defendant Morrow was a correctional officer primarily assigned to the law

3   library, whose duties included escorting prisoners from their cell blocks at CSP-SAC to the law

4   library and securing such prisoners in the holding cages at the library.  Because plaintiff was

5   housed in the stand-alone ad seg unit, plaintiff could only access the law library where defendant

6   Morrow worked.

7          Defendant Morrow would take requests for law library materials from the inmate housed

8   in the holding cage and hand it to another inmate who worked as a clerk in the law library who

9   would go retrieve the requested material from the law library.  Defendant Morrow testified that if

10  no inmate clerk was working at the law library, "there's no law library."  (ECF No. 230 at 66.)

11  Inmate clerks would not show up for law library work if "there was a lock down or incident in

12  their cell block or they were sick, something like that."  (Id.)

13         Defendant Morrow was responsible for calling ad seg inmates to the law library.

14  Defendant Morrow did not call plaintiff into the law library from September 14, 2007, through

15  November 8, 2007, when plaintiff was transferred out to court.  Defendant Bradford testified that

16  in 2007-2008:  (a) she and defendant Morrow would talk about which prisoners had PLU status

17  and were going to access the library on particular days; (b) the law libraries at CSP-SAC were

18  short-staffed, with too many prisoners needing law library access and too few staff, and it would

19  have been easier to accommodate prisoner's requests for access to materials if there were more

20  library staff; (c) there were no computers in the law library where she and defendant Morrow

21  were assigned; (d) there was no one to fill in for her when she was unavailable to work, so the law

22  library would "shut down," and (e) libraries would shut down approximately "[t]wice a week."

23  (ECF No. 230 at 37.)

24                 *Reply by Morrow & Bradford*

25         Defendants contend that plaintiff failed to adduce any evidence that either defendant

26  Morrow or Bradford actively interfered with plaintiff's access to the court.  Plaintiff was in the

27  law library six times between August 22 and November 2, 2007.  It is undisputed that defendant

28  Morrow did not determine PLU access, and plaintiff offered no evidence that defendant Morrow

67

1   did anything to prevent plaintiff from accessing the law library.  (ECF No. 236 at 10.)

2          Defendants point out that plaintiff's claim against defendant Bradford rests on his

3   allegation that he did not receive PLU access on September 21, 2007, but his initial deadline was

4   September 28, 2007, and his extended deadline for filing objections was November 7, 2007.

5   Plaintiff was given law library access prior to the November 2, 2007 deadline, including

6   November 2, 2007, five days before the objections were due.  (ECF No. 236 at 10.)

7          C.  Legal Standards

8          As discussed above, plaintiff must adduce evidence demonstrating:  (1) the loss of a

9   "nonfrivolous" or "arguable" underlying claim; (2) the official acts frustrating the litigation; and

10  (3) a remedy that may be awarded as recompense but that is not otherwise available in a future

11  suit.  See Christopher, 536 U.S. at 413-14; see also Phillips, 477 F.3d at 1076 (citing Christopher,

12  536 U.S. at 413-14).

13         Where, as here, interference is alleged, the right of access to courts does not stop at the

14  pleading stage of a civil rights or habeas litigation, because prisoners have the right to litigate

15  such claims "without active *interference*."  Silva, 658 F.3d at 1102.  In other words, once the

16  litigation of a habeas or civil rights claim advances beyond the pleading stage, prisoners also have

17  the right to serve and file necessary documents, send and receive communications to and from

18  judges and lawyers, or to assert and sustain defenses related to such matters without barriers by

19  state actors.  See id. at 1103 (citations omitted).  In Silva, the plaintiff was repeatedly transferred

20  between different prison facilities and prison officials withheld necessary legal documents to

21  hinder the litigation of his pending civil lawsuits.  See id., 658 F.3d at 1104.  The Ninth Circuit

22  concluded that such facts sufficiently alleged an actual injury under Lewis -- as a result of prison

23  officials' actions, several of Silva's lawsuits were dismissed.  See Silva, 658 F.3d at 1104.  The

24  court found that dismissal of a pending claim because of prison officials' actions, standing alone,

25  was sufficient to demonstrate that the plaintiff had been denied access to the courts.  Id.

26         D.  Discussion

27             1.  Loss of Underlying Claim

28         Here, as the Ninth Circuit already found, plaintiff sustained his actual injury once he was

68

1    unable to file timely objections, and his case was dismissed.  The challenge to his criminal

2    conviction was not frivolous, and no further inquiry into the nature of plaintiff's underlying court

3    case is appropriate.  Phillips, 477 at 1076.

4                          2. No Other Remedy

5           Plaintiff had no other remedy than the relief available in this denial of access suit.  Unlike

6    the prisoner in Christopher, plaintiff has no independent tort cause of action against defendants

7    Bradford and Morrow for the violation of his right to access the court.  Moreover, even if state

8    law permitted plaintiff to file a successive post-conviction relief suit, such a suit could not

9    provide the relief plaintiff seeks here, namely compensation for the expense and additional efforts

10   he had to undertake to continue prosecuting his habeas action.

