1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ANTHONY PENTON,                      No.  2:11-cv-0518 TLN KJN P

                        Plaintiff,
12
                v.                        ORDER AND FINDINGS AND
13                                        RECOMMENDATIONS
     HUBARD, et al.,
14
                        Defendants.
15

16          Plaintiff is a state prisoner, represented by counsel.  This action proceeds under 42 U.S.C.

17   § 1983 on plaintiff's claims that defendant Johnson violated plaintiff's right of access to mail and

18   right of access to the courts.[1]  Plaintiff filed a motion for partial summary judgment against

19   defendant Johnson.  Defendant Johnson filed a motion for summary judgment and/or partial

20   summary adjudication.  As set forth more fully below, it is recommended that both motions be

21   denied.

22   ////

23

24   _____
     [1]  Plaintiff's third cause of action was solely pled as to defendant Pool.  On April 14, 2020,
25   defendants Pool, Quinn and Besenaiz were granted judgment on the pleadings.  (ECF No. 207.)
     Defendant Nunez, despite service of process, has not appeared; clerk's default was entered (ECF
26   No. 142), and plaintiff's motion for default judgment is pending.  The motion for summary
     judgment filed by defendants Donahoo, Salas, Walker, Bradford, Lynch, Virga, Morrow and
27   Gaddi was addressed by earlier findings and recommendations, adopted by the district court on
     September 30, 2021.  (ECF Nos. 251, 254.)  The identities of Doe Defendants 1-11 remain
28   unknown.  (ECF No. 104 at ¶ 79.)

                                            1

1

**Introduction**

2      It is undisputed that plaintiff was deprived of all of his mail, both legal and personal, for

3  over eight months.  There are very few cases addressing such a prolonged withholding of an

4  inmate's mail, none of which issued in our circuit.  In 1989, a district court in Nebraska addressed

5  "[w]hether the policy of the defendants not to forward incoming 'legal mail' to an inmate after

6  the inmate left the custody of DCCC, but rather to return the mail to the sender(s),

7  unconstitutionality deprived Sorich of his right of access to the courts.  Sorich v. Terry, No. CIV.

8  86-L-722, 1989 WL 87386, at *1 (D. Neb. June 29, 1989).[2]  In Sorich, the district court noted that

9  "only one other court has dealt with the precise mail forwarding issue in a case similar factually

10  to the case at bar," which was "resolved in a resounding fashion against the defendants."  Id. at *8

11  (citing United States ex rel. Wolfish v. Levi, 439 F.Supp. 114, 145-46 (S.D. N.Y. 1977), aff'd in

12  part and rev'd in part on other grounds, 573 F.2d 118, 133 n.31 (2d Cir. 1978), rev'd in part on

13  other grounds, sub nom., Bell v. Wolfish, 441 U.S. 520, 529 n.10 (1979) (the district court's

14  decision on mail forwarding was not appealed).)

15      In Wolfish, a habeas corpus action and an alternative 28 U.S.C. § 1361 action, the district

16  court addressed, in pertinent part, "the refusal of the Metropolitan Correctional Center ("MCC"),

17  a federal jail-type facility in New York City, to forward mail when an inmate was transferred

18  from the MCC to another institution, the MCC having instead returned the mail to the senders."

19  Sorich, 1989 WL 87386, at *7 (citing Wolfish, 439 F.Supp. at 145).  The respondents in Wolfish

20  had argued that "[s]ince there is no evidence indicating that inmates are unable to send change of

21  address notices to the local Post Office station either before or after the transfer, there is no reason

22  to impose that burden on the MCC."  Id.  The district court emphatically rebuffed respondents'

23  argument:

24             It is not to be doubted that the distinguished respondents in this case
                appreciate the fundamental human needs answered by the mails to
25             people in confinement. See, e.g., if citation is needed, Taylor v.
                Sterrett, 532 F.2d 462, 481 (5th Cir. 1976). Yet the bureaucratic
26             indifference exercised in respondents' names brushes past simple

27  ─────────────────────

28  [2]  The court in Sorich was addressing a challenge to the mail policy as unconstitutional.  In this
   case, plaintiff does not contend that the practice was unconstitutional.

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

> decency for no good reason whatever. In the nature of the situation, inmates' mail will be returned to sender, not forwarded, when they have had no chance at all to redirect it for themselves by filing change-of-address notices. This is so, obviously, because transfers are sudden, often occurring after the sending, but before receipt, of the letter MCC finds itself unwilling to forward. Even where this is not so, the "burden" that worries respondents is inconsequential. The piece of mail must be handled in any case -- whether to be returned or sent to its addressee. The extra trouble of digging out and writing a forwarding address -- a beneficence commonly performed by irate former landlords, jaundiced ex-employers, and others not looked to for public examples of caring -- is of no meaningful weight in this setting. Finally, as respondents must know as well as anyone, they deal with a group in which literacy, attention to workaday detail, and knowledge of agency procedures may be less prevalent than it is in the population at large. If an inmate neglects (or does not know about) a change-of-address notice, MCC personnel might find ready means to supply the omission rather than fight for the right to return the mail to its sender. The court will not compel, though it presumes to suggest, this procedure.
>
> The court holds, however, in any event, that the refusal to forward mail is a species of obstinate neglect of vital needs that qualifies classically as arbitrary and capricious official conduct, totally unsupportable by any reason that can be deemed sound or sufficient in the circumstances. The court will order the relief petitioners seek in this respect.

15   <u>Wolfish</u>, 439 F. Supp. 114, at 145-46.  The district court in <u>Sorich</u> was persuaded by the <u>Wolfish</u>

16   opinion, adopting its reasoning in whole, finding the:

17

18

19

20

21

> forwarding practice of the DCCC as applied to Sorich to have been unconstitutional, as it denied Sorich his due process rights of access to the courts. This policy violated Sorich's constitutional right to access the courts, because the policy rendered the postal system unavailable to Sorich during a time when he had no control over his movement between the prison and the DCCC; thus, the policy denied Sorich the opportunity to receive and in turn to respond to legal matters in a timely fashion, resulting in the very real possibility that important legal rights might have been forfeited.

22   <u>Sorich</u>, 1989 WL 87386, at *10.  The court denied qualified immunity to the county jail official

23   over the defective forwarding policy for legal mail in part because other prisons, including the

24   Bureau of Prisons, had more robust forwarding policies that did not impinge on the inmate's right

25   of access to courts and noting that its analysis would be the same under <u>Turner v. Safley</u>, 482

26   U.S. 78 (1987).  <u>Sorich</u>, 1989 WL 87386, at 11 n.9.

27        Much later, the Court of Appeals for the Tenth Circuit addressed a case where the

28   prisoner's mail had been held from March 2000 to March 2001 while he was temporarily

3

1   transferred from a prison in Kansas to a jail in Boulder, Colorado, for court proceedings.

2   Simkins v. Bruce, 406 F.3d 1239, 1242 (10th Cir. 2005).  In Simkins, the mailroom supervisor's

3   affidavit showed a course of deliberate conduct to hold and not forward the prisoner's mail,

4   pursuant to her training but despite standard operating procedures to the contrary.  Id. at 1242-43.

5   The Tenth Circuit held that even though the mailroom supervisor was doing what she was trained

6   to do and did not understand her obligations under the operating procedures, her decision to hold

7   the prisoner's mail in violation of such procedures was "intentional conduct interfering with his

8   legal mail, and does not require an additional showing of malicious motive."  Id. at 1242.

9          In the instant case, following plaintiff's abrupt transfer, without his legal materials, into

10  U.S. Marshal custody for putative testimony in a criminal case out of state, plaintiff's mail was

11  indisputably held at CSP-SAC for over eight months, during which time he suffered an actual

12  injury to his habeas case, and also suffered a tragic inability to contact his father prior to his

13  father's death.

14         One of the difficulties presented by this case, however, is that aside from defendant

15  Nunez, plaintiff identified no mailroom staff person who handled or processed plaintiff's mail.

16  Instead, plaintiff seeks to hold defendant Johnson, mailroom supervisor, liable for his role in

17  continuing the practice of holding mail for prisoners who are out to court until the prisoner

18  returns.  Such a practice had been in place at CSP-SAC for over seven years, including during

19  Johnson's prior tenure as office assistant.  But, unlike the mailroom supervisor in Simkins,

20  defendant Johnson denies holding or directing anyone to hold plaintiff's mail, and testified that

21  defendant Nunez should not have held plaintiff's mail for so long, but should have found out

22  where plaintiff was housed.  Defendants further argue that in addition to defendant Johnson not

23  being liable merely because of his position as supervisor, plaintiff's mail could not be forwarded

24  because no one in the CSP-SAC mailroom, including Johnson, had plaintiff's address where he

25  was housed out to court.

26  ////

27  ////

28  ////

4

1    I. Background

2        On April 12, 2018, plaintiff's counsel filed an unverified fourth amended complaint.[3]  As

3    to defendant Johnson (and Does 1-11), plaintiff alleges the following.  In his first cause of action,

4    defendant L. Johnson violated plaintiff's right to access the courts in violation of the First and

5    Fourteenth Amendments.  (ECF No. 104 at 20-21.)  "As a result, [plaintiff] was not able to

6    challenge his unconstitutionally increased sentence in light of the Ninth Circuit's opinion in

7    Butler v. Curry," "constitut[ing] active interference with [plaintiff's] right of access to the courts,

8    and resulted in a loss of a substantial, nonfrivolous claim."  (Id.)

9        In his second cause of action, defendant Johnson (and Does 1-11), wrongfully withheld

10   plaintiff's mail without notice and with no legitimate penological reasons, from November 8,

11   2007, through July 29, 2008.  (ECF No. 104 at 25.)  As a result of the deprivation of his mail,

12   plaintiff also lost his ability to contact his father before he died.

13       Plaintiff sues all of the defendants in their individual capacities.  He seeks a declaratory

14   judgment, money damages, costs and attorneys' fees.  (ECF No. 104 at 29-30.)

15   II. Requests for Judicial Notice

16       Both parties ask the court to take judicial notice of the docket sheet and certain filings

17   from plaintiff's habeas case filed in another federal district court, Penton v. Kernan, No. 3:06-cv-

18   0233 WQH RBM (S.D. Cal.).  Defendant Johnson also asks the court to take judicial notice of the

19   docket sheets from Penton v. Westervelt, No. F051784 (Fifth Dist. Cal.), and Penton v. Kernan,

20   No. 19-56201 (9th Cir.).  (ECF No. 224-11.)  Plaintiff did not oppose such request.

21       The court may take judicial notice of facts that are "not subject to reasonable dispute

22   because it . . . can be accurately and readily determined from sources whose accuracy cannot

23   reasonably be questioned," Fed. R. Evid. 201(b), including undisputed information posted on

24   official websites.  Daniels-Hall v. National Education Association, 629 F.3d 992, 999 (9th Cir.

25   ───────────────
     [3]  Unverified allegations in pleadings do not create genuine disputes of material fact on summary
26   judgment.  See Moran v. Selig, 447 F.3d 748, 759 (9th Cir. 2006) ("the complaint in this case
     cannot be considered as evidence at the summary judgment stage because it is unverified.").
27   However, the court relies on the fourth amended complaint solely to provide background details
     about this lawsuit and not as substantive evidence in support of, or in opposition to, the pending
28   motions for summary judgment.

1    2010).  It is appropriate to take judicial notice of the docket sheet of a California court.  White v.

2    Martel, 601 F.3d 882, 885 (9th Cir. 2010).  The address of the official website of the California

3    state courts is www.courts.ca.gov.  Accordingly, the requests for judicial notice are granted.  Fed.

4    R. Evid. 201(b)(2).

5    III.  Defendant's Evidentiary Objections

6            Defendant Johnson objects that plaintiff failed to identify Darrell Cain as a potential

7    witness or identify the report authored by the Office of Internal Affairs ("OIA") in Rule 26

8    disclosures, and seeks to strike the report as well as Cain's testimony, and any reference to either

9    in plaintiff's briefing.  (ECF No. 233-3.)  However, as demonstrated by plaintiff, defendant has

10   had more than ample notice.  In his initial disclosure report, plaintiff identified CSP-SAC, the

11   Office of the Inspector General ("OIG"); Roy Wesley, Inspector General; as well as CDCR

12   documents and OIA reports.  (ECF No. 239.)  In addition, defendant Johnson was party to the

13   July 17, 2019 protective order negotiated to resolve CSP-SAC's challenge to plaintiff's subpoena

14   for the OIA report.  On July 22, 2019, Mr. Kamberian mailed CSP-SAC's production of the OIA

15   Report to counsel for plaintiff and defendant Johnson.  (ECF No. 238-1 at 4.)

16           On September 9, 2019, following extension of the fact discovery deadline, plaintiff issued

17   a deposition subpoena to the CDCR to obtain information about the OIA report and its underlying

18   investigation.  The CDCR designated Mr. Darrell Cain, Senior Special Agent of the OIA, as the

19   person most knowledgeable to testify on behalf of the OIA.  Counsel for defendant Johnson

20   participated in Mr. Cain's deposition on October 9, 2019; the OIA report was introduced as an

21   exhibit, and plaintiff's counsel questioned Mr. Cain extensively about the report.  In addition,

22   plaintiff's counsel introduced the OIA report at defendant Virga's deposition, also attended by

23   defendant Johnson's counsel, and questioned Virga extensively about it.  Finally, the OIA report

24   was mentioned in plaintiff's second set of interrogatories to defendant Johnson on July 3, 2019,

25   and asked Johnson to describe, inter alia, "all investigations and disciplinary actions" he was

26   subject to, and "the CDCR OIA Investigation and the OIG Investigations, as they Relate To You

27   or Your conduct while employed at CSP-SAC."  (ECF No. 238-1 at 4.)

