LONGYEAR & LAVRA, LLP
Van Longyear, CSB No.: 84189
Nicole M. Cahill, CSB No.: 287165
555 University Avenue, Suite 280
Sacramento, CA 95825
Phone: 916-974-8500
Facsimile: 916-974-8510
Emails: longyear@longyearlaw.com
         cahill@longyearlaw.com

Attorneys for Defendant, L. Johnson

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA SACRAMENTO DIVISION

|  |  |
|---|---|
| ANTHONY PENTON, | Case No.: 2:11-CV-00518-DJC-KJN |
| Plaintiff, | **BRIEF IN SUPPORT OF DEFENDANT JOHNSON'S RULE 50 MOTION** |
| vs. | **Date: 1-18-24** |
| L. JOHNSON, JAMES WALKER, TIMOTHY V. VIRGA, BRYAN DONAHOO, NUNEZ, J.R. BRADFORD, K. POOL, R. MORROW, R. GADDI, LE'VANCE ANTHONY QUINN, LYNCH, G. SALAS, BEZZANES, AND DOES 1 THROUGH 13, | **Time: 1:30 pm** <br> **Judge: Hon. Daniel Calabretta** |
| Defendants. |  |

### I.    INTRODUCTION

Defendant Johnson ("Johnson") submits this brief pursuant to the Court's request for briefing following the renewal of Johnson's Rule 50 motion at the conclusion of trial in this case. (472:24-473:13.)  On September 20, 2023, a verdict was rendered in favor of Plaintiff, Anthony Penton, despite no evidence to support liability under either a theory of individual liability or supervisorial liability under 42 U.S.C. § 1983.  Immediately after Johnson's renewed Rule 50 motion following the reading of the verdict, the Court voiced its own skepticism of the evidence that was presented that could support the verdict under either theory.  (473:2-13.)  In addition, the Court specifically requested that the parties brief the issue of qualified immunity as applied

to this case.  (473:14-18.)  On September 26, 2023, the Court issued a minute order setting a briefing schedule.  (ECF No. 371.)  Due to the timing of the release of the transcript and the holidays, the parties stipulated to a modified briefing schedule.  (ECF Nos. 379 and 380.)

## II.      LEGAL STANDARD FOR RULE 50 MOTION

"Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion."  *Torres v. City of L.A.*, 548 F.3d 1197, 1205 (9th Cir. 2008).  In evaluating a Rule 50(b) motion, a court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 150 (2000).

## III.     ARGUMENT

### A.      No Evidence Supports Individual Liability Against Johnson

Individual liability under § 1983 requires the plaintiff to prove that the individual actually committed the constitutional violation at issue.  *See, e.g., Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir. 2010); *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); Ninth Circuit Model Jury Instruction No. 9.3.  With respect to Plaintiff's access to courts claim and right to mail claim, the individual who actually processed Plaintiff's mail and kept it in the out-to-court box would be the individual who acted to commit a supposed constitutional violation – i.e., the alleged wrongful withholding of Plaintiff's mail. In fact, the employee that actually processed Plaintiff's mail was never identified.  The only evidence offered that related to the actual processing of Plaintiff's mail was that from Officer Gaddi, who delivered mail to Plaintiff on July 29, 2008.  (249:2-4.)  No evidence was offered to prove that Johnson ever touched the Plaintiff's mail or that he ordered anyone else to do anything with Plaintiff's mail.  (387:19-388:3.)  There was also no evidence presented as to who failed to check if Plaintiff had returned from out to court status or why the mail was not delivered upon his return.  As there was no evidence offered to suggest that the person that actually processed Plaintiff's mail was Johnson, there can be no individual liability as to Plaintiff's access to courts claim or right to mail and notice claims against Johnson.  Accordingly, Plaintiff's access to courts and right to mail claims against Johnson fail before the instructions as to the specific claims are even analyzed.

Even if the Court looks passed the initial requirement for individual involvement under § 1983 and continues to the substantive claims, there is no evidence to support liability against Johnson.  With respect to the access to courts claim, this claim specifically requires an act or omission by the defendant that constitutes active interference.  *See Silva v. DiVittorio*, 658 F.2d 1090, 1102 (9th Cir. 2011).  Active inference must be more than mere negligence.  *Curry v. Boylan*, 2018 U.S. Dist. LEXIS 213053, at *9 (W.D. Wash. Nov. 2018); *Parks v. Wren*, 2013 U.S. Dist. LEXIS 203573, at *7 (C.D. Cal. May 6, 2013).  Just as there was no evidence that Johnson did anything with respect to Plaintiff's mail in order to satisfy the initial hurdle of demonstrating individual liability under § 1983, there was no evidence to demonstrate an act or omission by Johnson that constituted active interference in an individual capacity.

The same holds true for Plaintiff's right to mail and notice claims.  There was no evidence offered that Johnson knew that Plaintiff's mail had been kept in the mailroom, caused the mail to be kept in the mailroom, or that he should have been responsible for providing notice.  (370:17-371:1; 373:21-374:5.)   Because there was no evidence offered to connect Johnson to the actual processing of Plaintiff's mail, there is no evidence to support a verdict against Johnson for the lack of notice claim.

**B.     No Evidence Supports Supervisorial Liability Against Johnson**

Under § 1983, supervisorial liability requires the plaintiff to prove more than mere "knowledge and acquiescence" of a constitutional violation.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  Accordingly, liability only arises upon some showing of personal participation by the supervisor.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  By contrast, *Monell* liability against the *governmental entity* may be based on a constitutional deprivation that was the product of a policy or custom of the entity itself.  *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  Additionally, on a supervisorial liability theory, a plaintiff must also prove that the supervisor's conduct had some sort of causal role in the alleged constitutional deprivation.  *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988).  High-level allegations about a supervisor's oversight responsibilities are insufficient to establish supervisorial liability.  *See Guerrero v. Cty.*

*of Alameda*, 2018 U.S. Dist. LEXIS 168330, at *6 (N.D. Cal. Sept. 28, 2018) (citing *Henry A. v. Willden*, 678 F.3d 991, 1004 (9th Cir. 2012)).

There was no evidence presented at trial that demonstrated Johnson directed his subordinates to do anything with respect to Plaintiff's mail, or that he otherwise directly participated in the processing of Plaintiff's mail.  (370:12-371:1.)  Without any evidence of personal involvement, Plaintiff must show that Johnson somehow implemented a policy or practice that was deliberately indifferent to the rights of others.  For liability to attach, Plaintiff must show that Johnson had policy-making authority and that he implemented a policy that was "so deficient that the policy itself is a repudiation of the constitutional rights" of the Plaintiff. *See Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991); *Waggy v. Spokane Cty. Wash.*, 594 F.3d 707, 713 (9th Cir. 2010).  There is no *respondeat superior* or vicarious liability under § 1983.  *Iqbal*, 556 U.S. at 676-77.