11                          3. Acts Frustrating Plaintiff's Ability to File Objections

12   *September 19, 2007*

13          As an inmate housed in the stand-alone ad seg unit, plaintiff could not attend the library

14   unless he was under escort by custody staff, and then only on Wednesdays.  Defendant Bradford

15   granted plaintiff's PLU status on September 14, 2007.  But plaintiff did not attend the law library

16   on Wednesday, September 19, 2007.  No copy of the ducat list for the attendance of inmates to be

17   escorted to the library on September 19, 2007 was cited or produced, if one exists.  There is no

18   evidence demonstrating plaintiff was on the list of inmates to be escorted to the library on

19   September 19, 2007, although it is reasonable to infer he should have been on the ducat list

20   because he had been granted PLU status.  No competent evidence explains why plaintiff was not

21   able to attend the library that day.[23]  Plaintiff failed to demonstrate either or both Bradford or

22   Morrow were responsible for plaintiff's inability to attend law library on September 19, 2007.

23   _____

24   [23]  The court may not consider plaintiff's deposition testimony that a fellow prisoner "Rodriguez,"
       who was housed next door to plaintiff, informed plaintiff that on September 14, 2007, Rodriguez
25     overheard defendant Morrow tell defendant Bradford, "[w]e do not want Inmate Penton in the law
       library."  (ECF No. 231 at 108 (Pl.'s Dep. at 160.)  Plaintiff has not provided a declaration by
26     inmate Rodriguez, and plaintiff's recollection of what Rodriguez allegedly heard is inadmissible
       hearsay.  A district court may only consider admissible evidence in ruling on a motion for
27     summary judgment.  See Fed. R. Civ. P. 56(e); Orr v. Bank of America, 285 F.3d 764, 773 (9th
       Cir. 2002).
28

1      Rather, it is unclear who was responsible for plaintiff's inability to attend. Defendant

2  Bradford testified that she could not recall whether she called plaintiff to the library that day, and

3  also testified that it was possible for inmates not to come to the library even when they are called

4  by the librarian. (Bradford Dep. at 140; 153-54; 181.) Defendant Bradford testified that an

5  inmate may refuse to come, or the correctional officer may decline to bring the inmate to the

6  library. (Bradford Dep. at 140; 153-54.) But defendant Bradford was not present at plaintiff's

7  housing; therefore, such testimony is unhelpful.

8      Defendant Morrow testified that custody had nothing to do with PLU status, or making the

9  list of PLU inmates who would go to the law library each day. (Morrow Dep. at 41, 154-55.)

10  Rather, the librarians determined PLU status, and defendant Morrow "did the timbers

11  coordination as far as what block was [going to the library]." (Morrow Dep. at 165.) Defendant

12  Morrow could only escort an inmate to the library if such inmate had been granted PLU status by

13  the librarian. Plaintiff adduced no evidence demonstrating that defendant Morrow failed to call

14  plaintiff from his cell in response to defendant Bradford including plaintiff on the PLU list for

15  law library access on September 19, 2007.

16      Defendant Bradford testified that in 2007 to 2008, she and defendant Morrow would talk

17  about which prisoners had PLU status and were going to access the library on particular days.

18  (Bradford Dep. at 201-02.) Specifically, when asked what work-related issues she would talk to

19  Morrow about, defendant Bradford responded:

20          Just some general things, PLU, got PLU coming up, how many you
            going to have, how many you expecting. Okay. Well let me get the
21          clerk to get the stuff out for -- yeah, we get the clerk to get stuff out,
            set up in the cage for him already, so when they got there, you know
22          -- and we knew individually from those times which one were
            coming in, we knew what it was that they would be needing to start
23          them off. So we would have them already prepared in the cages for
            them, so it would be less problem or less back and forth for them in
24          the beginning to get started. If you have what they need available,
            then they get started right away, you won't have to worry about it.
25

26  (Bradford Dep. at 201-02.) Bradford denied having any conversations with Morrow about

27  plaintiff. (Id. at 108.) Defendant Morrow denied talking to Bradford about any of the inmates.

28  (Morrow Dep. at 167.) Plaintiff provided no declaration stating he witnessed any conversation

between Morrow and Bradford.  Other than defendant Bradford's generalized testimony, there is no competent evidence that defendants Morrow and Bradford discussed plaintiff, his PLU status, or his ability to attend the law library on September 14, 2007 or September 19, 2007.

Defendants argue that a one-time failure to provide law library access only constitutes, at most, negligence.  Plaintiff maintains that the failure was intentional to keep plaintiff out of the library.  However, plaintiff adduced no competent evidence that either Bradford or Morrow intentionally prevented plaintiff from attending law library on September 19, 2007.  Indeed, as discussed above, it is unclear why plaintiff did not attend.  Because it is undisputed that defendant Bradford put together the daily list for those inmates granted PLU status, a reasonable inference could be made that defendant Bradford failed to call plaintiff to the library on September 19, 2007.  But there is no evidence that such failure was intentional as opposed to simply negligent.  There is no competent evidence that Bradford and Morrow worked together to prevent plaintiff from attending the library on September 19, 2007.  There is no evidence that either defendant Bradford or defendant Morrow erected a barrier that was intended to impede plaintiff's ability to litigate.

Further, even if defendant Bradford failed to call plaintiff to the library on September 19, 2007, plaintiff failed to establish that defendant Bradford's failure to act was the proximate cause of actual prejudice to plaintiff.  Plaintiff's inability to attend the library on one occasion, absent any evidence showing an intentional act to hinder plaintiff, is insufficient to demonstrate "active interference" with plaintiff's right to litigate.  See Silva, 658 F.3d at 1104 (finding cognizable a claim that defendants actively interfered with prisoner's right to litigate by repeatedly transferring him to different institutions and that defendants seized and withheld the prisoner's legal materials in order to hinder plaintiff's ability to access the courts).

Finally, the undersigned cannot find that plaintiff's inability to attend the library on September 19, 2007, unduly frustrated his efforts to file objections because plaintiff was able to obtain an extension of time until November 7, 2007, and was given library access on November 2, 2007.

////

71

1      *September 26, 2007 to Transfer Out to Court*

2              The failure of defendants Bradford and Morrow to call plaintiff to the library on

3      September 26, 2007, cannot be viewed as active interference on their parts because plaintiff

4      concedes the "law library was closed that day." (Pl.'s Dep. at 153.) Nonparty Sgt. Cross escorted

5      plaintiff to the library that day but there was no one there to assist. (Pl.'s Dep. at 152-53.)