28   ////

                                                       6

1    Plaintiff's motion for partial summary judgment against defendant Johnson, in which the
2    OIA Report and excerpts of the Cain deposition were cited, was filed on June 12, 2020.

3    Because counsel for defendant Johnson has had the OIA report for almost a year, and was
4    also personally involved by signing the protective order and participating in depositions in which
5    the report was addressed, defendant Johnson's objections are overruled, and his request to strike
6    the OIA report and Cain's deposition testimony is denied.

7                    **Standards Governing Motions for Summary Judgment**

8    Summary judgment is appropriate when it is demonstrated that the standards set forth in
9    Rule 56 of the Federal Rules of Civil Procedure are met.  "The court shall grant summary
10   judgment if the movant shows that there is no genuine dispute as to any material fact and the
11   movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]the moving party
12   always bears the initial responsibility of informing the district court of the basis for its motion,
13   and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and
14   admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence
15   of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting
16   then-numbered Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at
17   trial, the moving party need only prove that there is an absence of evidence to support the non-
18   moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle
19   Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325; see
20   also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a
21   party who does not have the trial burden of production may rely on a showing that a party who
22   does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").)
23   Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,
24   against a party who fails to make a showing sufficient to establish the existence of an element
25   essential to that party's case, and on which that party will bear the burden of proof at trial.
26   Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of
27   the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.
28   ////

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Liberty Lobby, Inc., 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines,

8

602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

### Other Applicable Legal Standards

I. The Civil Rights Act

       To prevail on a claim under § 1983, a plaintiff must demonstrate:  (1) the violation of a federal constitutional or statutory right; and (2) that the violation was committed by a person acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  An individual defendant is not liable on a civil rights claim unless the facts establish the defendant's personal involvement in the constitutional deprivation or a causal connection between the defendant's wrongful conduct and the alleged constitutional deprivation.  See Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).

II. Supervisorial Liability

       A supervisor is liable for the acts of his subordinates "if the supervisor participated in or directed the violations, or knew of the violations [of subordinates] and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Johnson v. Duffy, 588 F.2d at 743-44.  Generally, a supervisor is liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011).  "The requisite causal connection can be established . . . by setting in motion a series of acts by others, . . . or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury."  Id. at 1207-08 (internal quotation marks and citation omitted); Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009).  Supervisory liability may also exist without any personal participation if the official implemented "a policy so deficient that the policy itself is a

1   repudiation of the constitutional rights and is the moving force of the constitutional violation."

2   Redman v. Cty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations and quotations

3   marks omitted), abrogated on other grounds by Farmer v. Brennan, 511 U.S. 825 (1994).

4                    **Motion re Exhaustion - Law of the Case**

5            As the court previously found in addressing the motion for summary judgment filed by

6   other defendants, the issue of exhaustion of administrative remedies was addressed in the August

7   12, 2021 findings and recommendations, and adopted *in toto* by the district court on September

8   30, 2021.  (ECF Nos. 251, 254.)  The court found that plaintiff's August 5, 2008 appeal only

9   addressed issues with plaintiff's legal mail, but that plaintiff's fully-exhausted appeal, log no.

10  SAC-07-02453, was sufficient to exhaust all of plaintiff's mail issues, including incoming,

11  outgoing, legal, and personal mail, at least during the pendency of plaintiff's appeal, which

12  includes the period that legal or personal mail was held in the mailroom, while he was out to court

13  for eight months, through at least July 29, 2008, when such mail was delivered to plaintiff, forty

14  days after his return to CSP-SAC.  (See ECF No. 251 at 23.)  Such rulings are law of the case and

15  apply equally to plaintiff and defendant Johnson.[4]  Thus, defendant Johnson's motion on the issue

16  of exhaustion of administrative remedies (ECF No. 224-1 at 17-18) should be granted as to the

17  August 5, 2008 screened-out appeal, but denied as to appeal log no. 07-02453.

18                     **Motions for Summary Judgment**

19  I.  The Parties' Evidence

20          Plaintiff's motion for partial summary judgment is supported by plaintiff's declaration

21  (ECF No. 226-3); counsel's declaration; plaintiff's administrative appeals log nos. 07-02453 and

22

23  _____
    [4] Once a decision of law is made, it becomes the "law of the case," and absent clear error or
24  changed circumstances should not be changed.  See United States v. Estrada Lucas, 651 F.2d
    1261, 1263-64 (9th Cir. 1980).  "The law of the case doctrine is a judicial invention designed to
25  aid in the efficient operation of court affairs."  Milgard Tempering, Inc. v. Selas Corp. of
    America, 902 F.2d 703, 715 (9th Cir. 1990) (citing Lockert v. United States Dept. of Labor, 867
26  F.2d 513, 518 (9th Cir. 1989)).  Under the doctrine, "a court will generally refuse to reconsider an
    issue that has already been decided by the same court or a higher court in the same case."
27  Gonzalez v. Arizona, 677 F.3d 383, 389-90 n.4 (9th Cir. 2012), cert. granted, 568 U.S. 962 (2012)
    and aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1 (2013).
28

08-1769; plaintiff's August 5, 2008 inmate appeal; plaintiff's filings in other court cases (as addressed in the requests for judicial notice, *supra*); July 29, 2008 CSP-SAC legal mail log; relevant excerpts of deposition transcripts for plaintiff, defendants Gaddi, Virga, Walker, Johnson, Donahoo, Quinn, and Besenaiz, and plaintiff's expert Daniel Vasquez; relevant portions of Title 15 of the California Code of Regulations updated through September 30, 2008, and October 15, 2009; and the August 20, 2012 OIA report.  (ECF No. 223; 247 (sealed OIA report).)

Defendant's motion for summary judgment is supported by counsel's declaration; excerpts of deposition testimony of plaintiff, defendant Johnson, and plaintiff's expert Daniel Vasquez; plaintiff's responses to defendant Johnson's request for production, set one, and interrogatories, set one; the U.S. Marshal's 2020 fact sheet; and plaintiff's filings in other court cases (as addressed in the requests for judicial notice, *supra*).  (ECF No. 224-3.)

## II.  Undisputed Facts

Both sides submitted statements of undisputed facts.  (ECF Nos. 222-2 & 246 (sealed); 224-2.)  Following review of the evidence submitted by both parties, the undersigned finds the following facts undisputed for purposes of summary judgment, unless otherwise stated.

1.  Plaintiff was convicted of robbery, attempted robbery, and false imprisonment on November 8, 2000, and was ultimately sentenced to 52 years and eight months.

2.  As a result of his conviction, plaintiff was incarcerated at California State Prison, Sacramento ("CSP-SAC") from approximately 2004 through 2010.

3.  Plaintiff's conviction was affirmed by the California Supreme Court and became final on March 18, 2006.

4.  On January 31, 2006, plaintiff filed a petition for habeas corpus in Penton v. Kernan, No. 3:06-cv-0233 WQH (PCL) (S.D. Cal.).[5]

5.  On March 3, 2006, plaintiff was ordered to immediately notify the United States District Court for the Southern District of California (hereafter "habeas court") of any change of

---

[5] The docket sheet and pertinent filings in Case No. 3:06-cv-0233 are located at ECF No. 224-11 at 5-14; 16-54 (R&R); 56-94.

1    address, and admonished that failure to keep the court so informed would subject the case to

2    dismissal.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 6).

3          6.  On October 2, 2006, while incarcerated at CSP-SAC, plaintiff filed an amended

4    petition for habeas corpus.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 21).

5          7.  On August 31, 2007, the habeas court recommended that the petition for writ of habeas

6    corpus be denied, and provided that any objections were to be filed on or before September 21,

7    2007.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 35).

8          8.  On September 2, 2007, plaintiff filed an administrative appeal concerning mail delays

9    at CSP-SAC.[6]

10         9.  On September 9, 2007, plaintiff received the findings and recommendations issued by

11   the habeas court.

12         10.  On October 2, 2007, plaintiff requested an extension of time, *nunc pro tunc*, to object

13   to the report and recommendations, which was granted on October 22, 2007, extending the

14   deadline to object to November 7, 2007.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entries 40,

15   41).

16         11.  On October 14, 2007, plaintiff appealed the informal denial of appeal Log No. 07-

17   02453.

18         12.  In response to a request by plaintiff, the habeas court mailed plaintiff a copy of the

19   docket on November 6, 2007.  (ECF No. 224-11 at 72-80.)

20         13.  The mailing from the habeas court was returned to the court and indicated it was

21   being returned because plaintiff was "not at CSP-SAC," and was filed by the habeas court on

22   December 6, 2007.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 44).

23         14.  Plaintiff received the habeas court's October 22, 2007 order on November 6, 2007.

24   (Pl.'s Dep. at 167-68.)  Plaintiff immediately submitted another motion for extension of time, but

25   the motion did not reach the habeas court.

26   _____

27   [6]  Although defendant Johnson contends that appeal Log No. 07-02453 only exhausted plaintiff's
     claims concerning outgoing mail, it is now law of the case that such appeal exhausted all of
28   plaintiff's mail claims, ingoing and outgoing, regular and legal.

15. Plaintiff did not file objections before the November 7, 2007 deadline.

16. On November 8, 2007, without prior notice, plaintiff was transferred into the custody of the U.S. Marshal, to be transported to Bowling Green, Kentucky, to serve as a prosecution witness in a criminal case. Plaintiff was not allowed to gather and bring his legal documents or notify family or friends of his transfer.

17. Plaintiff testified that the trip to Bowling Green involved several stops along the way, including the Sacramento County Jail, a stop in Oklahoma, and another stop at a CCA facility in Memphis, Tennessee, possibly taking up to three weeks.[7] (Pl.'s Dep. at 48-50, 53, 75.) Plaintiff testified he was housed in Bowling Green, Kentucky, for approximately seven months. (Pl.'s Dep. at 53.)

18. Plaintiff did not know how long he was to be out to court in Kentucky.

19. Following plaintiff's transfer, two pieces of legal mail arrived for plaintiff at CSP-SAC in November of 2007: (a) a letter from the San Bernardino County Counsel received November 9, 2007, and a letter from the California Court of Appeal, Fresno, California, received November 19, 2007.

20. In addition, the CSP-SAC mailroom returned correspondence from the habeas court addressed to plaintiff that arrived at CSP-SAC for him in November 2007, and did not notify plaintiff. Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 44).

21. Plaintiff's habeas petition was denied on December 20, 2007, and judgment was entered against plaintiff on December 26, 2007. Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entries 45, 46).

22. On December 21, 2007, defendant Johnson partially granted appeal Log No. 07-02453. In his first level appeal response, defendant Johnson wrote that "[a]ll submitted documentation and supporting arguments have been considered[,]" and that "[a] thorough inquiry has been conducted regarding the claim presented." (ECF No. 223 at 137.) Defendant Johnson

---

[7] Plaintiff could not recall exactly how long the trip took: he testified he stayed at the Sacramento County Jail for one week, maybe two; was at Memphis about a week; that the trip took approximately three weeks, and that he reached Kentucky about two to three weeks after leaving CSP-SAC. (Pl.'s Dep. at 49, 52, 53, 75.)

1  wrote that California Code of Regulations, Title 15, Section 3138, General Mail Regulations, (e)

2  and the Mailroom Operational Procedure 17,

3  
> dictate[d] that the Mailroom process outgoing and Incoming mail
> within a reasonable time frame. The Mailroom forwards all mail
4  
> received from the Facilities in the form of outgoing mail the same
> day that it is received in the Mailroom. Mail is forwarded out daily
5  
> Monday through Friday, excluding State mandated holidays.

6  
> All incoming mail is processed and sent to the Facilities within two
> working days. For example, mail received in the Institution on
7  
> Monday is processed and forwarded to the Facilities on Tuesday.

8  
> In response to your request to be notified in case your mail is
> withheld, you will be given notification in the form of Notification
9  
> of Disapproval-Mail/Packages/Publications (CDCR 1819) after
> receiving this form you will have 15 working days to decide the
10  
> disposition of the mail in question.

11  (ECF No. 223 at 137.)[8]  Defendants Virga and Walker testified that defendant Johnson should

12  have discovered the two pieces of legal mail received in November of 2007 when Johnson

13  conducted the first formal response to plaintiff's appeal Log No. 07-02453.  (Virga Dep. at 262-

14  65; Walker Dep. at 174-75.)

15      23.  From November 8, 2007, until his return to CSP-SAC on June 19, 2008, plaintiff was

16  on "out to court" status, out of CSP-SAC's custody, and incarcerated primarily in a Kentucky

17  prison.