Plaintiff presented absolutely zero evidence that Johnson either created the policy of holding out to court inmate mail or had the policy making authority to change the policy. Instead, the evidence demonstrated that Johnson merely learned the procedure from his supervisor while he was an office assistant and did not change the practice when he was promoted.  (386:1-19.)  No evidence was offered to support the notion that Johnson had policy-making authority.  To the contrary, evidence was presented that the warden signs off on policies relating to the handling of the mail for inmates that are temporarily absent from the institution. (*See* 273:8-17; 275:22-276:16; 333:25-334:7.)  While no direct evidence demonstrated what the formal, written policy for the handling of mail was for the specific time period at issue, there was ***no*** evidence to support an inference that the process would have been different for the 2007-2008 time period.  Indeed, Warden Virga testified that under certain circumstances his practice was not to forward mail when an inmate was temporarily gone. (271:11-272:4.)  Similarly, there was no evidence presented that the practice was to hold the mail for out to court inmates indefinitely. Indeed, the only evidence presented for how long the practice required the holding of out to court inmate mail came by way of indirect evidence from Virga – that is, that the policy in 2013 required that the mail be held for one month and then returned to sender.  (276:8-16.)  Indeed, no

evidence was adduced related to how long mail was supposed to be held while an inmate was out-to-court.  Johnson testified that while the mailroom was instructed to hold out to court mail, he also testified that had he known Plaintiff's mail had been held for so long, he would have forwarded it.  (*See* 370:25-371:1.)  The only reasonable inference drawn from this testimony, coupled with Virga's testimony, is that although out-to-court inmate mail was held pending the inmate's return, if that absence continued for a prolonged period of time, staff was expected to notice the prolonged absence and bring it to someone's attention.  While Plaintiff's expert, Daniel Vasquez, testified that his expectation, *as a warden*, would have been that the prison should have required the mailroom supervisor to track down an inmate that had been transferred, this only gives rise to the inference that the practice as described by Warden Virga was inadequate.  Vasquez did not offer any opinion that Johnson should have disregarded the Warden's interpretation of Title 15 and implemented his own policy or that he had authority to do so.  Indeed, Vasquez testified that ultimate responsibility for the failure to forward mail lies with the Warden.  (333:4-334:7.)  The only reasonable inference from this evidence is that the decision to change the policy lies with the Warden – not Johnson as a first-line supervisor.

Further, even if Johnson had policy-making authority to change the practice for handling out to court mail that had been in existence when he was promoted, there was no evidence presented that Johnson was on notice that it was likely to violate inmates' constitutional rights.  In fact, the only inference that could be drawn from the evidence presented at trial was that there had not been any other instance of an inmate being out-to-court for such a long period of time that it caused long delays in receiving mail.  Officer Gaddi testified that he noted the dates the mail was received on the mail log because he found it "peculiar" that the mail was delivered so late and that he'd never seen such an occurrence before.  (261:8-19.)  As such, there was no evidence presented that Johnson – or anyone – was on actual or constructive notice that the practice would likely result in constitutional violations.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012) (discussing requirement for actual or constructive notice that policy would result in constitutional violation in considering *Monell* claim).

/ / /

Additionally, no conduct by Johnson is so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the injury. *Oviatt v. Pearce*, 954 F.2d 1470, 1481 (9th Cir. 1992); *see also* Jury Instruction No. 30 at ECF No. 357 at p. 35. As already argued, Johnson did not create the practice/policy, nor did he have authority to change it. There was no evidence of any act by Johnson that can be construed as the moving force behind Plaintiff's injury. All of Plaintiff's § 1983 claims under a supervisorial theory of liability fail on this point.

Contrary to Plaintiff's insistence during closing arguments, a mere failure to supervise is generally insufficient to establish supervisorial liability under § 1983. *See Martinez v. Sherman*, 2022 U.S. Dist. LEXIS 7304, at *10 (E.D. Cal. Jan. 12, 2022) ("'failure to supervise' theory can be the basis for a supervisor's liability under § 1983 in *only limited circumstances*, such as where the failure amounts to deliberate indifference") (emphasis added) (citing *City of Canton v. Harris*, 489 U.S. 378, 387-90 (1989)). Simply suggesting that Johnson "didn't do his job" by not supervising one subordinate in this one instance is not sufficient to give rise to supervisorial liability under § 1983. (*See* 444:9-10.) To hold otherwise would improperly convert supervisorial liability into *respondeat superior*. *See Sullivan v. Biter*, 2017 U.S. Dist. LEXIS 65165, at *1 (E.D. Cal. Apr. 28, 2017) ("Conclusory allegations that various prison officials knew or should have known about constitutional violations occurring against plaintiff simply because of their general supervisory role are insufficient to state a claim under 42 U.S.C. § 1983").

These same arguments hold true for Plaintiff's claims premised on a right to notice that his mail was withheld. No evidence was presented related to Johnson's involvement with the decision not to give notice, nor that Johnson was responsible for some policy that caused other mailroom staff not to provide notice. Indeed, Johnson testified that he was unaware that Plaintiff's mail was even in the mailroom. (370:17-371:1; 373:21-374:5.) No evidence was presented to contradict this testimony.

Accordingly, Johnson is entitled to judgment notwithstanding the verdict on Plaintiff's access to courts, right to mail, and right to notice claims.

/ / /

**C.   Johnson is Entitled to Qualified Immunity Because No Case Allows for Supervisorial or Individual Liability Under Similar Facts**

To determine if an official is entitled to qualified immunity, a court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether the right was clearly established at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In order for a right to be clearly established, it must be sufficiently clear that "'every reasonable official would have understood what he is doing violates that right.'" *Hambry v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (emphasis in original) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015)). The constitutional question at hand must be beyond debate and existing precedent must have settled the question of constitutionality of the official's actions "as those actions unfolded in the specific context of the case at hand." *Hambry*, 821 F.3d at 1091. The proper inquiry is not one of "broad general proposition," but rather should be "undertaken in light of the specific context of the case." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

Though the issue of qualified immunity has been briefed in this case and the Ninth Circuit affirmed the denial of Johnson's summary judgment motion on the basis of qualified immunity, those instances focused on whether there was notice that the practice was unconstitutional when the facts were viewed in the light most favorable to the Plaintiff on the summary judgment record. However, now, Plaintiff has had ample opportunity at trial to present facts to establish liability for both individual and supervisorial liability against Johnson. It is Plaintiff's burden at trial – not Johnson's.

With respect to individual liability, no clearly established law permits liability against an individual defendant on an access to courts or right to mail claim where there is no evidence that the defendant processed the mail or was even aware that the inmate's mail was being held.

Though admittedly the Ninth Circuit's ruling in this case finds that the law was clearly established that a prison may not hold an inmate's mail for eight months while they are out to court, Plaintiff failed to present evidence at trial that *Johnson* was vested with any authority to

change the practice or personally withheld the mail.  Nor did the Ninth Circuit's order relate to whether the law was clearly established as to whether an individual without policy making authority may be held liable under a supervisorial liability theory for a policy or practice they did not create.  As noted above, it was not until 2011 that the Ninth Circuit held that prisoners have a right to litigate their claims without active interference.  *See Silva*, 658 F.3d at 1103.  Thus, in 2007-2008, it was entirely unclear how a first line supervisor like Johnson, without policy making authority, could actively interfere with a prisoner's right to access the courts.  There is no authority that would have put Johnson, a first line supervisor without policy making authority, on notice that he violates a prisoner's right to access the courts by doing nothing.