6      Plaintiff adduced no evidence demonstrating that either Bradford or Morrow were responsible for

7      no clerk being present or the library being closed that day, or were in charge of staffing the library

8      or ensuring that a replacement librarian was available to cover Bradford's absence.

9              Plaintiff contends he was not again called to the law library before he was transferred out

10     to court on November 8, 2007, which again prevented him from filing objections. However, it

11     does not appear that plaintiff requested PLU status after the September 28, 2007 deadline ran and

12     before he was transferred out to court on November 8, 2007. Defendant Bradford testified that

13     when she granted plaintiff's September 14, 2007 PLU request, she set the deadline as September

14     28, 2007, because it was the later of the two deadlines provided in the Report &

15     Recommendations. (Bradford Dep. at 165-66.) Inmates can only be given PLU status "once at a

16     time." (Bradford Dep. at 165.) After that deadline expires, the inmate must again apply for PLU

17     status. Unless plaintiff was granted PLU status after he was unable to access the law library on

18     September 26, 2007, defendants Bradford and Morrow were under no obligation to call or escort

19     plaintiff to the library thereafter.

20             On September 27, 2007, plaintiff opted to seek an extension of time from the habeas

21     court, which granted a revised deadline of November 7, 2007, to file objections. But plaintiff did

22     not receive such order until November 6, 2007. Because his mail was delayed, plaintiff was

23     deprived of his ability to file a new request for PLU status based on the new deadline. However,

24     the mail delay cannot be attributed to either defendant Bradford or Morrow, who had no

25     involvement in the processing or delivery of plaintiff's mail.

26             Plaintiff then immediately sought another extension of time to file objections, but his

27     request was not received by the habeas court, but not because of acts or omissions by defendants

28     Bradford or Morrow. Plaintiff was then transferred out to court on November 8, 2007, without

1  his legal materials.

2      Thus, the undersigned cannot find that defendants Bradford or Morrow were responsible

3  for plaintiff's inability to attend the law library after September 28, 2007, and before he was

4  transferred out to court on November 8, 2007.

5          E.  Qualified Immunity

6              1.  Legal Standards

7      In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to

8  determine whether qualified immunity exists.  First, the court asks:  "Taken in the light most

9  favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated

10  a constitutional right?"  Id. at 201.  If "a violation could be made out on a favorable view of the

11  parties' submissions, the next, sequential step is to ask whether the right was clearly established."

12  Id.  To be "clearly established," "[t]he contours of the right must be sufficiently clear that a

13  reasonable official would understand that what he is doing violates that right."  Id. at 202 (internal

14  quotation marks and citation omitted).  Accordingly, for the purposes of the second prong, the

15  dispositive inquiry "is whether it would be clear to a reasonable officer that his conduct was

16  unlawful in the situation he confronted."  Id.  Courts have the discretion to decide which prong to

17  address first, in light of the particular circumstances of each case.  See Pearson v. Callahan, 555

18  U.S. 223, 236 (2009).

19              2.  Morrow and Bradford:  2007 Access to the Courts Claims

20          The Parties' Positions

21      Defendants contend they are entitled to qualified immunity.  (ECF No. 220-1 at 39) (citing

22  J'Weial v. Gyles, 2019 WL 5862208 at *4-5 (E.D. Cal. Nov. 18, 2019), adopted, 2019 WL

23  6894273 (E.D. Cal. Dec. 18, 2018).)  In Gyles, a civil rights prisoner alleged that he could not

24  adequately prepare his defense because he was denied PLU status.  Id.  Gyles was entitled to

25  qualified immunity because the Supreme Court, in the context of a habeas petition, found that

26  "federal appellate courts have split on whether Faretta[24] implies a right of the pro se defendant to

27  
_____

28  [24]  Faretta v. California, 422 U.S. 806 (1975) (establishing a Sixth Amendment right to self-representation).

73

1 have access to a law library." Gyles, 2019 WL 5862208 at *4 (citing Kane v. Garcia Espitia, 546

2 U.S. 9, 10 (2005).)  Thus, defendants argue it was not clearly established that pro se defendants

3 had a right to access the law library in 2007.

4     *Plaintiff's Opposition*

5    Plaintiff argues that defendants "confuse a lack of a clearly established right of access to a

6 law library with the clearly established right of access to the courts that can be violated by

7 inadequate library access." (ECF No. 230 at 44) (citing Lewis, 518 U.S. at 346).  The court in

8 Gyles observed that in Lewis, the Supreme Court recognized that prisoners in Lewis could have

9 raised an access to court claim based on an insufficient prison library if the insufficiency "actually

10 hindered their effort to pursue legal claims." Gyles, 2019 WL 5862208, at *4.  Finally, plaintiff

11 contends that Gyles is not relevant because the prisoner raised a claim for violation of the Sixth

12 Amendment right to prepare an adequate defense," Gyles, at *3, not that prison staff actively

13 interfered with the prisoner's ability to litigate his habeas case in violation of the First and

14 Fourteenth Amendments.  (ECF No. 230 at 44-45.)

15     *Reply*

16    Defendants counter that plaintiff cites no controlling authority that would put reasonable

17 prison officials on notice that, in the specific context of defendants' conduct, it would have been

18 beyond debate that their actions would violate plaintiff's constitutional rights, instead relying on

19 general access to the court cases.  (ECF No. 236 at 10.)

20    *Discussion*

21    Plaintiff defines the clearly established law too broadly, as argued by defendants.  "The

22 dispositive question is whether the violative nature of *particular* conduct is clearly established.

23 This inquiry must be undertaken in light of the specific context of the case, not as a broad general

24 proposition." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (internal quotations and citations omitted).