18      24.  After plaintiff arrived in Bowling Green, Kentucky, he did not file a notice of change

19  of address with CSP-SAC or attempt to contact anyone at CSP-SAC.[9]

20      25.  After plaintiff arrived in Bowling Green, Kentucky, plaintiff did not file a notice of

21  change of address with the habeas court.[10]

22  _____

23  [8]  Although defendant Johnson signed the appeal response on December 21, 2007, the appeal
response was not delivered to plaintiff until July 14, 2008.  (ECF No. 223 at 134.)

24  [9]  Plaintiff disputes this fact (ECF No. 234-1 at 8).  In his deposition, plaintiff testified he was
waiting for a response to his pending grievance and did not have the address or phone number for
25  CSP-SAC.  (Pl.'s Dep. at 81:8-82:4.)

26  [10]  Plaintiff disputes this fact (ECF No. 234-11 at 8).  In his deposition, plaintiff testified that he
27  wrote his case numbers on his hand, but by the time he reached Kentucky weeks later, the
numbers had washed off.  In addition, while another inmate's wife was able to locate plaintiff's
28  case number for his Fifth Appellate District tort case, she allegedly was unable to locate

26.  While plaintiff was housed in Bowling Green, Kentucky, plaintiff notified the Fifth District Appellate Court of California of plaintiff's current mailing address, and also filed various documents with that court.[11]

27.  From November 8, 2007, through June 19, 2008, plaintiff did not receive any mail that arrived for him at CSP-SAC.

28.  From approximately 2004 through April 2, 2012, defendant Johnson was employed at CSP-SAC with the title Office Services Supervisor.

29.  Prior to Johnson's promotion to supervisor, he was employed as an office assistant in the CSP-SAC mailroom.

30.  As a general office assistant in the CSP-SAC mailroom, defendant Johnson was responsible for the processing of incoming and outgoing inmate mail.

31.  As an office assistant, he processed mail by placing it through a scanner, reading the mail and determining whether an inmate was on the "watch list," and looking for any irregularities in the mail.

32.  As an office assistant, mail would be "pitched" into the proper cubby for the respective housing units and the mailbag would be dropped off for pick up by the officers.

33.  The protocol during defendant Johnson's tenure as an office assistant was not to read legal mail, but instead it was placed in a plastic bag to be read in the cell blocks in front of the inmates by the officers.

34.  As an office assistant, defendant Johnson did not deliver mail to inmates and has no knowledge of what happened to mail after it was placed for pick up.

35.  In response to written discovery, plaintiff adduced no evidence that defendant Johnson personally withheld plaintiff's mail.[12]

_____

plaintiff's habeas case number.

[11]  The docket sheet for plaintiff's case in the Fifth Appellate District is located at ECF No. 224-11 at 96-100.

[12]  In his deposition, defendant Johnson was asked whether, after issuing the December 21, 2007 first formal level appeal response, defendant Johnson ever withheld plaintiff's mail at any time at

15

36.  As the CSP-SAC mailroom supervisor, defendant Johnson was "responsible for the operations of the mailroom" and "had the overall responsibility" over the "processing in and out of inmate mail."

37.  The following tasks were also included within defendant Johnson's responsibility for operating the CSP-SAC mailroom:  overseeing other staff members in the CSP-SAC mailroom who processed inmate mail; responding to inmate appeals at the first formal level of review; answering questions about mail; monitoring staff to ensure "they were processing mail correctly and on time"; meter processing; ensuring mail was properly read by staff; overseeing the chain of custody for contraband found in mail; preparing employee performance evaluations; and staffing the mailroom; training staff in the mailroom; and being up to date on policies regarding the handling of inmate mail.

38.  When asked what he would do to supervise staff, defendant Johnson testified he would "ask them a question if they got it completed," and if staff responded they could not complete a task, Johnson testified he would "find out why they couldn't get it done, and find out if they needed help."  (Johnson Dep. at 99.)

39.  Defendant Johnson was also responsible for abiding by the regulations governing the disposition of inmate mail as set forth in Title 15 of the California Code of Regulations pertaining to the operations of the CDCR.

40.  Defendant Johnson learned how incoming mail was processed at the CSP-SAC mailroom as a general office assistant.[13]  (Johnson Dep. at 127.)

---

the CSP-SAC mailroom, and defendant responded, "Not to my knowledge."  (Johnson Dep. at 183.)  Defendant Johnson also denied ever directing anyone in the CSP-SAC mailroom, from November 8, 2007, to July 29, 2008, to put a hold on plaintiff's mail.  (Johnson Dep. at 184.)

[13]  Plaintiff disputed defendant Johnson's proposed undisputed statement No. 46: "Defendant Johnson learned the procedure for processing inmate mail by watching staff while he was a general office assistant."  (ECF No. 234-1 at 14.)  Plaintiff cited to deposition testimony by defendants Johnson and Virga, and referred to plaintiff's August 5, 2008 inmate appeal.  Id. at 14-15.)  But plaintiff fails to explain how the cited evidence rebuts defendant's testimony as to how he learned how incoming mail at CSP-SAC was processed.  The evidence cited by plaintiff does not address how defendant Johnson learned about practices in the CSP-SAC mailroom.

1    41.  On a daily basis, defendant Johnson would work with one to three different staff

2    members in the mailroom.  (Johnson Dep. at 82; 88-90.)

3    42.  Defendant Johnson identified workers in the mailroom during 2007-2008 as Laverne

4    Woods (aka "Woody"), Carol Bolt, and Jolene Nunez (all full-time), and Vivian Galley and

5    another woman, whose name defendant Johnson could not recall (both part-time), and maybe

6    three other people Johnson could not identify.  (Johnson Dep. at 82, 88-92; 104, 116-17.)

7    Defendant Johnson also identified Janice Novincido, Constance Berg, and Milton Lobano as

8    working in the mailroom in 2008.  (Johnson Dep. at 88-89.)

9    43.  Jolene Nunez's primary responsibility was processing incoming and outgoing legal

10   mail.  (Johnson Dep. at 139-40.)

11   44.  The mailroom at CSP-SAC had a computer system, referred to as the DDPS, that

12   could locate an inmate housed in the facility by searching with the inmate's CDC number.

13   45.  Defendant Johnson testified that the DDPS did not tell where the inmate was at court,

14   it just said the inmate was out to court.[14]  (Johnson Dep. at 137.)

15   46.  There was a practice in the CSP-SAC mailroom regarding the handling of mail for

16   inmates who were out to court.

17   47.  Defendant Johnson described that from at least January 1, 2007 through April 2,

18   2012, if the CSP-SAC mailroom received mail (both regular and legal) for an inmate that was

19   "out to court," "then that piece of mail would not go in to him" and instead would go in a "box"

20   or "pigeon hole" "that was labeled, 'Out to court.'"

21   48.  In further describing this operating practice for mail that arrived at CSP-SAC for an

22   out to court inmate, defendant Johnson testified that "our procedure [was] to hold [the mail] in the

23

24   _____

     [14]  Plaintiff disputed defendant Johnson's undisputed fact 48, "For inmates that were temporarily

25   'out to court,' the system would inform mailroom staff that the inmate was 'out to court' but
     would not identify where the inmate was located."  (ECF No. 234-1 at 15.)  Plaintiff cited

26   deposition testimony of defendants Johnson and Virga, as well as plaintiff's August 5, 2008
     administrative appeal.  (Id.)  But plaintiff does not explain how such evidence rebuts that portion

27   of defendant Johnson's testimony that the DDPS computer would simply note "out to court" and
     not provide the address where the inmate was housed while out to court.

28

1 | office until [the inmate] came back from court" and to check "like, every three days to see if they

2 | came back from court."

3 |       49.  During his deposition in this case, defendant Johnson testified as follows:

4 |     <u>Plaintiff's Counsel</u>:  I think we've covered it a few times, but . . . for

5 | mail that came to CSP-SAC for inmates who were on out-to-court status, the policy was to process the mail and hold it in the pigeon

6 | hole that you've been referring to, monitor the mail until the inmate was no longer [on] out-to-court status and was back at CSP-SAC;

7 | correct?

8 |     <u>Defendant Johnson</u>:  Yeah.

9 | (Pl.'s Dep. at 163:1-9.)

10 |       50.  Mail received by CSP-SAC inmates who were out to court was not sent to where the

11 | inmate was housed for out to court purposes.

12 |       51.  In explaining why out to court inmate mail was stored in the CSP-SAC mailroom

13 | until the inmate returned, defendant Johnson answered that he could not determine an out to court

14 | inmate's whereabouts using the CSP-SAC computer system.

15 |       52.  After reading § 3133-F of Title 15, in reference to both Title 15 exhibits,[15] defendant

16 | Walker testified that defendant Johnson's operation of the CSP-SAC mailroom in connection

17 | with the handling of out to court inmate mail was different from the regulation at Section 3133-F

18 | of Title 15 of the California Code of Regulations.  (Walker Dep. at 118-21; 161-62.)  After

19 | reading § 3133-F of Title 15, in reference to the first exhibit, when asked whether defendant

20 | Johnson's process for out to court inmate mail was different, defendant Virga responded "yes.

21 | It's contrary to what is said in the Title 15." (Virga Dep. at 185-86.)  In reference to the second

22 | exhibit, when asked whether defendant Johnson's process for out-to-court inmate mail was

23 | different from the process set forth in Subsection F of Exhibit 2, defendant Virga responded,

24 | "Yes." (Virga Dep. at 188.)

---

[15]  Plaintiff provided copies of the exhibits.  (ECF No. 223 at 377-400 (Exs. T & U).)  Section 3133(f) "Forwarding Mail," reads, in pertinent part:  "Mail received for an inmate who has been transferred from the facility where the mail is received shall be immediately forwarded to the facility or agency that has current custody of the inmate.  Mail addressed to an inmate who has been transferred or released shall not be returned to the sender as 'Addressee Unknown' unless the individual has been discharged from CDCR."  <u>Id.</u>

53. All mail that arrived for plaintiff at CSP-SAC from November 8, 2007, until June 19, 2008 -- i.e., while plaintiff was on out to court status and away from CSP-SAC -- was not forwarded to the facility that had current custody of plaintiff.

54. Plaintiff did not receive his mail upon his return to CSP-SAC on June 19, 2008.

55. On July 17, 2008, plaintiff appealed defendant Johnson's December 21, 2007 first formal level response to appeal Log No. 07-02453.

56. Approximately 40 days after plaintiff's return to CSP-SAC, plaintiff's mail was returned to him on July 29, 2008, by defendant Gaddi.

57. Such untimely delivery of mail after an inmate returns from out to court status is contrary to the practice of CSP-SAC mailroom to check every few days to see if the inmate has returned.

58. A legal mail log prepared by defendant Gaddi -- which was also signed by his supervisor Le'Vance Anthony Quinn -- accompanied the delivered mail.

59. The legal mail log provided that the legal mail delivered to Mr. Penton on July 29, 2008, actually arrived at CSP-SAC on the following dates:  (1) San Bernardino County Counsel (November 9, 2007); (2) Court of Appeal Fifth District (Fresno) (November 19, 2007); (3) U.S. District Court (S.D. Cal.) (December 28, 2007); (4) U.S. District Court (S.D. Cal.) (January 2, 2008); (5) Court of Appeal Fifth District (Fresno) (January 9, 2008); (6) Court of Appeal Fifth District (Fresno) (February 29, 2008); (7) Court of Appeal Fifth District (Fresno) (April 14, 2008); (8) Court of Appeal Fifth District (Fresno) (April 25, 2008); and (9) Department of Justice (Sacramento) (April 28, 2008).

60. During their depositions in this case, defendants Gaddi, Virga and Quinn confirmed that the legal mail log established that the listed mail actually arrived at CSP-SAC many months prior to when the mail was delivered to plaintiff on July 29, 2008.

61. Defendant Gaddi also testified that he wrote these received dates on the legal mail log that accompanied the corresponding legal mail delivered to plaintiff on July 29, 2008, because:  "I was concerned that maybe down the road I might be asked about this, so that's why I put on there
////

19

1   that it was received that day.  That it was received prior months before me issuing it to him that

2   day.  Obviously, I was concerned. That's why I wrote this down here."  (Gaddi Dep. at 98.)

3           62.  The mail plaintiff received from defendant Gaddi on July 29, 2008, included the

4   habeas court's December 20, 2007 denial of plaintiff's habeas petition and the clerk's December

5   26, 2007, entry of judgment.

6           63.  The habeas court denied plaintiff's habeas petition without issuing or denying a

7   certificate of appealability, and the clerk entered judgment on December 26, 2007; plaintiff's

8   deadline to seek an appeal was January 30, 2008.

9           64.  By the time plaintiff received his mail, the time to object to the report and

10   recommendations had expired, as had the time to request a certificate of appealability and to

11   appeal the judgment.[16]

12           65.  The mail plaintiff received on July 29, 2008, also included three letters from

13   plaintiff's family regarding urgent updates on his father's health and subsequent death.