Though the Tenth Circuit case *Simkins v. Bruce*, 406 F.3d 1239 (10th Cir. 2005), was relied on for the notion that prison officials must forward legal mail to inmates transferred to other facilities, there was evidence in that case that the mailroom supervisor *personally held the mail* of the plaintiff.  *Id*. at 1242.  There was also evidence that the supervisor did so in contravention of prison policy, thus making her decision intentional.  *Id*.  Further, the mailroom supervisor, Patricia Keen, *was not being sued*.  As such, *Simkins* is distinguishable from the facts as presented at trial in this case.

As to Plaintiff's right to mail and right to notice claims, the same arguments hold true. While the Ninth Circuit has determined that the right to receive mail without undue delay was clearly established based on the summary judgment record, there was no evidence presented at trial that *Johnson* knew Plaintiff's mail was withheld for a prolonged period of time or that Johnson instituted the policies and practices related to the withholding and failure to give notice. As such, no authority allows liability to imposed under a supervisorial liability theory for a violation of a right to mail or right to notice claim.  Accordingly, Johnson is entitled to qualified immunity.

/ / /

/ / /

/ / /

/ / /

1

## IV.   CONCLUSION

Because the record is devoid of evidence to support either individual or supervisorial

liability against Johnson, the Court should grant Johnson's Rule 50(b) motion.  Only one

reasonable conclusion can be drawn from the evidence presented at trial: Johnson bears no

liability in this case.  Contrary to existing precedent for § 1983 liability, the verdict holds

Johnson liable under a *respondeat superior* theory of liability and cannot stand.  Further, as there

is no clearly established law support liability against a supervisor without evidence of any action

or policy making authority, Johnson is also entitled to qualified immunity and this motion should

also be granted on those grounds.


Dated: November 27, 2023                    LONGYEAR & LAVRA, LLP


                                        By:  /s/ Nicole M. Cahill
                                            VAN LONGYEAR
                                            NICOLE M. CAHILL
                                            Attorneys for Defendant,
                                            L. Johnson

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA


ANTHONY PENTON,
        PLAINTIFF,

VS.                                   SACRAMENTO, CALIFORNIA
                                      NO. 2:11-CV-00518
LAYTON JOHNSON, JR.,                  TUE., SEP. 19, 2023
        DEFENDANT.                    8:33 A.M.
_____/

              TRANSCRIPT OF JURY TRIAL - VOLUME 2
   BEFORE THE HONORABLE DANIEL J. CALABRETTA, DISTRICT JUDGE
                       ---OOO---


APPEARANCES:

  FOR THE PLAINTIFF:            SIMPSON, THACHER & BARTLETT,
                               LLP
                               2475 HANOVER STREET
                               PALO ALTO, CA  94304
                               BY:  HARRISON J. FRAHN , IV
                               PIERCE MACCONAGHY
                               HILARY WONG
                               JONATHAN SANDERS
                               ATTORNEYS AT LAW


  FOR THE DEFENDANT:           LONGYEAR & LAVRA, LLP
                               555 UNIVERSITY AVENUE
                               SUITE 280
                               SACRAMENTO, CA  95825
                               BY: NICOLE M. CAHILL
                               ATTORNEY AT LAW


  OFFICIAL COURT REPORTER:     KIMBERLY M. BENNETT,
                               CSR, RPR, RMR, CRR
                               501 I STREET
                               SACRAMENTO, CA 95814


  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1    Q.   THANKS.

2         DOES THIS LEGAL MAIL FORM SHOW THAT YOU DELIVERED NINE

3    PIECES OF LEGAL MAIL TO MR. PENTON ON JULY 29, 2008?

4    A.   NINE PIECES.

5    Q.   NINE PIECES.

6         ON THE SIDE, YOU'LL SEE SOME TINY NUMBERS.  COULD YOU LOOK

7    AT LINE 12 AND THEN READ WHAT IS IN THE FOURTH COLUMN?

8    A.   TO THE RIGHT?  OR JUST READ LINE 12 AND READ WHAT?

9    Q.   THE FOURTH COLUMN.  THE HIGHLIGHTED BOX.

10   A.   OH.  U.S. DISTRICT COURT, SAN DIEGO, CALIFORNIA.

11   Q.   COULD YOU FINISH READING THE --

12   A.   ABBREVIATION FOR RECEIVED, REC, PERIOD, IN CAPITAL LETTERS.

13   12, LOOKS LIKE 25, BUT, FOR SURE, IT'S '07, CSP, SAC.  MAYBE

14   IT'S 12/28.

15   Q.   I THINK IT'S 12/28.

16   A.   OKAY.

17   Q.   PROBABLY WASN'T DELIVERED ON CHRISTMAS.

18        SO YEAH.  CAN YOU LOOK AT THE LINE BELOW THAT AS WELL, LINE

19   13, AND WHAT IS THE RECEIVED DATE ON THAT?

20   A.   RECEIVED -- ONCE AGAIN, ABBREVIATED CAPITAL LETTERS --

21   11/9/07, CSP, SAC.