25    Prisoners have a constitutional right of access to the courts.  See Lewis, 518 U.S. at 350;

26 Bounds, 430 U.S. at 821.  But Bounds and Lewis do not address the right to litigate without

27 active interference.  Bounds established a prisoner's right to affirmative assistance, holding that

28 "the fundamental constitutional right of access to the courts requires prison authorities to assist

1    inmates in the preparation and filing of meaningful legal papers by providing prisoners with

2    adequate law libraries or adequate assistance from persons trained in the law." Bounds, 430 U.S.

3    at 828.  In Lewis, the Supreme Court limited prisoners' rights to affirmative assistance to the

4    pleading stage.  Silva, 658 F.3d at 1103.  But no party cited, and this court has not found, a

5    Supreme Court case that addresses the boundaries of active interference with a prisoner's right to

6    litigate.

7            The Court looks next to existing Ninth Circuit law.  "The Ninth Circuit first recognized a

8    First Amendment right to access courts without interference in Silva."  Norton v. Hallock, 2018

9    WL 5629345, at *5 (N.D. Cal. Oct. 29, 2018) (citing Silva, 658 F.3d at 1103) ("we hold that

10   prisoners have a right under the First and Fourteenth Amendments to litigate claims challenging

11   their sentences or the conditions of their confinement to conclusion without *active interference* by

12   prison officials").  Silva was decided in 2011, years after the events at issue here, and therefore

13   does not provide clearly established authority for plaintiff.  But more importantly, plaintiff's

14   reliance on Silva (or cases cited therein) is unavailing because none of them address the conduct

15   at issue here:  whether it was clearly established that prison staff actively interfere with a

16   prisoner's access to the courts by failing to call the prisoner to the law library on 1 or 2 days.[25]

17           "District courts within the Ninth Circuit have also interpreted 'active interference' to

18   require something more than negligence but those courts have also not clearly defined the

19   boundaries of 'active interference.'"  Norton, 2018 WL 5629345, at *6 (collecting cases).  "Other

20   circuits also have not defined or otherwise determined the boundaries of 'active interference,' and

---

21   [25] In Silva, the defendants were alleged to have acted with malicious intent by transferring Silva
22   between different facilities and seizing and withholding Silva's legal files for the purpose of
     interfering with Silva's ability to litigate pending civil lawsuits.  Silva, 658 F.3d at 1102-03
23   (finding that such alleged facts stated a First Amendment claim sufficient to survive motion to
     dismiss).  While the Ninth Circuit recognized "that prisoners' First and Fourteenth Amendment
24   rights to access the courts without undue interference extend beyond the pleading stages," the
     cited cases do not involve prison staff's failure to call or escort a prisoner to the law library.
25   Silva, 658 F.3d at 1103.  Rather, the cases cited in Silva alleged affirmative conduct interfering
     with the prisoner's ability to litigate his appeal.  Vigliotto v. Terry, 873 F.2d 1201, 1202 (9th Cir.
26   1989)("a defendant is deprived of due process if prison authorities confiscate the transcript of his
     state court conviction before appeal"); DeWitt v. Pail, 366 F.2d 682, 685 (9th Cir. 1966) (prisoner
27   alleged that defendant Pail had confiscated DeWitt's copy of a transcript on appeal and other
     legal papers, preventing him from pursuing his direct appeal).
28

those that have discussed it are similar to <u>Silva</u> in recognizing that 'active interference' requires malicious or deliberate intent." <u>Norton</u>, 2018 WL 5629345, at *6 (collecting cases). None of the cases cited by the district court in <u>Norton</u> addressed the failure of prison staff to call or escort the prisoner to the law library. None of these cases place beyond debate the constitutional question of whether a prison staff's failure to call a prisoner to the law library, without more, actively interferes with a prisoner's right to litigate such that it denies the right to access the courts.

Even if plaintiff adduced evidence that both defendants Bradford and Morrow intentionally prevented plaintiff from accessing the law library on September 19, 2007, it was not clearly established, either in 2007 or even now, that a prison official's intentional failure to call or escort a prisoner to the law library on one occasion, without more, actively interferes with a prisoner's right to litigate such that it denies the right to access the courts. <u>See</u> <u>Brown v. Oregon Dep't of Corr.</u>, 751 F.3d 983, 990 (9th Cir. 2014) (finding defendants are not liable for violation of right that was not clearly established at time violation occurred). Accordingly, defendants Bradford and Morrow are entitled to qualified immunity on plaintiff's 2007 access to the court claims.

Finally, even assuming, arguendo, that plaintiff challenged the actions of defendants Bradford and Morrow based solely on a denial of access to the library claim, defendants would also be entitled to summary judgment. "[T]he constitutional right of access requires a state to provide a law library or legal assistance only during the pleading stage of a habeas or civil rights action." <u>Cornett v. Donovan</u>, 51 F.3d 894, 898 (9th Cir. 1995). In <u>Silva</u>, the Ninth Circuit confirmed that in <u>Cornett</u>, the court "only refers to claims involving library access and legal assistance." <u>Silva</u>, 658 F.3d at 1103. "In the leading case on the right of access, the Supreme Court continued to state that its 'main concern' was 'protecting the ability of an inmate to prepare a petition or complaint.'" <u>Cornett</u>, 51 F.3d at 898, quoting <u>Bounds</u>, 430 U.S. at 828 n.17 (internal quotation and citation omitted). In 2007, plaintiff was only constitutionally guaranteed access to the library at the pleading stage of his habeas case. Thus, it was not clearly established that in 2007 plaintiff was entitled to library access to prepare objections or a certificate of appealability to file in his pending habeas action.

Accordingly, defendants Bradford and Morrow are also entitled to qualified immunity.