14           66.  The first letter said that plaintiff's father had gotten lost because of his dementia; the

15   second letter said that his father was hospitalized with terminal pneumonia and urged plaintiff to

16   call home to speak with his father one last time; and the third letter informed plaintiff that his

17   father passed away on July 25, 2008.

18           67.  Although plaintiff could not remember the exact postdate of such letters, he testified

19   that they were postmarked two to four months prior to receipt.  (Pl.'s Dep. at 189.)

20           68.  On August 5, 2008, plaintiff filed a second inmate appeal to address the holding of his

21   legal mail while he was "out to court."[17]

22           69.  Defendant Jolene Nunez, a CSP-SAC mailroom staff member, conducted the informal

23   level of review of plaintiff's second appeal.

24   ////

---

25   [16]  Plaintiff was eventually able to appeal the habeas judgment and the appeal was pending in the

26   Ninth Circuit Court of Appeals at the time these motions were briefed.

27   [17]  Plaintiff contends that the second appeal addressed both legal and regular mail, but the court
    found that such appeal only addressed legal mail, which is now law of the case.

28

70.   On August 18, 2008, defendant Nunez denied the second appeal at the informal level, writing that "The reason you received the legal mail dating back to 2007 is because the mailroom was holding it while you were out to court."  This was the first time plaintiff was informed that his mail was held in the CSP-SAC mailroom while he was out to court.

71.   Though the procedure in the mailroom was to regularly check if an inmate was still out to court, defendant Johnson testified that defendant Nunez should have figured out where plaintiff was at some point and forwarded his mail given the length of plaintiff's absence.

72.   On May 18, 2018, pro bono counsel for plaintiff filed a motion for reconsideration in plaintiff's habeas case.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 53).

73.   The habeas court granted the motion for reconsideration on August 28, 2018, and allowed plaintiff to file objections.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 61).

74.   Plaintiff filed objections on November 26, 2018.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 66).

75.   On September 12, 2019, the habeas court adopted all portions of the report and recommendations, except as to plaintiff's Sixth Amendment claim based on the trial judge's increase of his sentence under California's Determinate Sentencing Law, which the habeas court denied after issuing its own opinion.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 77).

76.   On December 4, 2019, the habeas court granted plaintiff's motion for a certificate of appealability as to all the issues plaintiff objected to.  Kernan, No. 3:06-cv-0233 (S.D. Cal. docket entry 83).

77.   Plaintiff's appeal of the habeas court's denial of the habeas petition was pending in the Court of Appeals for the Ninth Circuit, but the Court affirmed the district court's decision during the pendency of this action.  Penton v. Kernan, Case No. 19-56201 (9th Cir. June 3, 2021).

**Plaintiff's Motion for Summary Judgment**

Plaintiff seeks summary judgment finding defendant Johnson liable for violating plaintiff's constitutional rights to mail and access to the courts.

////

////

1    I. <u>Mail</u>

2         A. <u>The Parties' Positions</u>

3         Plaintiff argues that defendant Johnson's practice of withholding out to court inmate mail

4    in the CSP-SAC mailroom violated plaintiff's First and Fourteenth Amendment rights to mail

5    because such practice caused plaintiff's mail to accumulate without notice for over eight months

6    while plaintiff was out to court and was in direct violation of prison regulations requiring that

7    such mail be immediately forwarded.  Defendant counters that there is no evidence that defendant

8    personally handled plaintiff's mail, and plaintiff's argument for respondeat superior liability

9    against defendant Johnson as mailroom supervisor is improper under § 1983.  Defendant argues

10   that defendant Gaddi's testimony that it was "peculiar" that plaintiff received his mail so late

11   rebuts plaintiff's argument that the delay was "regular."  Further, defendant argues that plaintiff

12   fails to establish a constitutional violation based on lack of notice because it is undisputed that no

13   one in the mailroom had plaintiff's forwarding address.

14        In reply, plaintiff argues that he linked his allegations to defendant Johnson, citing

15   multiple paragraphs of his fourth amended complaint, and that he is entitled to summary

16   judgment because "discovery revealed that Johnson's practice of withholding 'out to court'

17   inmate mail caused the over eight-month withholding of [plaintiff's] legal and personal mail."

18   (ECF No. 238 at 4.)  Plaintiff argues that the repeated withholding of plaintiff's mail was not an

19   isolated event, but "was systematic and repetitive."  (<u>Id.</u>)

20        B. <u>Governing Standards</u>

21        Prisoners have a First Amendment right to send and receive mail.  <u>Thornburgh v. Abbott</u>,

22   490 U.S. 401, 407 (1989); <u>Crofton v. Roe</u>, 170 F.3d 957, 959 (9th Cir. 1999); <u>Witherow v. Paff</u>,

23   52 F.3d 264, 265 (9th Cir. 1995).  As to incoming prisoner mail, prison officials have a

24   responsibility to promptly forward mail to inmates.  <u>See</u> <u>Bryan v. Werner</u>, 516 F.2d 233, 238 (3d

25   Cir. 1975) ("We believe, however, that officials do have a responsibility to promptly forward mail

26   to people like appellant, even where the mail is addressed to them in care of the law clinic and

27   they are no longer working at the clinic.").  For example, prisoners must be able to seek and

28   receive the assistance of attorneys, and regulations and practices unjustifiably obstructing access

                                        22

1    to the courts are invalid.  Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled in part by

2    Thornburgh, 490 U.S. 401.[18]

3          A jail or prison may restrict an inmate's right to receive mail but only if the regulations

4    are "reasonably related" to legitimate penological interests.  See Turner v. Safley, 482 U.S. 78,

5    89-91 (1987); Witherow, 52 F.3d at 265.  Legitimate penological interests include "security,

6    order, and rehabilitation."  Procunier, 416 U.S. at 413.

7          C.  Discussion

8               1.  Failure to Forward Mail

9          Initially, the undersigned is not persuaded by Pierce v. Gonzales, 2011 WL 703594 (E.D.

10   Cal. Feb. 18, 2011), or Calihan v. Adams, 2011 WL 284467 (E.D. Cal. Jan. 26, 2011).  While

11   both district court cases found that shorter delays in mail delivery stated cognizable civil rights

12   claims, neither court addressed the culpability of an individual defendant.  Indeed, in both cases,

13   the court went on to find that the prisoner failed to sufficiently link his allegations to specific

14   defendants and dismissed the pleadings with leave to amend.  Pierce, at *7 (citing see Rizzo, 423

15   U.S. at 371); Calihan, 2011 WL 284467, *3.  In addition, unlike in Calihan and Pierce, there is no

16   evidence that plaintiff's mail was held for nefarious reasons.

17         Here, plaintiff sues defendant in his individual capacity, and it is undisputed that

18   defendant Johnson was the supervisor of the mailroom.  In his motion, plaintiff studiously avoids

19   such role, choosing instead to focus on his "practice."  Plaintiff fails to address the impact of

20   Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), on defendant Johnson's putative liability.

21   ////

22

23   [18]  The Supreme Court emphasized the importance of mail:  "Communication by letter is not
     accomplished by the act of writing words on paper.  Rather, it is effected only when the letter is
24   read by the addressee.  Both parties to the correspondence have an interest in securing that result,
     and censorship of the communication between them necessarily impinges on the interest of each.
25   Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is
     plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of
26   speech.  And this does not depend on whether the nonprisoner correspondent is the author or
     intended recipient of a particular letter, for the addressee as well as the sender of direct personal
27   correspondence derives from the First and Fourteenth Amendments protection against unjustified
     governmental interference with the intended communication."  Procunier, 416 U.S. at 408-09.
28

                                                    23

1    On the other hand, defendant contends that plaintiff fails to show defendant Johnson's

2    personal involvement.  However, the Ninth Circuit has stated:

3    We have never required a plaintiff to allege that a supervisor was
     physically present when the injury occurred. In <u>Larez v. City of Los</u>
4    <u>Angeles</u>, 946 F.2d 630 (9th Cir. 1991), we explained that to be held
     liable, the supervisor need not be "directly and personally involved
5    in the same way as are the individual officers who are on the scene
     inflicting constitutional injury." <u>Id.</u> at 645. Rather, the supervisor's
6    participation could include his "own culpable action or inaction in
     the training, supervision, or control of his subordinates," "his
7    acquiescence in the constitutional deprivations of which the
     complaint is made," or "conduct that showed a reckless or callous
8    indifference to the rights of others." <u>Id.</u> at 646 (internal citations,
     quotation marks, and alterations omitted).

9

10   <u>Starr v. Baca</u>, 652 F.3d 1202, 1205-06 (9th Cir. 2011).  The requisite causal connection can be

11   established not only by some kind of direct personal participation in the deprivation, but also by

12   setting in motion a series of acts by others which the actor knows or reasonably should know

13   would cause others to inflict the constitutional injury."  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743-44

14   (9th Cir. 1978).

15   Here, plaintiff adduced evidence that it was defendant Johnson's practice that caused

16   plaintiff's mail to accumulate, and its delivery delayed.  While defendant Johnson did not create

17   the practice, he continued the practice once he was promoted to mailroom supervisor, despite

18   evidence that the practice violated Title 15 regulations requiring that mail be "immediately

19   forwarded" to inmates transferred away from the prison, as well as defendant's concession that he

20   was responsible for knowing applicable Title 15 regulations.  In addition to ensuring all mail is

21   processed correctly (UDF 37), one of plaintiff's essential duties as supervisor was to "[r]ead and

22   be up-to-date on all memoranda and policies concerning the handling of regular and legal

23   correspondence.  Update mailroom internal procedures in compliance with departmental

24   procedures."  (ECF No. 247 at 132.)  Arguably, the continued practice of holding rather than

25   forwarding mail to inmates who were out to court resulted in plaintiff's mail languishing in the

26   mailroom for over eight months.  Moreover, a reasonable juror could find defendant's role in

27   reviewing and investigating plaintiff's grievance on December 21, 2007, over a month after

28   plaintiff had been transferred out to court, sufficient to demonstrate a causal connection,

24

1     particularly where defendant Johnson failed to discover plaintiff's first two pieces of withheld

2     legal mail after his purported "thorough inquiry." (UDF 22, 59.) Defendants Virga and Walker

3     both testified that during such investigation, defendant Johnson should have discovered the legal

4     mail plaintiff received in November of 2007 while plaintiff was out to court.[19]

5         On the other hand, defendant adduced evidence that he and mailroom staff did not know

6     where plaintiff was housed while out to court.

7         Also, defendant Johnson testified that defendant Nunez should have monitored plaintiff's

8     mail and found out where plaintiff was housed while out to court. But plaintiff's expert Vasquez

9     testified that in his experience, it was the mailroom supervisor who was responsible to see that

10     legal mail was forwarded to an inmate. Thus, there is a material dispute of fact as to whether it

11     was defendant Johnson's practice that caused the accumulation of mail, whether it was an

12     inability to locate plaintiff, or whether it was the mailroom staff's failure to properly monitor

13     plaintiff's mail that caused the delay in plaintiff's mail.

14         Upon review of the evidence, the undersigned finds that such material issues of fact

15     preclude summary judgment for plaintiff.

16              2. Failure to Provide Notice

17         Plaintiff argues that defendant Johnson also violated plaintiff's due process right to notice

18     that his mail was withheld. Defendant counters that plaintiff offered no evidence to prove that

19     defendant Johnson or anyone else in the CSP-SAC mailroom knew where plaintiff was housed

20     while out to court, and thus such mail could not be forwarded. Defendant also argues that

21     plaintiff's reliance on <u>Krug v. Jabczenski</u>, 329 F.3d 692 (9th Cir. 2003), is unavailing because in

22     <u>Krug</u>, the prisoner was not seeking notice of mail that was not being forwarded, but rather was

23     focused on the exclusion of publications that were deemed obscene by the institution. In reply,

24     plaintiff contends that minimal procedural safeguards are required when prison officials withhold

25     inmate mail.

26

27     [19] Despite such identified practice, there is also evidence that at least one of plaintiff's letters from the court was returned to the court due to plaintiff's absence from CSP-SAC. (UDF 13.)

28     The practice of returning such mail is also supported by Besenaiz's testimony that mail was not forwarded; rather, it was returned to sender.

In <u>Procunier</u>, the Supreme Court held "that the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." 416 U.S. at 417-18. Specifically, an inmate "has a Fourteenth Amendment due process liberty interest in receiving notice that his incoming mail is being withheld by prison authorities." <u>Frost v. Symington</u>, 197 F.3d 348, 353-54 (9th Cir. 1999). This liberty interest is protected from "arbitrary government invasion," and any decision to censor or withhold delivery of mail must be accompanied by "minimum procedural safeguards." <u>Sikorski v. Whorton</u>, 631 F. Supp. 2d 1327, 1341 (D. Nev. 2009) (quoting <u>Procunier</u>, 416 U.S. at 417-18.) The "minimum procedural safeguards" are: (1) notifying the inmate that the mail was seized; (2) allowing the inmate a reasonable opportunity to protest the decision; and (3) referring any complaints to a prison official other than the one who seized the mail. <u>Procunier</u>, 416 U.S. at 418-19; <u>Krug v. Lutz</u>, 329 F.3d 692, 697-08 (9th Cir. 2003) ("Following <u>Thornburgh</u>, this circuit has repeatedly acknowledged that withholding delivery of inmate mail must be accompanied by the minimum procedural safeguards established in [Procunier].").