22   Q.   THANK YOU.

23        SO THAT ONE WAS RECEIVED EVEN EARLIER IN NOVEMBER.

24   A.   UM-HUM.

25   Q.   WHAT WERE YOU TRYING TO CONVEY BY WRITING THESE DATES LIKE

1   Q.  THAT'S STILL THEIR HOME, SO TO SPEAK?

2   A.  YEAH.

3   Q.  IS THAT A YES?

4   A.  YES.  SORRY.  YES.

5   Q.  OKAY.  YOU TESTIFIED EARLIER THAT AS IT RELATED TO THE --

6   THE LEGAL LOG FORM THAT WE LOOKED AT -- DO YOU RECALL THAT?

7   A.  YES.

8   Q.  YOU STATED THAT YOU FOUND IT PECULIAR, AND THAT'S WHY YOU

9   WROTE THOSE RECEIVED DATES?

10   A.  RIGHT.

11   Q.  DO YOU RECALL THAT?

12   A.  CORRECT.

13   Q.  OKAY.  AND WHAT WAS PECULIAR ABOUT THAT?

14   A.  THE DATES, AS I TESTIFIED, WERE APPROXIMATELY EIGHT TO NINE

15   MONTHS OLD.

16   Q.  AND WAS IT PECULIAR BECAUSE THAT HADN'T OCCURRED BEFORE?

17   A.  I'VE NEVER SEEN THAT.  EVER.

18   Q.  OKAY.

19   A.  EXCEPT FOR THAT ONE TIME.

20   Q.  DO YOU RECALL -- YOU TESTIFIED A LITTLE BIT AGO ABOUT

21   LOOKING THE INMATE UP IN THE COMPUTER --

22   A.  YES.

23   Q.  -- DO YOU RECALL THAT?

24       AS IT PERTAINED TO OUT-TO-COURT INMATES, DO YOU RECALL,

25   DURING YOUR DEPOSITION, THAT YOU TESTIFIED THAT YOU WEREN'T

1       YOU CAN ANSWER.

2              THE WITNESS:  STARTS WITH:  A. TEMPORARY ABSENCE.

3   MAIL WILL BE HELD FOR AN INMATE WHO IS TEMPORARILY AWAY FROM

4   THE FACILITY WHEN THE INMATE'S RETURN IS ANTICIPATED WITHIN ONE

5   WEEK.

6   Q.  BY MS. WONG:  SO FOR AN INMATE LIKE MR. PENTON WHO HAD BEEN

7   TRANSFERRED OUT OF CSP, SAC FOR OVER -- FOR OVER SEVEN MONTHS,

8   THIS PROVISION WOULD NOT APPLY?

9              MS. CAHILL:  OBJECTION.  LEGAL CONCLUSION.

10             THE COURT:  SUSTAINED.

11  Q.  BY MS. WONG:  YOUR UNDERSTANDING IS THAT A PROVISION LIKE

12  THIS THAT STATES SPECIFICALLY, THEN, THAT TEMPORARY ABSENCE IS

13  DEFINED AS ANTICIPATED FOR -- AN -- AN INMATE'S TEMPORARY

14  ABSENCE IS APPLICABLE ONLY WHEN THEY ARE ANTICIPATED TO RETURN

15  WITHIN ONE WEEK WOULD NOT APPLY IF THE INMATE WERE AWAY FOR

16  SEVERAL MONTHS AT A TIME?

17             MS. CAHILL:  OBJECTION.  VAGUE.  SPECULATION.

18             THE COURT:  OVERRULED.

19      YOU CAN ANSWER.

20             THE WITNESS:  I GUESS I HAVE TO ANSWER THAT QUESTION

21  WITH MY EXPERIENCE, NOT WITH THE ONE-WEEK ISSUE HERE.

22      THE REALITY IS IS THERE IS -- INMATES ARE SENT TO PLACES

23  WHERE THEY'RE GONE FOR MORE THAN ONE WEEK THAT WE DO NOT SEND

24  THE MAIL TO.  THEY CAN BE IN A COUNTY JAIL SOMEWHERE FOR MORE

25  THAN A WEEK; THEY CAN BE IN A HOSPITAL FOR MORE THAN A WEEK;

1    THEY CAN BE IN A LOT OF PLACES FOR MORE THAN A WEEK THAT WE

2    DON'T SEND THE MAIL TO THEM.

3         NOW, I KNOW IT SAYS ONE WEEK, BUT THAT'S NOT THE

4    PRACTICE --

5              MS. WONG:  YOUR HONOR, CAN WE STRIKE THAT AS

6    NONRESPONSIVE?  THE QUESTION WAS WHETHER OR NOT THIS PROVISION

7    WOULD APPLY TO INMATES WHO --

8              THE COURT:  OVERRULED.  I SUSTAINED THE OBJECTION FOR

9    APPLYING A LEGAL CONCLUSION.  YOU ASKED HIM ABOUT HIS

10   EXPERIENCE; HE'S ANSWERING THAT QUESTION.

11             MS. WONG:  UNDERSTOOD.

12             THE COURT:  YOU CAN CONTINUE TO ANSWER, SIR.

13             THE WITNESS:  I'M JUST SAYING THAT THERE IS A LOT OF

14   PLACES THAT AN INMATE WILL GO TO THAT TAKES LONGER THAN A WEEK

15   THAT WE DON'T FORWARD THE MAIL TO.

16             MS. WONG:  ONE MOMENT.

17        (PAUSE IN PROCEEDINGS.)

18   Q.  BY MS. WONG:  MR. VIRGA, WOULD YOU EXPECT AN INMATE TO HAVE

19   HIS MAIL FORWARDED IF HE HAD BEEN TRANSFERRED OUT OF A FACILITY

20   FOR SIX MONTHS?

21   A.  YES.

22             MS. WONG:  THANK YOU.  NO QUESTIONS FURTHER.

23             THE COURT:  ANY RECROSS?

24             MS. CAHILL:  YES, YOUR HONOR.

25   ///

1                          RECROSS-EXAMINATION

2    BY MS. CAHILL:

3    Q.  MR. VIRGA, WHEN YOU WERE -- WHEN YOU USED THE TERM

4    TRANSFERRED, ARE YOU REFERRING TO AN INMATE THAT'S BEEN

5    TRANSFERRED FOR PERMANENT REHOUSING?

6    A.  WELL, THE TERM FITS BOTH.  IT CAN BE EITHER PERMANENT OR

7    TEMPORARY.  TRANSFER -- THE TERM TRANSFER FITS BOTH.

8    Q.  SURE.  ISN'T IT TRUE, THOUGH, THAT IN 2013, WHEN YOU WERE

9    THE WARDEN, THAT THE POLICY FOR TEMPORARY ABSENCES REQUIRED

10   MAIL TO BE HELD FOR ONE MONTH AND THEN RETURNED TO SENDER?

11              MS. WONG:  OBJECTION.  RELEVANCE.  2013.

12              THE COURT:  OVERRULED.

13         YOU CAN ANSWER.

14              THE WITNESS:  I HAVE A VERY VAGUE FAMILIARITY WITH

15   THAT STATEMENT.  I COULDN'T SWEAR ON A STACK OF BIBLES IT'S

16   ABSOLUTELY TRUE.  BUT, YOU KNOW, YOU'RE TALKING ALMOST TEN

17   YEARS AGO.

18   Q.  BY MS. CAHILL:  MAY I SHOW YOU A DOCUMENT TO REFRESH YOUR

19   MEMORY?

20   A.  SURE.

21              THE COURT:  PLEASE JUST MAKE SURE YOU'RE SHOWING

22   COUNSEL ON THE WAY UP.

23              MS. CAHILL:  YES.

24              MS. MACCONAGHY:  YOUR HONOR, MAY WE HAVE A BRIEF

25   SIDEBAR ON THIS?  IT'S -- I THINK THERE IS SOME --

1  WASN'T TO RETURN IT TO SENDER UNDER THE LAW -- UNDER THE

2  REGULATIONS.  EXCUSE ME.

3          MS. CAHILL:  BUT WE'RE NOT TALKING ABOUT THE

4  REGULATIONS.  WE'RE TALKING ABOUT WHAT HIS -- WHAT THE POLICY

5  OF THIS PRISON WAS.

6          THE COURT:  GIVE ME A SECOND.

7    I MEAN, I THINK ULTIMATELY, I ALLOWED THE TITLE 15 BECAUSE

8  WE WERE GOING TO BE CLEAR WITH THE JURY THAT TITLE 15 DOESN'T

9  GOVERN THE CONSTITUTIONAL RIGHT.  AND I AGREE THAT TITLE 15 WAS

10  RELEVANT IN SHOWING WHAT REASONABLE POLICIES ARE.  I THINK THAT

11  RULING ALLOWS FOR THIS KIND OF INFORMATION TO GET IN, THAT

12  OTHER PORTIONS OF TITLE 15 AT A DIFFERENT POINT IN TIME

13  CONTEMPLATED SOMETHING A LITTLE BIT DIFFERENT.

14    SO I THINK THE DEFENSE COUNSEL KIND OF GETS THE BENEFIT OF

15  THAT PORTION OF MY RULING.  I THINK YOU CAN, ON CROSS, CLARIFY

16  WHERE THAT CAME FROM.

17          MS. MACCONAGHY:  SURE.

18          THE COURT:  BUT, YOU KNOW, I'LL ALLOW HER TO SHOW IT

19  TO HIM AND ASK QUESTIONS ABOUT IT.

20    THANK YOU.

21    (BENCH CONFERENCE CONCLUDED.)