76

1    VI.  Plaintiff's Retaliation Claims

2        Plaintiff raises retaliation claims as to defendants Salas and Lynch; thus, the undersigned

3    first sets forth the governing standards, and will then address each defendant in turn.

4        A.  Legal Standards Governing Retaliation Claims

5        It is well established that "[p]risoners have a First Amendment right to file grievances

6    against prison officials and to be free from retaliation for doing so."  Watison v. Carter, 668 F.3d

7    1108, 1114 (9th Cir. 2012).  "Within the prison context, a viable claim of retaliation entails five

8    basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2)

9    because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

10   exercise of his First Amendment or other rights, and (5) the action did not reasonably advance a

11   legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005)

12   (footnote and citations omitted).  To prove the second element, retaliatory motive, plaintiff must

13   show that his protected activities were a "substantial" or "motivating" factor behind the

14   defendant's challenged conduct.  Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting

15   Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)).  Plaintiff must provide

16   direct or circumstantial evidence of a defendant's alleged retaliatory motive; mere speculation is

17   not sufficient.  See McCollum, 647 F.3d at 882-83; accord Wood v. Yordy, 753 F.3d 899, 905

18   (9th Cir. 2014).  In addition to demonstrating defendant's knowledge of plaintiff's protected

19   conduct, circumstantial evidence of motive may include:  (1) proximity in time between the

20   protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the

21   protected conduct; and (3) other evidence showing that defendant's reasons for the challenged

22   action were false or pretextual.  McCollum, 647 F.3d at 882 (quoting Allen v. Iranon, 283 F.3d

23   1070, 1077 (9th Cir. 2002)); Hines v. Gomez, 108 F.3d 265, 267-68 (9th Cir. 1997) (inferring

24   retaliatory motive from circumstantial evidence).

25       The mere threat of harm can be a sufficiently adverse action to support a retaliation claim.

26   Shepard v. Quillen, 840 F.3d 686, 688-89 (9th Cir. 2016); Brodheim, 584 F.3d at 1270.  A

27   retaliation claim can also be made by a prisoner for adverse actions against him for making

28   written or verbal threats to sue, because such threats "fall within the purview of the

77

1   constitutionally protected right to file grievances." Entler v. Gregoire, 872 F.3d 1031, 1039 (9th

2   Cir. 2017) (district court erred in finding that prisoner did not state a First Amendment retaliation

3   claim for prison's disciplinary actions against him for making threats of legal action if his

4   grievances were not addressed).

5           Retaliation claims brought by prisoners must be evaluated in light of concerns over

6   "excessive judicial involvement in day-to-day prison management, which 'often squander[s]

7   judicial resources with little offsetting benefit to anyone.'" Pratt v. Rowland, 65 F.3d 802, 807

8   (9th Cir. 1995) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  In particular, courts

9   should "'afford appropriate deference and flexibility' to prison officials in the evaluation of

10  proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt, 65 F.3d at

11  807 (quoting Sandin, 515 U.S. at 482).

12          B.  Defendant Salas

13          *Undisputed Facts*

14          1.  Officer Salas was a Correctional Officer at CSP-SAC from about 1993 to November

15  2011.  During part of this time, including during 2008, Salas was assigned as the administrative

16  segregation property officer.

17          2.  Officer Salas did not work in the mail room or appeals office during his employment at

18  CSP-SAC in 2007 to 2008.  (ECF No. 220-4 at 164 (Salas Decl. ¶¶ 1-3) (DEF 159-60).)[26]

19          3.  Officer Salas was not aware the plaintiff had filed a grievance related to his mail or

20  legal mail or legal problems.  Salas did not participate in and was not aware of plaintiff's mail

21  related or legal related grievances.  (Salas Decl. ¶¶ 2 & 5, DEF 159-60.)[27]

---

22  [26]  Plaintiff disputes this fact based on Salas' deposition testimony that at some point in his career,
23  it was "possible" he worked in a mail room, and earlier in his career he had to deliver mail to
    inmates in their cells.  (ECF No. 230 at 45, citing Salas' Dep. at 23-24, 44-45.)  But defendant
24  Salas testified that he stopped doing that "in the 90s, '95 or something," and did not recall ever
    distributing mail after 2008.  (Salas Dep. at 45.)  Salas also testified that in 2007-2008, he worked
25  as the property officer for the ad seg unit, and had a caged area in the receiving and release area.
26  (Salas' Dep. at 24-25; 44-45.)

27  [27]  Plaintiff disputes this fact (ECF No. 230-2 at 33), but points to no competent evidence
    demonstrating that defendant Salas was aware plaintiff had filed a grievance related to his legal or
28  personal mail, or legal problems.

4. Mail and annual or quarterly packages are not processed the same. Mail is processed through the mailroom; quarterly and annual packages go through the receiving warehouse to receiving and release. The packages are put on a pallet and brought to receiving and release by truck. A package officer then distributes packages to inmates. (Salas Decl ¶ 4, DEF 160.)

5. Salas responded at the informal level to an inmate appeal regarding plaintiff's 2008 annual package. The September 23, 2008 informal response written by defendant Salas states: "Penton my records indicate that your D-status started 6-19-08. However, it was determined to be incorrect. Therefore, your annual package was unintentionally sent back to the vendor based on my records. You are eligible to receive an annual package at this point of your appeal. I am unable to determine reimbursement for the charges." (ECF No. 231 at 181 (PENTON_SALAS00003.); see also (Salas Decl. ¶¶ 6-10, 12 (Ex. A), DEF 160-161, 164, 163-66.)

6. Inmates in privilege group D are eligible to receive one personal property package per year. Inmates shall be eligible to acquire a personal property package after completion of one year of privilege group D assignment. (Salas Decl. ¶¶ 8-9 & 11, DEF 161.)