It is undisputed that plaintiff was not provided notice that his mail would be held while he was out to court. Moreover, there is no evidence demonstrating that defendant's practice included a provision for a prisoner to be provided notice when his mail was held while he was out to court. Indeed, the appeal response in which defendant Johnson informed plaintiff he would be notified if his mail was withheld in the future cited CDCR Form 1819, which specifically governs the disapproval of mail, packages or publications, meaning the inmate would not be allowed to receive such item. The response did not inform plaintiff his mail would be held while he was out to court.

In opposition, defendant maintains that no notice could be provided because defendant Johnson and mailroom staff did not know where plaintiff was housed while out to court. Indeed, defendant Johnson testified that the computer used by mailroom staff only provided "Out to Court," and did not indicate the address where the prisoner was temporarily housed. Also, prison regulations provide that change of address cards will be "issued upon request to inmates who are

////

26

1 | scheduled for transfer. . . ." Cal. Code Regs. tit. 15, § 3147(E). (ECF No. 16 at 39; Ex. 5 to

2 | Johnson Dep.; BATES 245.)

3 |    It appears that at least initially, no party, including plaintiff, had plaintiff's out to court

4 | address. There is no evidence from the U.S. Marshal as to plaintiff's movement history, no

5 | Kentucky jail records as to the date of plaintiff's arrival. Rather, plaintiff relies on his vague

6 | memories as to his transport from CSP-SAC to Kentucky, estimating it took about two to three

7 | weeks. (UDF 17.) Plaintiff offers no evidence as to whether the U.S. Marshal shared plaintiff's

8 | location with anyone at CDCR or CSP-SAC, or whether such information remained confidential,

9 | as defendant suggests it might due to the nature of plaintiff's putative testimony. (ECF No. 224-1

10 | at 15.) At a minimum it appears that plaintiff's location during his transit to Kentucky was not

11 | disclosed, likely due to security concerns. (See ECF No. 224-10 at 2) ("*When a prisoner is in*

12 | *transit*, the Marshals do not disclose any transportation details except verification that an inmate

13 | is in Marshals' custody and confirmation when a prisoner movement is complete." (Emphasis

14 | added).)

15 |    But the continued delay of plaintiff's mail cannot be justified once plaintiff arrived in

16 | Bowling Green, Kentucky. Arguably, defendant or mailroom staff in the CSP-SAC mailroom

17 | should have monitored plaintiff's out to court mail and discovered that many weeks had elapsed,

18 | and then sought plaintiff's address elsewhere. Prison regulations provide that mail for an inmate

19 | who is temporarily away from the facility may be held "when the inmate's return is anticipated

20 | within one week." Cal. Code Regs. tit. 15, § 3133(h).

21 |    Defendant Johnson's deposition testimony suggests that mailroom staff had the ability to

22 | find out where an inmate was housed. (UDF 71.) Plaintiff's expert Vasquez testified that in the

23 | prisons where he served as warden, it was the mailroom supervisor's responsibility to ensure that

24 | mail was forwarded to inmates out to court. And, prison regulations at the time required that

25 | plaintiff's mail be forwarded to inmates transferred out to court. Indeed, Section 3134(g)

26 | "Forwarding Confidential Correspondence," provides that if the inmate's name and number do

27 | not match, "the mailroom will contact the Litigation Coordinator who will telephone the court to

28 | clarify the identification of the addressee in order to expedite delivery of the confidential

1  correspondence." Cal. Code Regs. tit. 15, § 3134(g); (ECF No. 223 at 380).  Such regulation

2  suggests that defendant Johnson or other mailroom staff could have contacted the litigation

3  coordinator to obtain plaintiff's current address, particularly when plaintiff's letter from the

4  California Court of Appeal for the Fifth District was delivered to CSP-SAC on November 19,

5  2007, after plaintiff arrived at the Kentucky jail.

6      But, a material dispute of fact exists as to whether defendant Johnson is culpable for such

7  failure to provide notice.  Plaintiff points to no deposition testimony by Johnson acknowledging

8  he was aware notice was required or to any prison regulation requiring such notice under these

9  circumstances.  In addition, was it defendant Johnson's responsibility as supervisor?  Or was it

10  the responsibility of the mailroom staff person who received the piece of mail for plaintiff?  Or

11  was it the responsibility of the mailroom staff charged with monitoring such withheld mail?  Such

12  questions of fact preclude entry of summary judgment on behalf of plaintiff.

13      The undersigned agrees with plaintiff that defendant's reliance on Ibeabuchi v. Penzone,

14  2019 U.S. Dist. LEXIS 4833, n.2 (Ariz. Jan. 9, 2019) is unavailing.  In Ibeabuchi, the inmate had

15  been permanently transferred to Arizona Department of Corrections custody from the county jail,

16  ostensibly with all of his property.  Id.  Here, unlike in Ibeabuchi, plaintiff was unexpectedly and

17  temporarily transferred, was refused the ability to bring his legal materials with him, and he had

18  no idea where he was going or for how long.

19      Therefore, based on such material disputes of fact, it is recommended that plaintiff's

20  motion for summary judgment on the issue of notice also be denied.

21          3.  Access to the Courts

22              a.  Governing Standards

23      Under the First and Fourteenth Amendments to the Constitution, state prisoners have a

24  right of access to the courts.  Lewis v. Casey, 518 U.S. 343, 346 (1996); Phillips v. Hust, 477

25  F.3d 1070, 1076 (9th Cir. 2007).[20]  "[A]ccess to the courts means the opportunity to prepare,

26

27  _____

[20]  Phillips was overruled on other grounds by Hust v. Phillips, 555 U.S. 1150 (2009) (holding
28  librarian entitled to qualified immunity due to reasonable belief that prisoner plaintiff not required
to comb-bind petition).

28

serve and file whatever pleadings or other documents are necessary or appropriate in order to commence or prosecute court proceedings affecting one's personal liberty."  Lewis v. Casey, 518 U.S. at 346 (quoting Hatfield v. Bailleaux, 290 F.2d 632, 637 (9th Cir. 1961)).  The court in Hatfield added that such access also included the opportunity to "to send and receive communications to and from judges, courts and lawyers concerning such matters.  Whether or not in a particular case the access afforded is reasonable depends upon all of the surrounding circumstances."  Id.

Traditionally, courts have identified two types of access claims:  "those involving prisoners' right to affirmative *assistance*, and those involving prisoners' right to litigate without active *interference*."  Silva v. Di Vittorio, 658 F.3d 1090, 1102 (9th Cir. 2011), overruled on other grounds as stated by Richey v. Dahne, 807 F.3d 1202, 1209 n.6 (9th Cir. 2015).

The right to assistance is limited to direct criminal appeals, habeas petitions, and civil rights actions.  Lewis v. Casey, 518 U.S. at 354.  But where interference is alleged, the right of access to courts does not stop at the pleading stage of a civil rights or habeas litigation.  Silva, 658 F.3d at 1102 (citations omitted).  Prisoners also have the right to pursue claims that have a reasonable basis in law or fact without active interference by prison officials.  Silva, 658 F.3d at 1103-04 (finding that repeatedly transferring the plaintiff to different prisons and seizing and withholding all of his legal files constituted active interference where the prisoner alleged cases had been dismissed).  This right forbids state actors from erecting barriers that impede the right of access to the courts by incarcerated persons.  Silva, 658 F.3d at 1102 (internal quotations omitted).

In both types of access to the courts claims, the defendant's actions must have been the proximate cause of actual prejudice to the plaintiff.  Silva, 658 F.3d at 1103-04; Phillips, 477 E. 3d at 1077.  "The touchstone of proximate cause in a § 1983 action is foreseeability."  Phillips, 477 F.3d at 1077 (citations omitted).

Where, as here, a prisoner asserts a backward-looking denial of access claim, seeking a remedy for a lost opportunity to present a legal claim, the prisoner must adduce evidence demonstrating:  (1) the loss of a "nonfrivolous" or "arguable" underlying claim; (2) the official

29

1    acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not

2    otherwise available in a future suit.  See Christopher v. Harbury, 536 U.S. 403, 413-14 (2002).

3         "An arguable (though not yet established) claim [is] something of value."  Lewis v. Casey,

4    518 U.S. at 353.  Therefore, to demonstrate the existence of a nonfrivolous claim, plaintiffs "need

5    not show, ex post, that [they] would have been successful on the merits had [their] claims been

6    considered."  Allen v. Sakai, 48 F.3d 1082, 1085 (9th Cir. 1994).  To hold otherwise "would

7    permit prison officials to substitute their judgment for the courts' and to interfere with a

8    prisoner's right to access on the chance that the prisoner's claim would eventually be deemed

9    frivolous."  Id.  Examples of actual prejudice include the "inability to meet a filing deadline or to

10   present a claim."  Lewis v. Casey, 518 U.S. at 348 (citations and internal quotations omitted).

11                                    b.  Discussion

12        The Ninth Circuit's finding that plaintiff's constitutional injury was complete when his

13   ability to challenge the magistrate judge's report and recommendation was impaired constitutes

14   law of the case.[21]  The undersigned is not persuaded by defendant's argument that the access to

15   courts claim fails because plaintiff was not transferred out to court until November 8, 2007, after

16   the November 7, 2007 deadline expired.  Plaintiff did not receive the court's October 22, 2007

17   order granting an extension until November 6, 2007, and his immediately-submitted request for

18   another extension did not reach the habeas court.[22]  Moreover, as argued by plaintiff, he was also

19   deprived of an opportunity to timely file a request for certificate of appealability or to file an

20   appeal.  Plaintiff adduced evidence that he sustained an actual injury when the holding of his legal

21   ////

22

23   [21]  While the Ninth Circuit's ruling is law of the case, petitioner was able to reopen his habeas
24   action, appeal the denial, and the denial was affirmed by the Ninth Circuit, raising interesting
     questions as to whether it is now moot.

25   [22]  Plaintiff declares that despite clearly addressing his motion for extension to the habeas court,
26   mailroom personnel sent the letter to the wrong court.  (ECF No. 225-3 at 2 ¶ 8.)  Defendant
     Johnson offered no evidence in rebuttal.  The parties do not dispute that the motion did not reach
27   the habeas court.  But plaintiff points to no evidence showing that defendant Johnson was
     responsible for the misdirection of the motion.

28

1  mail while plaintiff was out to court hindered his ability to access the courts and pursue his

2  habeas petition.

3          Similarly, just as the Ninth Circuit found that plaintiff's underlying habeas claims were

4  not frivolous, so too did the habeas court when it subsequently granted plaintiff a certificate of

5  appealability finding that issues raised in petitioner's amended petition "are non-frivolous and

6  debatable among reasonable jurists." Penton v. Malfi, No. 6-cv-233-WQH-RBM (S.D. Cal. Dec,

7  14, 2019).  (ECF No. 222-3 at 142.)  The challenge to his criminal conviction was not frivolous,

8  and no further inquiry into the nature of plaintiff's underlying court case is appropriate. Phillips,

9  477 F.3d at 1076.

10         Further, the undersigned is persuaded that this case provides the sole remedy to account

11 for plaintiff's injuries suffered as a result of the failure to forward plaintiff's mail and alleged

12 hindrance of his access to the courts.

13         That said, the issue here is whether there are material disputes of fact as to defendant

14 Johnson's culpability in the denial of such access.  For example, was it the continued practice of

15 defendant Johnson that was the proximate cause of the actual injury?  Or was the cause of

16 plaintiff's actual injury his own failure to inform the habeas court of his current address, as the

17 court required?

18         As argued by plaintiff, one circuit has addressed an instance where the prisoner's mail was

19 not forwarded while the prisoner was out to court.  Simkins v. Bruce, 406 F.3d 1239 (10th Cir.

20 May 9, 2006).  In Simkins, the Tenth Circuit held that the prison mailroom supervisor's conduct

21 holding the prisoner's mail rather than forwarding it to him constituted intentional conduct

22 violating the prisoner's right of access to the courts.  Id.  However, such case is distinguishable

23 because in Simkins, there was no dispute over whether the mailroom had the prisoner's address

24 while out to court, and the mailroom supervisor Ms. Keen admitted to receiving yet holding the

25 mail for over a year according to her training, but in contravention of prison regulations.  Id.

26 Indeed, the mail supervisor in Simkins submitted an affidavit to that effect.  Id. at 1242.  The

27 judge in Simkins stated:  "defendants' own evidence demonstrates that Ms. Keen intentionally

28 held plaintiff's mail for over a year in contravention of prison regulations.  That course of action

1   is not mere negligence; rather, it is intentional conduct violating plaintiff's right of access to the

2   courts." Id.

3          Here, to the contrary, defendant Johnson provided no such affidavit, and plaintiff adduced

4   no evidence that defendant Johnson knew plaintiff was out to court, personally held plaintiff's

5   mail, or knew plaintiff's mail was being withheld.[23]  Indeed, defendant Johnson testified that

6   defendant Nunez should not have held the mail for so long and should have found out where

7   plaintiff was housed.  It is also not clear who in the CSP-SAC mailroom processed each of the

8   nine pieces of plaintiff's mail to the out-to-court box, or who failed to monitor the withheld mail.