22  Q.  BY MS. CAHILL:  MR. VIRGA, IF YOU'D TURN TO THE LAST PAGE

23  OF THAT DOCUMENT.

24  A.  OKAY.

25  Q.  AND I UNDERSTAND YOUR NAME IS -- I DON'T HAVE A COPY OF IT.

1    I APOLOGIZE.  I GAVE YOU MY ONLY COPY.  YOUR NAME APPEARS AT

2    THE BOTTOM OF THAT DOCUMENT, RIGHT?

3    A.  CORRECT.

4    Q.  AND IS THAT YOUR SIGNATURE?

5    A.  NO.  THAT WAS SIGNED FOR ME BY SOMEONE ELSE.

6    Q.  AND THAT'S COMMON IN YOUR JOB, RIGHT?

7    A.  YES.

8    Q.  OKAY.  AND THE -- THERE IS A PROVISION JUST ABOVE YOUR

9    SIGNATURE BLOCK RELATED TO TEMPORARY ABSENCES.  AND CAN YOU

10   READ WHAT THAT SAYS?

11   A.  IN THE EVENT A CSP, SAC INMATE IS AWAY FROM THE INSTITUTION

12   FOR AN EXTENDED PERIOD OF TIME, THE MAILROOM WILL HOLD THE MAIL

13   FOR ONE MONTH AND THEN WILL RETURN IT TO SENDER AFTER THE

14   PERIOD OF TIME HAS EXPIRED.

15   Q.  AND WHAT'S THE DATE OF THAT DOCUMENT?

16   A.  8/27/13.

17          MS. CAHILL:  OKAY.  YOUR HONOR, I HAVE NO FURTHER

18   QUESTIONS.

19          THE COURT:  ALL RIGHT.  ANY REDIRECT?

20          MS. WONG:  ONE MOMENT, YOUR HONOR.

21          MS. CAHILL:  MAY I TAKE THE DOCUMENT FROM THE

22   WITNESS, OR SHOULD I LEAVE IT FOR NOW?

23          THE COURT:  WHY DON'T YOU LEAVE IT FOR NOW.

24          MS. CAHILL:  OKAY.

25          THE COURT:  JUST IN CASE.

```
 1                  THE WITNESS:  WHAT ARE YOU REFERRING TO, MA'AM?

 2                  THE COURT:  WHY DON'T YOU RESTART THE QUESTION.

 3                  MS. CAHILL:  SURE.

 4   Q.  BY MS. CAHILL:  DO YOU RECALL THAT DURING YOUR DEPOSITION

 5   IN THIS CASE, THAT IT WAS YOUR OPINION THAT THE WARDEN WAS

 6   RESPONSIBLE FOR THE WITHHOLDING OF PLAINTIFF'S MAIL IN THIS

 7   CASE?

 8                  MR. SANDERS:  OBJECTION, YOUR HONOR.  I'M NOT SURE IF

 9   SHE'S QUOTING OR --

10                  THE WITNESS:  I'M NOT SURE I UNDERSTAND YOUR --

11                  THE COURT:  HOLD ON ONE SECOND.  LET ME TALK TO THE

12   ATTORNEYS FIRST.

13       SORRY.  CAN YOU STATE THAT AGAIN?

14                  MR. SANDERS:  I'M SORRY, YOUR HONOR.  I STILL DON'T

15   KNOW -- I HAVE THE PAGE, BUT I'M NOT SURE IF SHE'S QUOTING OR

16   WHAT SHE'S REFERRING TO.

17                  MS. CAHILL:  I APOLOGIZE.  IT'S 27, AND IT KIND OF

18   BLEEDS ON TO MID-28.  I CAN READ IT VERBATIM IF THAT WOULD BE

19   HELPFUL.

20                  THE COURT:  COUNSEL, IS THERE AN OBJECTION?

21                  MR. SANDERS:  YEAH.  I THINK IT WOULD BE HELPFUL TO

22   READ IT JUST SO HE HAS THE CONTEXT.

23                  THE COURT:  OKAY.

24                  MS. CAHILL:  SURE.

25   Q.  BY MS. CAHILL:  QUESTION: -- THIS IS PAGE 27, LINE 21 -- DO
```