7. Defendant Salas consistently testified that he miscalculated plaintiff's arrival date. (Salas Dep. at 76, 78, 88-89, 90, 92.) In his declaration, Salas explained that if the records mistakenly indicated that plaintiff's D status started on June 19, 2008, then plaintiff would not have completed one year of privilege group D assignment as of September 2008, and would not have been eligible for an annual package in 2008. (Salas Decl. ¶¶ 8-9 & 11, DEF 161.)

Plaintiff disputes that the package was returned in error, citing Salas' testimony that the criteria for sending back packages is "pretty accurate" and "not complicated," and that in all his time as a property officer, he could "only think of this one occurrence with Mr. Penton" where he made this mistake. (Salas Dep. at 85:4-20; 101:4-9.)

*Discussion*

While plaintiff is correct that retaliatory motive can be proven by circumstantial evidence, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." Brodheim, 584 F.3d at 1271 (internal quotation marks omitted) (quoting Soranno's, 874 F.2d at 1314). Here, plaintiff failed to demonstrate a causal connection

79

1    between the return of plaintiff's annual package and plaintiff's protected conduct.  Indeed,

2    plaintiff adduced no evidence demonstrating that defendant Salas was even aware of plaintiff's

3    protected conduct.  Plaintiff points to no personal interaction with defendant Salas or other

4    evidence showing such causal connection.  Plaintiff makes much of defendant Salas' deposition

5    testimony that it was "possible" he had been assigned other duties while working at CSP-SAC,

6    but plaintiff fails to acknowledge defendant Salas' later testimony that he did not work in the mail

7    room in 2007 or 2008; that his mail duties likely ended in the 1990s, or that Salas' "duties were

8    ad seg property specific."  (Salas Dep. at 120).  But even assuming it was "possible" that

9    defendant Salas worked in the mail room, such "possibility" is insufficient to demonstrate that

10    defendant Salas worked in the mail room at a time where he would have seen one of plaintiff's

11    grievances such that he became aware of plaintiff's protected conduct.  That is an inference too

12    far.  Thus, even assuming the court could infer a retaliatory motive from defendant Salas'

13    acknowledgment that he had never returned a package for any inmate other than plaintiff, there is

14    no evidence demonstrating a source for a retaliatory motive.  There is no triable issue of material

15    fact as to whether defendant Salas was aware of plaintiff's protected conduct.  There is simply no

16    evidence that Salas was aware.

17          Plaintiff points to Salas' testimony that the reason he did not fix his mistake was that

18    plaintiff had already filed a grievance concerning the missing package.  Plaintiff argues that such

19    concession illustrates a pattern of retaliatory intent.  (ECF No. 230 at 46.)  Defendant Salas did

20    testify that the issue could have been eliminated by talking to plaintiff cell-side, because Salas

21    could have called the vendor, but because plaintiff had already filed his grievance, "it went over

22    [Salas'] jurisdiction."  (Salas Dep. at 101-02.)  But, again, plaintiff failed to demonstrate that

23    defendant Salas was aware of plaintiff's protected conduct before Salas returned plaintiff's

24    package, or before he failed to attempt to resolve the issue by meeting with plaintiff cell-side

25    because Salas believed the pending grievance took it out of Salas' hands.  There is no

26    demonstrated pattern of retaliatory intent in connection with Salas' conduct.  Therefore,

27    defendant Salas is entitled to summary judgment on plaintiff's retaliation claim.

28    ////

1     C. Defendant Lynch

2         *Undisputed Facts*

3         1. Defendant Lynch was assigned to CSP-SAC as a Correctional Counselor I from April

4    2006 to about October 2009.  (ECF No. 220-5 at 145 (Lynch Decl.) (DEF 322).)  As a

5    Correctional Counselor I, Lynch would not present cases for committee review regarding

6    housing, rehabilitation programs, custody level or similar issues.  Lynch would talk with inmates

7    beforehand to discuss possible outcomes of committee decisions and take the inmates' input for

8    possible committee actions.  (ECF No. 220-5 at 146 (DEF 323).)

9         2. As a Correctional Counselor I, part of Lynch's job was to inform inmates that transfers

10   are a possibility based on their program eligibility, classification, housing status and similar

11   factors.[28]  (ECF No. 220-5 at 146 (DEF 323).)

12        3. Inmate transfers are determined at the committee level.  (ECF No. 220-5 at 146-47

13   (DEF 323-24).)  Specifically, an institutional classification committee would determine an

14   inmate's transfer to another institution based on the various factors including the inmate's

15   disciplinary history (or lack thereof) during the relevant time, as well as the inmate's input, such

16   as requests to transfer closer to their home or to an institution with different programming

17   opportunities.  Inmates are notified in writing if a committee were to consider a transfer for the

18   inmate.  The only way an inmate could be approved for a transfer is through a committee

19   decision.  (Id.)

20        *Law of the Case*

21        Initially, plaintiff argues that plaintiff's retaliation claim survives summary judgment

22   based on the court's ruling on defendants' motion for judgment on the pleadings, citing the law of

23   ────────────────────

24   [28]  Plaintiff claims this fact is disputed, citing testimony from the depositions of plaintiff and
     defendant Lynch.  (ECF No. 230-2 at 35.)  But plaintiff's testimony is that plaintiff spoke with

25   defendant Lynch about multiple issues, including multiple grievances, and at one of these
     interactions, likely in 2008, defendant Lynch told plaintiff, "If I were you, I would try to get

26   transferred.  You have nothing coming here."  (Pl.'s Dep. at 44.)  Defendant Lynch's testimony
     was that he had many conversations with plaintiff, but did not recall ever saying "you have

27   nothing coming to you" to plaintiff.  (ECF No. 231 at 428-29 (Lynch Dep.).)  Plaintiff fails to
     explain how such testimony rebuts defendant Lynch's claimed job duties as to informing inmates

28   about possible transfers.  The undersigned finds this fact undisputed.