9   Finally, aside from being an out of circuit case, Simkins predates the Supreme Court's decision in

10  Iqbal, 556 U.S. 679.

11         In essence, plaintiff argues that the practice of holding mail for inmates who were out to

12  court constitutes intentional conduct, not negligence, and is active interference that deprived

13  plaintiff of his fundamental First Amendment rights.  (ECF No. 238 at 8.)  Defendant argues that

14  plaintiff must adduce evidence that defendant Johnson actively interfered with plaintiff's right to

15  litigate, Silva, 658 F.2d at 1102, and plaintiff bears the burden to establish a causal link between

16  the actual injury and the acts or omissions of defendant Johnson "beyond controversy."  Phillips,

17  588 F.3d at 655.

18

19  [23]  It is undisputed that plaintiff adduced no evidence through written discovery that defendant
    Johnson personally withheld plaintiff's mail, legal or personal.  (UDF 35.)  Plaintiff points to no
20  evidence demonstrating that defendant Johnson personally handled or failed to forward plaintiff's
    mail.  When asked whether, after issuing the December 21, 2007 first formal level appeal
21  response, defendant Johnson ever withheld plaintiff's mail at any time at the CSP-SAC mailroom,
    defendant testified, "Not to my knowledge."  (Johnson Dep. at 183.)  Defendant Johnson also
22  denied ever directing anyone in the CSP-SAC mailroom, from November 8, 2007, to July 29,
    2008, to put a hold on plaintiff's mail.  (Johnson Dep. at 184.)  In briefing defendant's motion for
23  summary judgment, plaintiff disputed defendant Johnson's statement of undisputed fact 53, which
    states "Defendant Johnson did not personally withhold plaintiff's mail."  (ECF No. 234-1 at 18.)
24  Plaintiff cites multiple pieces of evidence, but fails to demonstrate how such evidence shows that
    defendant Johnson personally handled plaintiff's mail or personally failed to deliver plaintiff's
25  mail.  (ECF No. 234-1 at 18-19.)  Indeed, even plaintiff's expert witness testified that he
    "[doesn't] have any evidence that [defendant Johnson] particularly singled out Mr. Penton to
26  withhold his mail."  (Vasquez Dep. at 53.)  Absent evidence not provided here, the undersigned
    cannot find that a material dispute of fact exists as to whether defendant Johnson personally
27  handled or personally failed to forward plaintiff's mail.
28

1    Thus, following review of the evidence, the undersigned finds there is a material dispute

2    of fact as to whether, in contravention to Title 15 regulations that required that the mail be

3    immediately forwarded to plaintiff, defendant Johnson's continuation of the practice constitutes

4    "active interference" as contemplated in <u>Silva</u>, or whether defendant Johnson's putative

5    culpability hinges solely on his supervisorial duties -- his alleged failure to adequately supervise

6    his subordinates to ensure that mailroom staff monitored the mail put in the box for out to court

7    prisoners such that the mail would be delivered upon their return or, in the event their absence

8    was prolonged, find out where the inmate was located and forward the mail.  Or, whether the

9    actual injury sustained by plaintiff in his habeas case was the result of his own failure to notify

10   the habeas court of his change of address.

11   For all of the above reasons, the undersigned finds that plaintiff is not entitled to summary

12   judgment.

13   4.  <u>Alleged Violation of Other Policies</u>

14   Finally, plaintiff contends that defendant Johnson violated other practices while he was in

15   charge of the CSP-SAC mailroom, relying on the OIA report, and defendant Johnson's deposition

16   testimony.  Inasmuch as the evaluation of the use of the OIA investigation involves review of

17   information that is sealed, the undersigned addresses, by separate order filed under seal, whether

18   such evidence should be admitted.

19   **Defendant Johnson's Motion for Summary Judgment**

20   I.  <u>The Parties' Positions</u>

21   A.  <u>Defendant Johnson's Position</u>

22   Defendant Johnson argues the following.  There is no evidence that defendant Johnson

23   personally withheld or directed his staff to withhold plaintiff's mail, or that defendant Johnson

24   caused any violation of plaintiff's right to access the courts.  Indeed, defendant Johnson testified

25   he did neither.  (Johnson Dep. at 183-84.)

26   In addition, in 2018, in addressing a motion for summary judgment, a California district

27   court found the prisoner failed to provide any evidence that the mailroom defendant "intentionally

28   interfered with or erected a barrier to plaintiff's right to litigate."  (<u>Id.</u>, quoting <u>Norton v. Hallock</u>,

33

1 2018 U.S. Dist. LEXIS 185951 at *2 (N.D. Cal. Oct. 29, 2018).)  Although Norton was deprived

2 of his one piece of legal mail for 35 days, and suffered an actual injury to his legal claim, the

3 district court held that "plaintiff has not provided any non-speculative evidence to demonstrate

4 that defendant proximately caused plaintiff's failure to receive timely notice of the Central

5 District of California's order in the mail."  Norton, at *10-11.  Relying on Silva, the district court

6 noted "[a] one-time delay or mishandling of mail without any facts to support an intentional act to

7 hinder plaintiff is insufficient to establish 'active interference' to a prisoner's right to litigate."

8 Norton, at *11 (quoting Silva, 658 F.3d at 1104).  Here, plaintiff presented no evidence that

9 defendant Johnson maliciously or deliberately withheld plaintiff's mail.  Rather, plaintiff's sole

10 reliance on defendant Johnson's supervisorial role fails because there is no respondeat superior

11 liability in § 1983 litigation, and there is also no evidence of active interference.

12     Further, there is no evidence that he or anyone else in the mailroom knew where plaintiff

13 was being housed after he was transferred into U.S. Marshal custody.  (ECF No. 224-1 at 15.)

14 While plaintiff was in transit, plaintiff's mail could not be forwarded for a month, and plaintiff's

15 expert conceded that best practices did not require the mailroom to track plaintiff down while on

16 such a lengthy transit.  (Id., citing Vasquez Dep. at 50.)  Despite plaintiff's argument that his mail

17 should have been forwarded, the record shows that plaintiff did not inform CSP-SAC of his new

18 location.  Plaintiff fails to demonstrate that defendant actively interfered with plaintiff's mail --

19 there is no evidence that defendant Johnson knew where plaintiff was yet chose not to forward his

20 mail.

21     The facts of this case are unique in that plaintiff was not transferred to another CDCR

22 facility, and plaintiff testified he did not know how long he would be gone and did not contact

23 CSP-SAC or the courts to inform them he was temporarily away from CSP-SAC.  (ECF No. 224-

24 1 at 15.)  Defendant Johnson testified that the mailroom was not privy to an inmate's temporary

25 out to court location.  (Johnson Dep. at 132.)  The U.S. Marshal's Service 2020 Prisoner

26 Transportation Fact Sheet suggests that the U.S. Marshal may have intended not to disclose

27 plaintiff's location for security reasons.  (ECF No. 224-1 at 15, citing ECF No. 224-10 at 2

28 ("When a prisoner is in transit, the Marshals do not disclose any transportation details except

34

1    verification that an inmate is in Marshals' custody and confirmation when a prisoner movement is

2    complete.").)  On January 7, 2008, the Fifth Appellate District contacted CSP-SAC, which

3    responded that plaintiff was still in the U.S. Marshal's custody, and no address for plaintiff was

4    noted by the state court.  (ECF No. 224-11 at 99.)  In addition, while plaintiff concedes he did not

5    inform CSP-SAC or the habeas court of his change of address, on February 22, 2008, plaintiff

6    filed a letter with the Fifth Appellate District Court, whose docket reflects the subsequent order

7    was served on plaintiff at CSP-SAC and Kentucky.  (ECF No. 224-11 at 99.)

8         Further, it was plaintiff's responsibility to notify the courts of his changed address, which

9    plaintiff recognized by filing one in the Fifth Appellate District.  (ECF No. 224-1 at 16) (citing

10   Carey v. King, 856 F.2d 1439, 1441 (9th Cir. 1988) ("A party, not the district court, bears the

11   burden of keeping the court apprised of any changes in his mailing address.").)  Yet plaintiff

12   made no effort to do so with regard to the federal courts.  Despite this fact, plaintiff's ability to

13   litigate was not hampered because even ten years later he was able to have the habeas case

14   reopened, file objections, and was able to appeal the district court's decision to the circuit.

15        For all these reasons, defendant Johnson claims he is entitled to summary judgment on

16   plaintiff's access to the courts claim.

17        B.  Plaintiff's Opposition

18        Plaintiff argues that defendant Johnson is not entitled to summary judgment for two

19   reasons.

20             1.  Malicious or Deliberate Intent is Not Required

21        Controlling case law does not require malicious or deliberate intent to establish an access

22   to the courts claim.  Norton did not hold that malicious or deliberate intent is required to establish

23   an access to the courts claim.  (ECF No. 234 at 16) (citing Norton, 2018 WL 5629345.)  Rather,

24   Norton evaluated the contours of active interference in the context of qualified immunity.  Id. at

25   *4-5.  Although the defendants in Silva were alleged to have acted with malicious intent, the

26   court in Norton did not identify any Ninth Circuit case requiring "malicious or deliberate" intent

27   to establish an access to the courts claim.  Id. at *6.  Plaintiff argues that there are no U.S.

28   Supreme Court or Ninth Circuit cases requiring that "malicious or deliberate intent" must be

1    established in a § 1983 access to courts case, pointing out that even defendant Johnson recognizes

2    that the court in Norton concluded that "the boundaries of active interference were not clearly

3    defined." (ECF No. 234 at 17.)  Thus, plaintiff argues the court should reject defendant

4    Johnson's claim.

5                    2.  Johnson's Deliberate Practice

6            Defendant Johnson, who was in direct control of and directly responsible for the CSP-

7    SAC mailroom from at least January 1, 2007, until April 2, 2012, operated the mailroom such that

8    all incoming mail directed to CSP-SAC inmates who were out to court and not in CSP-SAC

9    custody would be withheld in the mailroom until sometime after the inmate returned. (ECF No.

10   234 at 17.)  Johnson testified that such mail would be stuffed in the "out to court" box or "pigeon

11   hole" and "would not go" to the inmate to whom the mail was addressed. (ECF No. 234 at 17-18,

12   quoting Johnson Dep. at 132, 162-63.))  Such practice was not negligent, but was intentional --

13   the product of defendant Johnson's "deliberate practice of withholding 'out to court' inmate mail

14   for an inmate until it was randomly discovered at some later date that the inmate had returned to

15   CSP-SAC." (ECF No. 234 at 18.)  Such evidence is further supported by defendant Nunez'

16   informal appeal response explaining, "[t]he reason you received the legal mail back to 2007 is

17   because the mailroom was holding it while you were out to court." (Id., citing ECF No. 223 at

18   205 (August 5, 2008 appeal).)

19            Further, defendant Johnson's practice of withholding "out to court" inmate mail was not

20   related to any penological purpose, as required by Turner and other related cases. (ECF No. 234

21   at 18.)  Defendant Johnson conceded that out to court inmate mail was withheld solely because he

22   could not determine such inmate's whereabouts by using the mailroom computer system.  He

23   provided no other justification for not "immediately forwarding" the mail as required by Title 15

24   of the CCR, failing to provide a justification reasonably related to a legitimate penological

25   purpose concerning security, order, or rehabilitation as required under Turner and other related

26   cases. (Id.) (citing Turner, 482 U.S. at 89.)  The fact that Johnson's practice conflicted with Title

27   15 regulations supports a finding that such practice served no penological interest. (ECF No. 234

28   at 18.)  Plaintiff argues that the lack of knowledge of plaintiff's whereabouts is not a legal defense

                                                    36

1   to an access to the courts claim and does not negate the requirement that such mail be forwarded

2   to out to court inmates.

3       Plaintiff denies that expert Vasquez conceded that "best practices did not require the

4   mailroom to track [Mr. Penton] down while on such a lengthy transit," by pointing out that

5   Vasquez was asked "[w]ould you expect if an inmate was in transit for months or longer for the

6   prison to keep tabs on him at every stop along that trip?" (ECF No. 234 at 18.) But plaintiff's

7   transit to Kentucky was less than three weeks, not months or longer. (ECF No. 234 at 19.)

8   Moreover, expert Vasquez testified that in his experiences as warden, the practice for incoming

9   mail for inmates temporarily out to court was to "immediately forward the mail . . . to wherever

10  they were currently in custody," and that "the supervisor in charge of the mailroom" was

11  "responsible for ensuring the out-to-court inmate mail was immediately forwarded to inmates

12  who had been transferred out of the prison." (Id.), quoting Vasquez Dep. at 59-60.)