1    YOU BELIEVE WARDEN WALKER IS RESPONSIBLE FOR THE WITHHOLDING OF

2    PLAINTIFF'S MAIL?

3         ANSWER:  YES.

4    A.  ULTIMATELY RESPONSIBLE, YES.

5    Q.  AND THAT'S BECAUSE THE BUCK STOPS WITH THE WARDEN, SO TO

6    SPEAK?

7    A.  THAT'S CORRECT.

8    Q.  OKAY.  SIR, WHAT'S YOUR HOURLY FEE IN THIS CASE?

9    A.  EXCUSE ME?

10   Q.  WHAT IS YOUR HOURLY RATE IN THIS CASE?

11   A.  IT'S A THOUSAND DOLLARS A DAY.

12   Q.  OKAY.  AND HOW MUCH HAVE YOU BEEN PAID THUS FAR BY

13   PLAINTIFF'S ATTORNEYS IN THIS CASE?

14   A.  I DON'T RECALL.  IT'S BEEN A WHILE.

15   Q.  OKAY.  DO YOU KNOW APPROXIMATELY HOW MANY HOURS YOU'VE PUT

16   INTO THIS CASE?

17   A.  APPROXIMATELY MAYBE 20 HOURS.

18   Q.  OKAY.  AND ARE YOU ANTICIPATING ANY FURTHER PAYMENT IN THIS

19   MATTER?

20   A.  YES.

21        MS. CAHILL:  OKAY.  NO FURTHER QUESTIONS AT THIS

22   TIME.

23        THE COURT:  ANY REDIRECT?

24        MR. SANDERS:  JUST BRIEFLY, YOUR HONOR.

25   ///

1  LOOK AT JOINT EXHIBIT 2, WHICH IS PREVIOUSLY ADMITTED INTO

2  EVIDENCE.  THIS IS THE LEGAL MAIL LOG.  AND I'LL DRAW YOUR

3  ATTENTION TO LINE 8.

4      HERE WE HAVE -- MR. GADDI TESTIFIED THAT THESE DATES HERE

5  ARE WHEN IT WAS RECEIVED BY THE SACRAMENTO MAILROOM.  SO LINE 8

6  NOTES, YOU KNOW, ONE PIECE HAVING ARRIVED ON NOVEMBER 9, 2007,

7  CORRECT?

8  A.  OH, OKAY.  YES.

9  Q.  OKAY.  AND THEN LINE 6 HAS ONE PIECE ARRIVED AT THE

10  SACRAMENTO PRISON MAILROOM ON NOVEMBER 19, 2007; IS THAT RIGHT?

11  A.  I SEE THAT, YES.

12  Q.  OKAY.  SO -- SO DOES THIS REFRESH YOUR RECOLLECTION THAT AS

13  OF DECEMBER 21, 2007, WHEN YOU DID YOUR 602 REVIEW, THAT AT

14  LEAST TWO PIECES OF MAIL HAD -- LEGAL MAIL HAD ARRIVED FOR

15  MR. PENTON SINCE HE'D BEEN TRANSFERRED?

16  A.  IT WASN'T TO MY KNOWLEDGE.  I DID NOT KNOW IT WAS THERE.

17  Q.  BUT IT WOULD BE ACCURATE TO SAY THAT THERE WERE TWO PIECES

18  OF LEGAL MAIL AT SACRAMENTO PRISON THAT HAD ARRIVED BY -- BY

19  THE TIME YOU WERE DOING YOUR REVIEW --

20  A.  YOU CAN SAY THAT BUT --

21          MS. CAHILL:  OBJECTION.  SPECULATION.  HE ALREADY

22  SAID HE DOESN'T KNOW.

23          THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.

24  WHY DON'T YOU FINISH YOUR STATEMENT.

25          THE WITNESS:  I DID NOT KNOW IT WAS THERE.  IF I HAD

1   KNOWN IT WAS THERE, IT WOULD HAVE BEEN FORWARDED.

2   Q.  BY MS. MACCONAGHY:  OKAY.  BUT, MR. JOHNSON, YOU WRITE ON

3   HERE THAT A, QUOTE, THOROUGH INQUIRY HAS BEEN CONDUCTED.

4       I'M JUST -- I'M JUST HOPING YOU CAN EXPLAIN IT TO ME.  I

5   DON'T UNDERSTAND --

6   A.  OKAY.

7   Q.  -- HOW --

8       PLEASE LET ME FINISH THIS QUESTION.

9   A.  OKAY.

10  Q.  -- A THOROUGH INQUIRY CANNOT HAVE BEEN CONDUCTED, RIGHT?

11          MS. CAHILL:  OBJECTION.  ARGUMENTATIVE.

12          THE COURT:  OVERRULED.

13      YOU CAN ANSWER.

14          THE WITNESS:  THERE WAS AN INDIVIDUAL THAT RESPONDED

15  TO MR. PENTON AT THE INFORMAL LEVEL, AND WHEN I ASKED HER ABOUT

16  THE -- WHAT SHE DID TO INVESTIGATE IT, SHE SAID SHE DID ALL SHE

17  COULD.

18          MS. MACCONAGHY:  SIR --

19          THE WITNESS:  -- BUT, YOU KNOW, AS FAR AS I KNOW,

20  THAT WAS AS THOROUGH AS SHE DID.  THAT WAS -- AND THEN I WENT

21  WITH WHAT SHE TOLD ME AND INTERVIEWED HIM.

22          MS. MACCONAGHY:  SO I'D LIKE TO STRIKE THAT AS

23  HEARSAY -- THE WHOLE STATEMENT.

24          THE WITNESS:  THAT'S WHAT I DID.

25          THE COURT:  OVERRULED.  I DON'T THINK IT'S BEING

1  AFTER HE RETURNED FROM -- AFTER HE RETURNED TO SACRAMENTO

2  PRISON, CORRECT?

3  A.  THAT'S WHAT IT SAYS, YES.

4  Q.  AND THAT'S THE EVIDENCE.  YOU KNOW --

5  A.  THAT'S THE EVIDENCE.

6  Q.  BUT ISN'T -- EVEN WITH THIS 40 DAYS, ISN'T THAT A VIOLATION

7  OF THE POLICY THAT YOU -- THAT YOU -- THE POLICY YOU'RE

8  TESTIFYING THAT EXISTS TODAY?  YOU'RE SAYING TODAY THIS IS THE

9  POLICY.  WASN'T THAT A -- A VIOLATION OF THAT?

10  A.  YEAH, I -- I GUESS YOU CAN STATE IT THAT WAY.

11  Q.  OKAY.  SO LET'S -- MR. JOHNSON, WOULD YOU SAY THAT WHEN YOU

12  WERE SUPERVISOR OF THE MAILROOM, YOU WERE GOOD AT YOUR JOB?

13          MS. CAHILL:  OBJECTION.  VAGUE.  RELEVANCE.

14          THE COURT:  OVERRULED.

15     YOU CAN ANSWER.

16          THE WITNESS:  I MEAN, THAT'S A HARD -- THAT'S A

17  HARD -- THAT'S A HARD QUESTION TO ANSWER, BECAUSE I DID WHAT

18  NEEDED TO BE DONE DURING THE DAY.  IF THAT WAS BEING GOOD OR

19  BAD, IT WAS A MATTER OF DOING WHAT NEEDED TO BE DONE TO GET

20  PAST THE DAY.

21  Q.  BY MS. MACCONAGHY:  BUT, MR. JOHNSON, I GUESS I JUST DON'T

22  UNDERSTAND.  WHAT NEEDED TO BE DONE.  BUT MR. PENTON'S MAIL

23  PILED UP FOR 8 MONTHS AND 22 DAYS.

24  A.  CAN'T EXPLAIN THAT.  I CANNOT EXPLAIN THAT.  IT WASN'T

25  SOMETHING THAT I SAW.  I HAD, BASICALLY, STAFF THAT I RELIED ON

1   TO TAKE CARE OF SO THAT STUFF DIDN'T -- SOMETHING LIKE THAT

2   WOULD NOT OCCUR, AND GAVE THEM THE JOB TO DO.  AND AS A

3   SUPERVISOR, I KNOW I SHOULD HAVE WENT BEHIND AND CHECKED IT,

4   BUT IT WASN'T -- THAT INDIVIDUAL WAS A TRUSTED PERSON THAT I

5   DIDN'T THINK I HAD TO CHECK BEHIND --

6   Q.  BUT --

7   A.  -- TO MONITOR HER WORK.  SORRY.

8   Q.  NO.  NO.  I APOLOGIZE.  I DID NOT MEAN TO CUT YOU OFF.

9       I -- I GUESS -- BUT, MR. JOHNSON, THESE -- THESE MAIL

10  WERE -- THIS WAS IN YOUR MAILROOM, RIGHT?  THIS IS THE -- THE

11  MAIL IS PILED -- AS YOU TESTIFIED, IT'S CUBBYHOLES.  YOU'RE

12  RIGHT OVER A PARTITION IN THE MAILROOM, CORRECT?

13  A.  CORRECT.

14  Q.  IT'S IN -- IT'S IN FRONT OF YOU?

15  A.  NO, IT WASN'T.  I -- LIKE I SAID, I RELIED ON AN INDIVIDUAL

16  TO MONITOR THAT LEGAL MAIL BECAUSE THAT OFFICE TECH, THAT WAS

17  HER JOB.  IF I ASKED HER HOW IT WAS GOING, IF SHE WAS ON TOP OF

18  STUFF, AND SHE SAID YES, I DIDN'T GO BEHIND AND CHECK HER.