1   the case doctrine.  However, plaintiff overstates the court's December 5, 2019 order in connection

2   with plaintiff's retaliation claim as to defendant Lynch.  Plaintiff contends that the court already

3   found that "Lynch's statement *can* constitute an adverse action" and that "retaliatory intent *can* be

4   evidenced circumstantially through the timing in which threats are made." (ECF No. 230 at 46

5   (emphasis added).)  While such statements are true, the court only found that, at the pleading

6   stage, taking plaintiff's statements as true, plaintiff plausibly stated a cognizable retaliation claim

7   against defendant Lynch.  (ECF No. 177 at 21-22.)  But the undersigned also noted that

8   
9   

> this does not mean that plaintiff would prevail on his retaliation
> claims or that the evidence would support his retaliation claims as to
> all five elements.  Rather, the undersigned concludes that, at this
> juncture, the allegations are sufficient to survive judgment on the
> pleadings.

10  

11  (ECF No. 177 at 22 n.8.)

12     In other words, simply because such statement *can* be true does not mean that plaintiff

13  adduced evidence proving the statement was an adverse action, or that its timing demonstrates

14  retaliatory intent.  Thus, law of the case does not apply to this claim; rather, the undersigned

15  addresses the evidence as it applies to the five elements of the retaliation claim in the context of a

16  motion for summary judgment, which is very different from how plaintiff's allegations are

17  viewed at the pleading stage.

18     *Discussion*

19     Plaintiff's fourth amended complaint is not verified.  Therefore, in order to rebut

20  defendants' evidence, plaintiff must provide his own declaration, deposition testimony, or other

21  evidence to support each element of his retaliation claim against defendant Lynch.

22     Here, plaintiff points to his own deposition testimony.  (ECF No. 230-2 at 35 (citing Pl.'s

23  Dep. at 43:5 - 44:15).)  Plaintiff testified that he spoke with defendant Lynch about multiple

24  issues, including multiple grievances, and at one of these interactions, "I believe it was in 2008,"

25  defendant Lynch told plaintiff, "If I were you, I would try to get transferred.  You have nothing

26  coming here."  (Pl.'s Dep. at 43-44.)  Plaintiff argues that Lynch's statements were made in the

27  fall of 2008 after plaintiff attempted to grieve the withholding of his mail using the inmate

28  appeals process.  (ECF No. 230 at 46.)  But plaintiff did not so testify.  Rather, plaintiff gave

1    examples of his multiple grievances:  "I conveyed my concerns about ad seg placement through

2    withholding of mail to not have access to law library."  (Pl.'s Dep. at 43.)  Plaintiff did not tie

3    defendant Lynch's alleged comments to any particular conversation or grievance, but rather

4    testified that Lynch said the words "at one of the interactions."  (Pl.'s Dep. at 44.)  Unlike in

5    Brodheim, where officer Cry wrote that Brodheim should be "careful" what he writes and

6    requests in his administrative grievances, defendant Lynch's words did not warn plaintiff to stop

7    doing anything and did not specifically reference grievances, litigation, or other protected

8    conduct.  Plaintiff did not provide additional context to support a finding that such comments

9    were a threat, or caused a chilling effect.  Indeed, plaintiff did not testify that he considered

10   defendant Lynch's words to be a threat or kept plaintiff from pursuing grievances.  (Pl.'s Dep. at

11   40-46.)

12        But even assuming Lynch's words alone constituted a threat, plaintiff failed to establish

13   timing such that it was plaintiff's protected conduct that was the substantial or motivating factor

14   behind defendant Lynch's words.  In Watison, 668 F.3d at 1114-16, the prisoner alleged facts

15   connecting Officer Santos' statements with the filing of an emergency grievance; here, plaintiff

16   did not testify to a specific causal connection between defendant Lynch's words and plaintiff's

17   filing of grievances.  See also Hoffmann v. Jones, 2018 WL 3436830, at *6 (E.D. Cal. July 17,

18   2018) ("Plaintiff has produced evidence (his declaration and verified complaint) that defendant

19   told him he would face discipline if he continued to file grievances, and that defendant

20   "approved" his grievance about the pipes as a way of preventing further review."), adopted 2018

21   WL 4629408 (E.D. Cal. Sept. 27, 2018).  The fact that plaintiff and defendant Lynch generally

22   discussed plaintiff's grievances, without more, fails to demonstrate a triable dispute of fact exists

23   as to such causal connection.  Moreover, it is undisputed that any transfer required committee

24   review, so defendant Lynch could not have ordered plaintiff to be transferred, and plaintiff does

25   not allege that he was transferred.  Because defendant Lynch could not order transfers, defendant

26   Lynch's words alone cannot be construed as an implicit threat to have plaintiff transferred.[29]

27   _____

28   [29]  In his opposition to the motion for judgment on the pleadings, plaintiff argued that defendant
     Lynch's statements "carried the implicit threat that his rights would continue to be violated and

1    Finally, plaintiff has not adduced evidence demonstrating a chronology of events from

2    which retaliation can be inferred, or that defendant Lynch spoke such words to plaintiff because

3    plaintiff attempted to file inmate grievances.

4    Accordingly, defendant Lynch is entitled to summary judgment on plaintiff's retaliation

5    claim.