13      Whether or not plaintiff's location was not disclosed by the U.S. Marshal during the

14  transit to Kentucky, once plaintiff arrived at the jail in Kentucky, defendant Johnson withheld

15  plaintiff's mail for the entire seven months, and then for another 40 days following his return to

16  CSP-SAC. (ECF No. 234 at 19.) Additionally, defendant Johnson's argument that plaintiff was

17  responsible for notifying the courts of his change of address is not a basis for summary judgment,

18  but in any event, genuine disputes of material fact exist as to whether plaintiff was able to contact

19  the habeas court and CSP-SAC. (ECF No. 234 at 20.) Plaintiff had no prior notice of his transfer

20  out to court, and was unable to contact family or friends to notify them of his whereabouts, and

21  was not permitted to take his legal materials. Plaintiff was unable to notify the habeas court while

22  he was out to court because he did not have a case number and was unable to notify his family

23  members of his whereabouts. (ECF No. 234 at 20.) Plaintiff did not have the address for CSP-

24  SAC. Thus, he had no way to update his whereabouts with the habeas court or CSP-SAC.

25      Per law of the case, plaintiff sustained his actual injury once he was unable to file

26  objections, as the Ninth Circuit previously ruled.

27      Finally, plaintiff reiterates that his claim is not premised solely on a theory of respondeat

28  superior; rather, defendant Johnson is directly liable for violating plaintiff's rights to mail and

1    access to the courts because it was Johnson's practice of withholding out to court inmate mail at

2    CSP-SAC that caused plaintiff's mail to be placed in the out to court box in the mailroom for over

3    eight months.  (ECF No. 234 at 24.)

4           C.  Defendant's Reply

5           Defendant argues that plaintiff attempts to apply a strict liability standard.  Plaintiff fails

6    to contradict the evidence that the mailroom's system did not inform staff where out to court

7    inmates were housed or that the mailroom did not know where plaintiff was housed while he was

8    out to court.  Plaintiff failed to rebut defendant's argument that plaintiff failed to notify the

9    mailroom or CSP-Sacramento of plaintiff's location while out to court, merely offering reasons

10   why he did not.  Just as plaintiff argues he was unable to notify the habeas court or CSP-

11   Sacramento of his out-to-court whereabouts, the CSP-Sacramento mailroom could not forward

12   plaintiff's mail when the mailroom had no forwarding address.  Therefore, the mailroom only had

13   two options:  hold plaintiff's mail until he returned, or return the mail to senders.  Whether or not

14   the mailroom held the mail or returned it to sender, the outcome would be the same; thus, no link

15   can be demonstrated.  (ECF No. 237 at 3) (citing Hathaway v. Cote, 622 F. App'x 701, 702 (9th

16   Cir. 2015) ("Where the adverse decision in the case underlying an access-to-courts claim would

17   have necessarily occurred anyway . . . no such link can be established.")  Defendant contends that

18   plaintiff's failure to offer evidence that defendant Johnson knew where plaintiff was housed while

19   out to court is fatal to his access to courts and right to mail claims.  (ECF No. 237 at 3.)

20           Next, plaintiff abandoned any argument concerning defendant Johnson's supervisorial

21   liability because plaintiff offers no evidence that defendant Johnson implemented the procedure

22   for processing the mail or to rebut defendant's assertion that he learned the procedure as an office

23   assistant in the mailroom.  Plaintiff concedes he has no evidence that defendant Johnson

24   personally handled plaintiff's mail, pointing instead to the practice in the mailroom at the time, to

25   hold inmate mail while an inmate was out to court.  Such argument fails because it would mean

26   that any employee that either worked in the mailroom or delivered mail between November 8,

27   2007, and July 29, 2008, would be liable for the violation of plaintiff's constitutional rights.

28   Plaintiff's sole reliance on defendant Johnson's role as supervisor fails absent evidence of a

1    personal connection or otherwise demonstrating defendant personally participated in the alleged

2    deprivation.  (ECF No. 237 at 3.)

3         Defendant counters plaintiff's argument that there was no legitimate penological reason

4    for the delay in delivering plaintiff's mail by pointing out there is no evidence demonstrating that

5    the CSP-Sacramento mailroom knew where plaintiff was in order to forward the mail.  Thus, no

6    alternative existed but to hold plaintiff's mail until he returned.  Defendant is entitled to summary

7    judgment on plaintiff's right to mail claim because there was no constitutional violation.

8         As to the access to the courts claim, defendant contends that plaintiff misconstrues the law

9    governing active interference.  Plaintiff must also demonstrate that each defendant actively

10   interfered with plaintiff's access to courts that caused him to lose a nonfrivolous claim for which

11   he has no other recourse.  (ECF No. 237 at 4.)  While no consensus has been reached as to the

12   definition of "active interference," many courts are finding that "something more than negligence

13   is required."  (ECF No. 237 at 4) (collecting cases).  To the extent plaintiff suggests the mailroom

14   "should have implemented a better system to get long term 'out to court' inmates their mail,"

15   such suggestion asks the court to ignore the authorities requiring something more than negligence

16   to demonstrate active interference.  (ECF No. 237 at 5.)

17        Defendant challenges two cases cited by plaintiff.  First, Mohammed v. Carrier, No. 3:05-

18   cv-3430 JSW (N.D. Cal. Feb. 13, 2006) (ECF No. 6), is an unpublished opinion not available on

19   Westlaw or Lexis, and is not persuasive authority, but in any event, the court noted that

20   "[i]solated incidents of mail interference *without any evidence of improper motive* do not give rise

21   to a constitutional violation."  (ECF No. 237 at 7) (citing Mohammed, at 3 (emphasis added)).

22   Second, Franklin v. Lewis, 2017 WL 1133363, at *5 (N.D. Cal. Mar. 27, 2017), aff'd, 792 F.

23   App'x 505 (9th Cir. 2020), supports defendant's argument (ECF No. 237 at 7):

24              A temporary delay or isolated incident of delay *or other mail
               interference without evidence of improper motive* does not violate a
25              prisoner's First Amendment rights.  "Absent evidence of a broader
               plan or course of conduct to censor plaintiff's mail
26              unconstitutionally, an honest error by prison officials does not justify
               relief under § 1983."
27

28

1    Franklin, 2017 WL 1133363, at *5 (emphasis added) (quoting Watkins v. Curry, 2011 WL

2    5079532, at *3 (N.D. Cal. Oct. 25, 2011) (citation omitted).)  There is no evidence of improper

3    motive in this case.  In addition, defendant points out that the defendants in Franklin were granted

4    summary judgment because Franklin failed to demonstrate that each supervisor defendant

5    personally participated in the alleged misconduct.  Here, defendant argues that plaintiff submits

6    no evidence that (a) defendant Johnson, mailroom supervisor, personally handled plaintiff's mail

7    at issue herein, and (b) defendant Johnson instituted the practice of holding mail for out to court

8    inmates, or (c) that such practice was implemented for an improper purpose or to intentionally

9    obstruct a prisoner's mail or right to litigate.  (ECF No. 237 at 8.)

10          Finally, defendant Johnson reiterates that "where a prisoner has left no forwarding

11   address, officials have no duty to seek the addressee."  See Ibeabuchi, 2019 U.S. Dist. LEXIS

12   4833 at **4-5 ("[i]t is a prisoner's responsibility to file a notice of change of address when his

13   address changes.").

14   II.  Discussion

15          A.  Mail

16          As discussed above, defendant adduced evidence that as mailroom supervisor, he cannot

17   be held liable for the actions or inactions of his subordinates.  On the other hand, plaintiff

18   adduced evidence that it was defendant Johnson's practice of holding inmates' mail while they

19   were out to court that caused the over eight month delay in the delivery of plaintiff's mail.  While

20   defendant argues that plaintiff's mail could not be forwarded because no one in the mailroom had

21   plaintiff's address while he was out to court, there is also evidence demonstrating defendant or

22   other mailroom staff could have found out where plaintiff was located after plaintiff's transit to

23   Bowling Green, Kentucky was completed.

24          Defendant speculates that the U.S. Marshal may have intended not to disclose plaintiff's

25   location due to security reasons.  But there is no evidence confirming that speculation.  The

26   evidence demonstrates that plaintiff was temporarily transferred into U.S. Marshal custody for

27   transfer to a Kentucky jail.  This court is not persuaded that officials at CSP-SAC had no way to

28   find out where plaintiff was housed for the purposes of forwarding his U.S. mail, despite the

                                                      40

1    mailroom computer at CSP-SAC only reflecting "out to court."  And, there is evidence reflecting

2    other sources mailroom staff had to accomplish this inquiry, i.e. contact the litigation coordinator.

3    Thus, the evidence suggests the CSP-SAC mailroom's options were not limited to holding the

4    mail or returning the mail to sender.

5          Defendant's argument that he cannot be held liable as supervisor because he did not

6    implement the procedure and learned the procedure as an office assistant is countered by

7    plaintiff's evidence that defendant continued the practice despite regulations to the contrary,

8    despite defendant's concession that as supervisor he was to abide by such regulations, and despite

9    his job description which required him to update procedures as necessary.  If a reasonable jury

10   found defendant liable for such continuing practice it would not expose mailroom staff to

11   liability, as argued by defendant, because only the supervisor was charged with such duties.

12         For all of the above reasons, material disputes of fact preclude summary judgment for

13   defendant.

14         B.  Access to the Courts

15         The undersigned is not persuaded that Norton, 2018 WL 5629345, is dispositive.  In

16   Norton, the prisoner challenged a 35-day delay in his receipt of one piece of mail from the

17   Central District of California, claiming such mail was improperly held at PBSP during his

18   temporary transfer away from PBSP, resulting in his lost ability to file an appeal in his habeas

19   case.  However, the evidence revealed that the mail had not been held at PBSP, but rather

20   forwarded to Norton at CIM where he was to be permanently housed.  The court in Norton stated

21   that the prisoner failed to provide evidence that the defendant "intentionally interfered with or

22   erected a barrier to plaintiff's right to litigate," and found that "[a] one-time delay or mishandling

23   of mail without any facts to support an intentional act to hinder plaintiff is insufficient to establish

24   "active interference" to a prisoner's right to litigate."  Id. at **3, 4 (citations omitted).

25         But here, there was no one-time delay or mishandling of mail.  Rather, plaintiff was

26   deprived of his mail for over eight months.  The evidence for either party does not show that the

27   failure to deliver plaintiff's mail was due to a one-time negligent mishandling of one piece of

28   mail.  Rather, all of plaintiff's mail for the duration of the eight month period was withheld, and

41

1  plaintiff adduced evidence that it was caused by defendant Johnson's practice.  Moreover, it was

2  foreseeable that retaining mail for over seven days could risk all sorts of consequences for the

3  prisoner, including a missed court deadline, or important family news.

4          Under all of these circumstances, a reasonable jury might find that defendant Johnson's

5  practice equated to active interference because it occurred consistently over a lengthy period of

6  time.  Or the jury might find that such practice erected a barrier to plaintiff's access to the courts,

7  as well as to his right to receive mail, particularly where it is foreseeable that holding mail for

8  months could have adverse consequences for the prisoner.  Indeed, in circumstances more akin to

9  the evidence presented here, the Tenth Circuit did not require an additional showing of malicious

10  motive because the intentional conduct of holding the mail was sufficient.  Simkins, 406 F.3d at

11  1242.  Plaintiff's evidence precludes summary judgment for defendant.

12          Based on the evidence adduced by plaintiff, the undersigned finds there are material

13  disputes of fact as to whether defendant Johnson violated plaintiff's right to access the courts.

14          D.  Conclusion

15          As discussed above, there are triable issues of material fact precluding entry of summary

16  judgment for defendant.  The court turns now to the issue of qualified immunity.

17  III.  Qualified Immunity

18          A.  Legal Standards

19          Officers are entitled to qualified immunity under § 1983 unless (1) the officers violate a

20  federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly

21  established at the time."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018).  Courts have

22  the discretion to decide which prong to address first, in light of the particular circumstances of

23  each case.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

24          "Clearly established" means that the statutory or constitutional question was "beyond

25  debate," such that every reasonable official would understand that what he is doing is unlawful.

26  See Wesby, 138 S. Ct. at 589; Vos v. City of Newport Beach, 892 F.3d 1024, 1035 (9th Cir.

27  2018).  This is a "demanding standard" that protects "all but the plainly incompetent or those who

28  knowingly violate the law."  Wesby, 138 S. Ct. at 589 (citing Malley v. Briggs, 475 U.S. 335, 341

42

1    (1986)).  To be "clearly established," a rule must also be dictated by controlling authority or by a

2    robust consensus of cases of persuasive authority.  Wesby, 138 S. Ct. at 589; see Gordon v.

3    County of Orange (Gordon II), 6 F.4th 961, 969 (9th Cir. 2021) ("Ultimately, the prior precedent

4    must be 'controlling -- from the Ninth Circuit or Supreme Court -- or otherwise be embraced by a

5    'consensus' of courts outside the relevant jurisdiction.")  In examining whether a right is clearly

6    established, courts are to define the law to a "high degree of specificity," and not "at a high level

7    of generality."  Wesby, 138 S. Ct. at 590.  The key question is "whether the violative nature of

8    particular conduct is clearly established" in the specific context of the case.  Vos, 892 F.3d at

9    1035 (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015)).  Although it is not necessary to identify

10   a case that is "directly on point," generally the plaintiff needs to identify where an officer acting

11   under similar circumstances was held to have violated a federal right.  Wesby, 138 U.S. at 577;

12   Vos, 892 F.3d at 1035; Felarca v. Birgeneau, 891 F.3d 809, 822 (9th Cir. 2018).  "[E]xisting

13   precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v.

14   al-Kidd, 563 U.S. 731, 741 (2011) (citations omitted).

15         This is not to say that an official action is protected by qualified immunity unless the very

16   action in question has previously been held unlawful; but it is to say that in the light of pre-

17   existing law the unlawfulness must be apparent."  Hope v. Pelzer, 536 U.S. 730, 739 (2002)

18   (citation omitted).  "Although earlier cases involving 'fundamentally similar' facts can provide

19   especially strong support for a conclusion that the law is clearly established, they are not

20   necessary to such a finding."  Id. at 741.  Accordingly, qualified immunity will be denied if a case

21   involves "the mere application of settled law to a new factual permutation."  Porter v. Bowen, 496

22   F.3d 1009, 1026 (9th Cir. 2007).

23         In addressing qualified immunity, the Court must view the evidence in the light most

24   favorable to the plaintiff and resolve all material factual disputes in favor of the plaintiff.

25   Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

26   ////

27   ////

28   ////

1          B. <u>The Parties' Arguments</u>

2              1. <u>Defendant's Position</u>

3          Defendant points out that in finding prison officials have a responsibility to immediately

4   forward mail to prisoners, district courts in the Ninth Circuit rely on out-of-circuit authority, not

5   Ninth Circuit precedent.[24]  (ECF No. 224-1 at 19.)  The Ninth Circuit did not hold that a prisoner

6   has a right to litigate claims challenging sentences or conditions of confinement to conclusion

7   without active interference until 2011.  (<u>Id.</u>, citing <u>see</u> <u>Silva</u>, 658 F.3d at 1103.)  Further, "[t]here

8   was no Ninth Circuit case that mandated the steps that must be taken to locate a prisoner who was

9   removed by federal authorities, for federal purposes, and placed in a facility undisclosed to the

10  defendant."  (ECF No. 224-1 at 19.)  Defendant Johnson testified that the mailroom system did

11  not tell mail staff where an inmate was housed while out to court, and they could not have known

12  where plaintiff was housed for the first month while he was in transit, as confirmed by expert

13  Vasquez' testimony.  There is no binding case law that would put defendant on notice that

14  mailroom staff's failure to check every day to see whether plaintiff had returned or a new address

15  was found would violate plaintiff's constitutional rights.  (ECF No. 224-1 at 20.)

16         In addition to finding the mailroom defendant entitled to summary judgment as a matter of

17  law, the court in <u>Norton</u> addressed the issue of qualified immunity after surveying district court

18  and out of circuit authorities, concluding that in order to determine active interference, more than

19  negligence is required, but the "boundaries of active interference were not clearly defined."

20  <u>Norton</u>, at *12 (ECF No. 224-1 at 21.)  Defendant argues that if the court in <u>Norton</u> could not find

21  clearly established law in 2018 on this issue, there was no clearly established law in 2007 and

22  2008.

23             2. <u>Plaintiff's Position</u>

24         Plaintiff contends the following.  Defendant's argument concerning plaintiff's transfer to

25  federal custody "goes too far to avoid liability," and plaintiff's rights to mail and access to the

26

27  [24]  Defendant cites <u>see, e.g.</u>, <u>Gonzales v. Leal</u>, 2011 U.S. Dist. LEXIS 91562, at *10 (E.D. Cal.
    Aug. 16, 2011) (citing <u>Bryan v. Werner</u>, 516 F.2d 233, 238 (3d Cir. 1975), for the proposition that
28  "[p]rison officials have a responsibility to forward mail to inmates promptly".)

courts was clearly established long before this case. (ECF No. 234 at 21.) Plaintiff's evidence demonstrates that it was defendant's practice of holding mail that directly violated plaintiff's constitutional right to send and receive mail (citing Witherow, 52 F.3d at 265). In addition, such practice lacked a legitimate penological interest because it violated Title 15 of the CCR, which both defendants Virga and Walker confirmed. (ECF No. 234 at 22.) Any reasonable official in charge of the CSP-SAC mailroom for the substantial period defendant was, and who worked in such mailroom prior to becoming supervisor, would understand it was against the law to interfere with an inmate's ability to receive or send mail without a legitimate penological interest. As to the evidentiary basis for defendant's claim to qualified immunity, plaintiff contends Johnson cannot assert the absence of genuine disputes of material fact. Thus, defendant is not entitled to summary judgment as to plaintiff's right to mail claim.

As to qualified immunity on plaintiff's access to court's claim, plaintiff's right of access to the courts has been established long before the incidents herein.[25] (ECF No. 234 at 22.) Such right includes the right to be free from deliberate legal mail interference that denies prisoners access to the courts.[26] (ECF No. 234 at 23.) In response to defendant's claim that the Ninth Circuit did not hold until 2011 that a prisoner has a right to litigate claims challenging sentences or conditions of confinement to conclusion without active interference, plaintiff contends that the court in Silva also observed that the Ninth Circuit has long recognized "that prisoner's First and Fourteenth Amendment rights to access the courts without undue interference extend beyond the pleading stages." Silva, 658 F.3d at 1103 (citing Vigliotto v. Terry, 873 F.2d 1201, 1202 (9th Cir. 1989); DeWitt v. Pail, 366 F.2d 682, 685 (9th Cir. 1966)). See also Lewis v. Casey, 518 U.S.

////

---

[25]  Plaintiff cited see Lewis v. Casey, 518 U.S. at 350), Allen v. Sakai, 48 F.3d 1082, 1085 (9th Cir. 1994); Sprinkle v. Robinson, 2007 WL 2389984, *7 (E.D. Cal. Aug. 20, 2007).

[26]  Plaintiff relied on Mohammed v. Carrier, No. 3:05-cv-3430 JSW (N.D. Cal. Feb. 13, 2006), (N.D. Cal. docket at ECF No. 6 at 3), (citing Jackson v. Procunier, 789 F.2d 307, 311 (5th Cir. 1986)) ("The deliberate delay of legal mail which adversely affects legal proceedings presents a cognizable claim for denial of access to the courts."); Franklin v. Lewis, 2017 WL 1133363, at *5, aff'd, 792 F. App'x 505 (9th Cir. 2020) (citing a string of cases to demonstrate the difference between accidental/negligent interference and deliberate interference).

1    at 351 ("[W]e had protected [the right of access to the courts] by prohibiting state prison officials

2    from actively interfering with inmates' attempts to prepare legal documents . . . .").

3         Finally, defendant's reliance on <u>Norton</u>, 2018 U.S. Dist. LEXIS 185951, *11 (N.D. Cal.

4    Oct. 29, 2018) is inapposite to the qualified immunity analysis here because the Northern District

5    addressed a one-time delay or mishandling of mail, without any facts showing an intentional act

6    that hindered court access.  (ECF No. 234 at 24.)  Here, plaintiff's mail was withheld for over

7    eight months, causing him actual injury and emotional distress.

8                              2.  <u>Defendant's Reply</u>

9         Defendant counters as follows.  Plaintiff failed to provide any binding authority

10   suggesting defendant is not entitled to qualified immunity, and defendant cited multiple Supreme

11   Court cases "scolding" the appellate courts for defining clearly established law "at a high level of

12   generality."  (ECF No. 237 at 5-6.)  Rather, plaintiff is required to demonstrate that at the time of

13   the alleged incidents, the failure to forward mail to an inmate at an unknown location violated

14   clearly established law for a right to mail claim or an access to courts claim, which plaintiff failed

15   to do.

16        Two district court cases also demonstrate the law was not clearly established in 2007 to

17   2008.  First, defendant rebuffs plaintiff's efforts to distinguish <u>Norton</u> because, in the context of

18   an access to courts claim, the court in <u>Norton</u> specifically analyzed "active interference" and

19   found its contours were not sufficiently defined to provide defendants notice their conduct might

20   violate the constitution.  (ECF No. 237 at 6-7, citing <u>Norton</u>, 2018 U.S. Dist. LEXIS at *2.)

21   Absent "evidence of malicious or deliberate intent to hinder a prisoner's right to litigate, a one-

22   time mishandling of mail was insufficient to establish active interference."  (ECF No. 237 at 7,

23   citing <u>Norton</u> at *19.)

24        Second, another district court case suggests that a prison official's failure to forward mail

25   when no forwarding address is provided does not violate the constitution or constitute active

26   interference.  (ECF No. 237 at 7), citing see <u>Ibeabuchi</u>, 2019 U.S. Dist. LEXIS 4833, at *n.2.)

27   Rather, the court in <u>Ibeabuchi</u> held prison officials have no duty to seek out prisoner who left no

28   forwarding address.  <u>Id.</u> at *4-5.

1    Further, defendant argues that the two cases relied upon by plaintiff do not demonstrate

2    that the law was clearly established. <u>Mohammed</u> is not persuasive authority for finding the law

3    was clearly established, and fails to demonstrate defendant is not entitled to qualified immunity.

4    (ECF No. 237 at 7), citing <u>Mohammed</u>, No. 3:05-cv-3430, ECF 6 page 3). And <u>Franklin</u>, 2017

5    U.S. Dist. LEXIS 44819, actually supports defendant's position, as argued in his motion, <u>supra</u>.

6         C. <u>Discussion</u>

7    Following review of the evidence, the undersigned concludes that there are material

8    disputes of fact as to the culpability of defendant Johnson as to all three claims. Defendant

9    presented evidence that plaintiff's mail could not be forwarded and notice could not be provided

10   because the mailroom did not have plaintiff's address, defendant did not handle or process

11   plaintiff's mail and did not know plaintiff was out to court or that his mail had been held for over

12   seven months. Defendant Johnson also testified that defendant Nunez should not have held

13   plaintiff's mail for so long, but should have found out where plaintiff was housed while out to

14   court. On the other hand, plaintiff adduced evidence that it was defendant Johnson's ongoing and

15   intentional practice of holding mail for inmates who were out to court that directly caused the

16   accumulation of plaintiff's mail for over seven months, and that such practice violated Title 15

17   regulations requiring that mail be "immediately" forwarded to inmates who are transferred away

18   from the facility. Plaintiff also presented evidence that it was defendant Johnson's responsibility,

19   as mailroom supervisor, to ensure that plaintiff's mail was forwarded to him while he was out to

20   court.

21   "When there are disputed factual issues that are necessary to a qualified immunity

22   decision, these issues must first be determined by the jury before the court can rule on qualified

23   immunity. The issue can then be raised in a [Rule 50(a)] motion at the close of evidence."

24   <u>Morales v. Fry</u>, 873 F.3d 817, 824 (9th Cir. 2017) (citing <u>Tortu v. Las Vegas Metro. Police Dep't</u>,

25   556 F.3d 1075, 1083 (9th Cir. 2009) ("When a qualified immunity claim cannot be resolved

26   before trial due to a factual conflict, it is a litigant's responsibility to preserve the legal issue for

27   determination after the jury resolves the factual conflict."); <u>see also</u> <u>A.D. v. Cal. High. Patrol</u>, 712

28   F.3d 446, 452 n.2 (9th Cir. 2013) (noting defendant preserved his position on qualified immunity

47

1   -- renewed in Rule 50(b) motion after trial -- by bringing Rule 50(a) motion for judgment as a

2   matter of law before case was submitted to jury).  Only the judge can decide whether a particular

3   constitutional right was "clearly established" once any factual issues are resolved by a fact finder.

4   See Morales, 873 F.3d at 823; see also Ninth Circuit Model Civil Jury Instruction 9.34 (2020)

5   (noting that "qualified immunity is a question of law, not a question of fact.").

6          Thus, the disputed material issues of fact preclude granting summary judgment on the

7   basis of qualified immunity on plaintiff's claims at this juncture.

8   IV.  Conclusion

9          Accordingly, IT IS HEREBY ORDERED that:

10          1.  The requests for judicial notice (ECF Nos. 222-3 & 224-11) are granted; and

11          2.   Defendant Johnson's request to strike (ECF No. 233-3) is denied.

12          Further, IT IS RECOMMENDED that the cross-motions for summary judgment (ECF No.

13   222, 224) be granted in part and denied in part, as follows:

14          1.  Defendant Johnson's motion for summary judgment (ECF No. 224) on the issue of

15   exhaustion of administrative remedies be granted as to the August 5, 2008 screened out appeal,

16   but denied as to appeal log no. 07-02453.

17          2.  Plaintiff's motion for partial summary judgment as to defendant Johnson (ECF No.

18   222) be denied; and

19          3.  Defendant Johnson's motion for summary judgment and/or partial summary

20   adjudication (ECF No. 224) on the merits be denied, and his motion for qualified immunity be

21   denied without prejudice to renewal at trial.

22          These findings and recommendations are submitted to the United States District Judge

23   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty** days after

24   being served with these findings and recommendations, any party may file written objections with

25   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

26   Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be

27   filed and served within fourteen days after service of the objections.  The parties are advised that

28   ////

1  failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  Dated:  February 10, 2022.

4

5

   /pent0518.xmsj

6

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28