19  EVEN THOUGH -- I MEAN, I COULD HAVE TAKEN THAT MAIL OUT AND

20  CHECKED IT MYSELF, BUT I DID NOT DO THAT.

21  Q.  OKAY.  SO LET ME CIRCLE BACK TO MY ORIGINAL QUESTION, WHICH

22  WAS WHEN YOU WERE SUPERVISOR OF SACRAMENTO PRISON, DO YOU THINK

23  YOU WERE GOOD AT YOUR JOB?

24          MS. CAHILL:  OBJECTION.  RELEVANCE.  VAGUE.

25  Q.  BY MS. MACCONAGHY:  IS --

1  Q.  AND -- I'M SORRY -- YOU SAID -- WHAT WAS YOUR TITLE THERE?

2  A.  GENERAL OFFICE ASSISTANT.

3  Q.  OKAY.  AND WHEN YOU STARTED AS A GENERAL OFFICE ASSISTANT,

4  DID -- YOUR SUPERVISOR AT THE TIME HAD -- HAD PROCEDURES AND

5  PROTOCOL IN PLACE FOR PROCESSING THE MAIL?

6  A.  YES.

7  Q.  OKAY.  IS THAT HOW YOU LEARNED HOW TO PROCESS MAIL?

8  A.  YEAH, JUST FROM WATCHING HIM AND -- YEAH, JUST FROM

9  WATCHING HIM.

10 Q.  OKAY.  AND WHEN DID YOU BECOME -- I BELIEVE YOU TESTIFIED

11 EARLIER IT WAS 2004 OR 2006?

12 A.  2004.

13 Q.  AND WHEN YOU STARTED IN THAT ROLE, DID ANY OF YOUR

14 SUPERIORS SIT YOU DOWN FOR SOME SORT OF FORMAL TRAINING TO BE A

15 SUPERVISOR?

16 A.  NO.

17 Q.  DID YOU MAKE ANY CHANGES TO THE PROTOCOL OR PROCEDURES FOR

18 HANDLING OUT-TO-COURT MAIL WHEN YOU TOOK OVER AS SUPERVISOR?

19 A.  NO, I DID NOT.

20 Q.  WOULD THE SYSTEMS -- THE DDPS THAT YOU WERE SPEAKING OF, IF

21 AN INMATE HAD BEEN PERMANENTLY TRANSFERRED TO ANOTHER PRISON

22 FOR HOUSING OR RELEASE, DID THE SYSTEM TELL YOU WHERE THE

23 INMATE WAS LOCATED UNDER THOSE CIRCUMSTANCES?

24 A.  I BELIEVE SO, YES.

25 Q.  WERE YOU ABLE TO MAKE CHANGES TO THAT SYSTEM?

1    A.  NO.

2    Q.  OKAY.

3    A.  THAT'S ALL DONE DOWNTOWN, I DO BELIEVE.

4    Q.  DO YOU EVER RECALL SEEING ANY CORRESPONDENCE FROM

5    MR. PENTON IN THE 2000 TO 2008 -- I'M SORRY -- 2007 TO 2008

6    TIME PERIOD WHERE HE ASKED THE MAILROOM TO FORWARD HIS MAIL?

7    A.  NO.

8    Q.  OKAY.

9    A.  I HAD NOT.

10   Q.  GOING BACK TO THE 602 THAT WE WERE LOOKING AT EARLIER

11   RELATED TO MR. PENTON'S COMPLAINT THAT MAIL WAS TAKING A WHILE

12   TO GET TO HIM WHILE HE WAS IN THE INSTITUTION, WERE YOU AWARE

13   OF ANY CIRCUMSTANCES UNDER WHICH MAIL WOULD BE TAKEN BY OTHER

14   EMPLOYEES OUT OF THE MAILROOM FOR REVIEW?

15   A.  YES.  THE ISU UNIT GENERATED A WATCH LIST, INMATES THAT

16   THEY WANTED TO MONITOR THEIR MAIL.  AND I THINK THERE WAS

17   EITHER WEEKLY OR MONTHLY TYPE SCENARIO WE'D GET UPDATES ON THAT

18   WATCH LIST.

19   Q.  DID YOU EVER HAVE ANY KNOWLEDGE YOURSELF WHERE MR. PENTON

20   WAS HOUSED WHILE HE WAS OUT TO COURT IN THE 2007 TO 2008 TIME

21   PERIOD?

22   A.  NO.

23   Q.  DID YOU EVER SPECIFICALLY TELL YOUR STAFF NOT TO GIVE

24   MR. PENTON HIS MAIL?

25   A.  NO.

1    ALL RIGHT.  4:16.  WE'RE PRETTY GOOD.  SO LET'S ALL PLAN TO

2  MEET HERE, 8:30.

3    JUST SO YOU KNOW, THERE IS AN EMPLOYEE APPRECIATION LUNCH.

4  SO I AM HOPING THAT WE GIVE THIS TO THE JURY BY 11:30.  THAT'S

5  WHEN WE NEED TO LEAVE FOR THAT LUNCH TO START, AND I WANT TO

6  MAKE SURE STAFF HAVE THE OPPORTUNITY TO ATTEND.  IT ENDS AROUND

7  1:45.  SO IN AN IDEAL WORLD, WE'VE GIVEN THIS TO THE JURY;

8  THEY'RE DELIBERATING.  BUT MY INTENT WOULD BE THAT THE COURT IS

9  NOT IN SESSION BETWEEN 11:30ISH AND 2:00ISH, JUST SO YOU ALL

10  KNOW.  SO I DON'T KNOW HOW LONG YOU THINK YOUR CLOSINGS ARE

11  GOING TO TAKE, BUT I HOPE NOT THAT LONG.

12           MS. CAHILL:  I HAVE NO INTENTION TO TALK FOR AN HOUR.

13           MR. FRAHN:  YOUR HONOR, ONE QUESTION.  THE VERDICT

14  FORM, IS A VERSION OF THAT GOING TO COME OUT BY E-MAIL TONIGHT?

15           THE COURT:  YES.

16           MR. FRAHN:  PERFECT.  THANK YOU.

17           THE COURT:  ANYTHING ELSE?

18      ALL RIGHT.  WE'LL SEE YOU ALL AT 8:30 TOMORROW MORNING.

19           MS. CAHILL:  THANK YOU, YOUR HONOR.

20           MS. MACCONAGHY:  THANK YOU, YOUR HONOR.

21              (PROCEEDINGS ADJOURNED, 4:16 P.M.)

22                     ---OOO---

23  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

24  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

/S/ KIMBERLY M. BENNETT
KIMBERLY M. BENNETT
CSR NO. 8953, RPR, CRR, RMR

1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF CALIFORNIA
2

3    ANTHONY PENTON,
            PLAINTIFF,
4
     VS.                              SACRAMENTO, CALIFORNIA
5                                     NO. 2:11-CV-00518
     LAYTON JOHNSON, JR.,             WED., SEP. 20, 2023
6           DEFENDANT.                8:36 A.M.
     _____/
7
                  TRANSCRIPT OF JURY TRIAL - VOLUME 3
8        BEFORE THE HONORABLE DANIEL J. CALABRETTA, DISTRICT JUDGE
                            ---OOO---
9

10   APPEARANCES:

11    FOR THE PLAINTIFF:             SIMPSON, THACHER & BARTLETT,
                                     LLP
12                                   2475 HANOVER STREET
                                     PALO ALTO, CA  94304
13                                   BY:  HARRISON J. FRAHN , IV
                                     PIERCE MACCONAGHY
14                                   HILARY WONG
                                     JONATHAN SANDERS
15                                   ATTORNEYS AT LAW

16
      FOR THE DEFENDANT:             LONGYEAR & LAVRA, LLP
17                                   555 UNIVERSITY AVENUE, SUITE
                                     280
18                                   SACRAMENTO, CA  95825
                                     BY: NICOLE M. CAHILL
19                                   ATTORNEY AT LAW

20

21    OFFICIAL COURT REPORTER:      KIMBERLY M. BENNETT,
                                     CSR, RPR, RMR, CRR
22                                   501 I STREET
                                     SACRAMENTO, CA 95814
23

24    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
      PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
25

1       ALL RIGHT.  THOSE ARE ALL THE JURY INSTRUCTIONS.  WE WILL

2  FIX THE CROSS-REFERENCE AND GET YOU A CORRECTED COPY WITH THE

3  CORRECTED CROSS-REFERENCES.

4       NOW I'LL ASK PLAINTIFF IF THEY WISH TO MAKE ANY CLOSING

5  ARGUMENT?

6            MS. MACCONAGHY:  YES, YOUR HONOR.

7       APPRECIATE YOUR PATIENCE.

8                 CLOSING ARGUMENT BY MS. MACCONAGHY

9            MS. MACCONAGHY:  DEFENDANT JOHNSON DID NOT DO HIS

10  JOB.  HE KNEW WHAT HIS JOB REQUIRED.  HE KNEW HE NEEDED TO

11  SUPERVISE HIS EMPLOYEES.  HE KNEW HE NEEDED TO IMMEDIATELY

12  FORWARD THE MAIL.  AND HE KNEW IF HE DID NOT DO HIS JOB, THERE

13  COULD BE TERRIBLE CONSEQUENCES.

14       DEFENDANT JOHNSON ADMITTED THAT ANTHONY'S MAIL SHOULD HAVE

15  BEEN DELIVERED.  DEFENDANT JOHNSON ADMITTED HE FAILED TO COMPLY

16  WITH THE CALIFORNIA CODE OF REGULATIONS AND TITLE 15.  AND

17  DEFENDANT JOHNSON EVEN ADMITTED THAT HE FAILED TO SUPERVISE THE

18  PERSON HE CLAIMED HAD RESPONSIBILITY FOR FORWARDING ANTHONY'S

19  MAIL.

20       YOU HEARD THAT MAIL WAS A LIFELINE FOR ANTHONY.  AND

21  WITHOUT THAT LIFELINE, HE WAS DEVASTATED.  HE LOST THE

22  OPPORTUNITY TO SPEAK TO HIS DAD FOR ONE LAST TIME.  HE MISSED A

23  CRITICAL LEGAL DEADLINE.  FOR TEN YEARS, ANTHONY THOUGHT THAT

24  HE HAD LOST THE ABILITY TO CHALLENGE HIS CONVICTION AT ALL.

25       AND AS YOU HEARD IN THIS TRIAL -- YOU HEARD TIME AND TIME

1    HERE.

2        YOU ARE NO LONGER UNDER ANY ORDERS NOT TO SPEAK TO ANYONE

3    ABOUT THIS CASE.  YOU HAVE THE ABSOLUTE RIGHT TO DISCUSS OR NOT

4    DISCUSS THE JURY DELIBERATIONS OR VERDICT WITH ANYONE.  IF YOU

5    CHOOSE TO DO SO, PLEASE REMEMBER THAT THESE PROCEEDINGS HAVE

6    BEEN VERY IMPORTANT TO THE PARTIES AND THE ATTORNEYS.  AND

7    PLEASE ALSO RESPECT THE FELLOW JURORS AND THEIR PRIVACY AND THE

8    VIEWS THAT THEY SHARED IN THE JURY ROOM.  GENERALLY, IT'S A

9    GOOD IDEA NOT TO SAY ANYTHING THAT YOU WOULDN'T WANT TO SAY

10   UNDER OATH.

11       ATTORNEYS OFTEN APPRECIATE ANY COMMENTS YOU MAKE TO THEM,

12   THAT ASSISTS THEM IN THE FUTURE.  THIS IS PURELY VOLUNTARY.

13   YOU ARE FREE TO TALK TO THE ATTORNEYS IF YOU WISH.  YOU ARE

14   ALSO COMPLETELY FREE TO SAY, NO, THANK YOU, AND GO HOME.

15       I HAVE A FEW MORE THINGS I NEED TO ADDRESS WITH THE

16   ATTORNEYS AFTER YOU'RE EXCUSED.  IF ANY OF YOU ARE WILLING TO

17   STICK AROUND FOR A FEW MINUTES IN THE JURY ROOM, I'D LIKE TO

18   COME THANK YOU PERSONALLY.  BUT I ALSO UNDERSTAND IF YOU'RE

19   READY TO GET HOME TO YOUR FRIENDS AND FAMILY.

20       SO THANK YOU ONCE AGAIN FOR YOUR SERVICE.  I'LL NOW ASK THE

21   CLERK TO ESCORT YOU BACK TO THE JURY ROOM.

22       (JURY NOT PRESENT, 3:42 P.M.)

23           THE COURT:  ALL RIGHT.  MS. CAHILL?

24           MS. CAHILL:  YES, YOUR HONOR.  I'D LIKE TO RENEW MY

25   RULE 50 MOTION AND MOVE FOR A NEW TRIAL AND RE-RAISE THE ISSUE

1    OF QUALIFIED IMMUNITY.

2          THE COURT:  OKAY.  I'M GOING TO SET THIS FOR

3    BRIEFING.  I WILL BE HONEST.  I HAVE -- I REALLY WANT TO LOOK

4    BACK AT THE TESTIMONY HERE.  I'LL JUST TELL YOU ALL, I HAVE

5    SOME CONCERNS ABOUT WHETHER OR NOT THERE WAS SUFFICIENT

6    EVIDENCE ON THE ISSUE OF SUPERVISORY LIABILITY.

7        I DON'T THINK THERE IS ANY EVIDENCE TO SHOW INDIVIDUAL

8    LIABILITY, AND WHEN I READ THE JURY INSTRUCTIONS, IT'S NOT

9    IMMEDIATELY OBVIOUS THAT THERE WAS AT LEAST DIRECT EVIDENCE ON

10   EACH OF THE ELEMENTS.  IT MAY BE THAT THEY'RE CIRCUMSTANTIAL.

11   I'M NOT SAYING I'VE REACHED A DECISION ONE WAY OR THE OTHER,

12   BUT I AM SAYING I WANT BRIEFING ON IT TO MAKE AN INFORMED

13   DECISION.

14       I THINK THAT'S -- TO ME, THAT'S WHERE THE DIFFICULTY LIES

15   ON THE QUALIFIED IMMUNITY.  THE RIGHT SEEMS CLEARLY

16   ESTABLISHED, BUT I DON'T KNOW THE TIMING, SO THAT WOULD BE

17   HELPFUL ABOUT WHEN THE CASES WERE AND WHEN THE CONDUCT WAS.

18   THAT'S JUST WHERE I'M AT NOW TO HELP YOU AND GIVE YOU GUIDANCE.

19       SO I'LL ISSUE A MINUTE ORDER --  IT MAY NOT BE TODAY; IT

20   MAY BE MONDAY -- JUST SETTING OUT THAT BRIEFING SCHEDULE.

21       ANYTHING ELSE THAT WE NEED TO DO TODAY?  FIRST, I'LL ASK

22   YOU, MS. CAHILL?

23          MS. CAHILL:  I JUST WANT CLARIFICATION IN TERMS OF

24   THE BRIEFING SCHEDULE THAT YOU'RE SETTING.  I BELIEVE -- I

25   DON'T HAVE THE RULE RIGHT IN FRONT OF ME, BUT THERE IS A

1    SOONER RATHER THAN LATER.

2              MS. MACCONAGHY:  THANK YOU, YOUR HONOR.

3              MS. CAHILL:  THANK YOU, YOUR HONOR.

4                 (PROCEEDINGS ADJOURNED, 3:44 P.M.)

5                          ---oOo---

6    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

7    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8

9                        /S/ KIMBERLY M. BENNETT
                         KIMBERLY M. BENNETT
10                       CSR NO. 8953, RPR, CRR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25