6    *Qualified Immunity*

7    "Qualified immunity shields government officials from civil damages liability unless the

8    official violated a statutory or constitutional right that was clearly established at the time of the

9    challenged conduct." Taylor v. Barkes, 575 U.S. 822, 825 (2015), quoting Reichle v. Howards,

10   566 U.S. 658, 132 U.S. 2088, 2093 (2012). As noted above, the inquiry involves two prongs:  did

11   the officer's conduct violate a constitutional right, and second, was the constitutional right clearly

12   established?  For a right to be clearly established, "[t]he contours of the right must be sufficiently

13   clear that a reasonable official would understand that what he is doing violates that right."

14   Anderson v. Creighton, 483 U.S. 635, 640 (1987).  As noted above, the undersigned has

15   discretion over which prong to address first, in light of the particular circumstances of each case.

16   See Pearson, 555 U.S. at 236.

17   *Discussion*

18   Plaintiff contends that defendant Lynch is not entitled to qualified immunity because it

19   was clearly established that an inmate has the right to be free from retaliation.  (ECF No. 230 at

20   48.)  But plaintiff characterizes the clearly established right too generally.  "A clearly established

21   _____

22   that [plaintiff] was no longer welcome at CSP-SAC and would face harm if he did not try to
     transfer or cease his attempts to vindicate his rights," and would chill a person of ordinary

23   firmness from using the grievance process.  (ECF No. 171 at 30-31.)  Plaintiff cited Holley v.
     California Department of Corrections, 2005 WL 1489858, at *2 (E.D. Cal. June 21, 2005), to

24   support such opposition, because the court found Holley stated a retaliation claim based in part on
     officer Herrera telling Holley, "you damn litigators don't have nothing coming."  Id.  Here,

25   however, plaintiff did not testify that he viewed defendant Lynch's statements the way counsel
     previously characterized them.  (Pl.'s Dep. at 40-46.)  In addition, Holley is distinguishable

26   because at the time Herrera made the statement, Herrera "refused to obtain medical care on

27   [Holley's] behalf."  Holley, 2005 WL 1489858, at *2.  Thus, unlike here, there was a clear
     adverse action connected with the verbal threat explicitly referencing litigation, Holley's

28   protected conduct.  No such link exists in this case.

1   right is one that is 'sufficiently clear that every reasonable official would have understood that

2   what he is doing violates that right.'"   Mullenix, 577 U.S. at 11 (quoting Reichle, 566 U.S. at

3   664).   "[E]xisting precedent must have placed the statutory or constitutional question beyond

4   debate."   Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011) (citations omitted).

5          Here, it was not until 2009 that the Ninth Circuit found that in the retaliation context, a

6   prisoner did not need to establish that the prison guard's statement contained an explicit threat of

7   discipline or transfer, because "[b]y its very nature, a statement that 'warns' a person to stop

8   doing something carries the implication of some consequence of a failure to heed that warning."

9   Brodheim, 584 F.3d at 1270.   Finding that "[t]he power of a threat lies not in any negative actions

10  eventually taken, but in the apprehension it creates in the recipient of the threat," the Ninth

11  Circuit reversed the district court's finding that the prisoner had produced inadequate evidence of

12  an adverse action.   Id. at 1271.

13         As noted above, plaintiff testified that defendant Lynch told plaintiff that "If I were you, I

14  would try to get transferred.   You have nothing coming here."   (Pl.'s Dep. at 44.)   Viewing the

15  alleged statement in the light most favorable to plaintiff, taking his version of what defendant

16  Lynch said as true, and construing, arguendo, defendant Lynch's statements to be a "threat"

17  sufficient to constitute an adverse action, Brodheim was not decided until 2009.   Thus, even if

18  defendant Lynch's words constituted a threat of retaliation, it would not be clear to a reasonable

19  prison official as of 2008 that such words would deter plaintiff's protected conduct and chill a

20  person of ordinary firmness.   Thus, defendant Lynch is entitled to qualified immunity on

21  plaintiff's retaliation claim.[30]

22  VII.  Conclusion

23         Accordingly, IT IS HEREBY ORDERED that defendants' request for judicial notice

24  (ECF No. 220-3) is granted.

25         Further, IT IS RECOMMENDED that the motion for summary judgment (ECF No. 220)

26  filed by defendants Bradford, Donahoo, Gaddi, Lynch, Morrow, Salas, Virga, and Walker be

27

28  [30]  Because defendant Lynch is entitled to qualified immunity, the court need not address
    defendant's statute of limitations argument.

1   granted in part and denied in part, as follows:

2          1. Defendants' motion for summary judgment based on plaintiff's alleged failure to

3   exhaust administrative remedies as to plaintiff's access to courts and interference with mail

4   claims be denied;

5          2. Defendant Bradford be granted summary judgment on plaintiff's claim that defendant

6   Bradford wrongfully denied plaintiff's 2008 request for PLU status, based on plaintiff's failure to

7   exhaust administrative remedies.

8          3. Defendant Lynch be granted summary judgment based on plaintiff's failure to exhaust

9   administrative remedies.

10         4. Defendants Walker, Virga, Donahoo, and Gaddi be granted summary judgment on

11  plaintiff's access to the courts and interference with mail claims.

12         5. Defendants Bradford and Morrow be granted summary judgment on plaintiff's 2007

13  access to the courts claims.

14         6. Defendants Bradford and Morrow be granted qualified immunity on plaintiff's 2007

15  access to the courts claims.

16         7. Defendants Salas and Lynch be granted summary judgment on plaintiff's retaliation

17  claims;

18         8. Defendant Lynch be granted qualified immunity on plaintiff's retaliation claim;

19         These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty** days after

21  being served with these findings and recommendations, any party may file written objections with

22  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

23  Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be

24  filed and served within fourteen days after service of the objections.  The parties are advised that

25  failure to file objections within the specified time may waive the right to appeal the District

26  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

27  Dated:  August 11, 2021

28  /pent0518.msj

8

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE